**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| NIR MEIR, | Case No. 24-11047-PDR |
| Debtor. | |
| AVISHAI ABRAHAMI, | Adv. No. _____ |
| Plaintiff, | |
| - against - | |
| NIR MEIR, | |
| Defendant. | |

**COMPLAINT FOR DENIAL OF DISCHARGE AND TO**
**DETERMINE DISCHARGEABILITY OF DEBT**

Plaintiff Avishai Abrahami ("Abrahami"), by his attorneys, Liebler, Gonzalez &

Portuondo and Zeichner Ellman & Krause LLP, brings this adversary complaint for fraud and to

except Debtor, Nir Meir's debt owed to Abrahami, which was procured through such fraud from

discharge in this bankruptcy case, and in support thereof states as follows:

**JURISDICTION AND VENUE**

1.      This is an adversary proceeding to determine the dischargeability of a debt pursuant

to Bankruptcy Rules 7001(f) and 11 U.S.C. § 523 and for denial of discharge pursuant to 11 U.S.C.

§ 727.

2.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and

1334(b).

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

1

**PARTIES**

4.      Abrahami is an individual residing in Tel Aviv, Israel.

5.      Nir Meir ("Meir" or "Debtor") resided in New York at the time of the conduct alleged herein.  Pursuant to his bankruptcy petition, Meir maintained a residence at 102 24th Street, Unit 1204, Miami Beach, Florida 33140 as of the Petition Date.  From on or around February 6, 2024, through June 2025, with one short period of release during that time, Meir was incarcerated at Rikers Island Correctional Facility located at 900-1006 Hazen Street, East Elmhurst, New York 11370.  During the pendency of his bankruptcy proceeding, and during any periods of release from incarceration, Meir was placed under house arrest at an undisclosed location.  Upon information and belief, he is presently on house arrest, wearing two ankle monitors, while his criminal proceedings remain pending.

**INTRODUCTION**

6.      Plaintiff Abrahami, an Israeli citizen and resident, brings this action because he was the victim of a $30 million fraud orchestrated by Meir, the former "Managing Principal" of the once-prominent real estate development group HFZ Capital LLC ("HFZ").  Meir committed the fraud because, by the summer of 2020, the house of cards that was HFZ was collapsing, and he was desperate for cash.  So, to maintain what had essentially become a Ponzi scheme, Meir engaged in a litany of fraudulent conduct to induce Abrahami to make a $30 million loan to two HFZ-affiliated entities: HFZ Member RB Portfolio LLC and HFZ Member RB Acquisitions LLC (together, the "Borrowers").

7.      As detailed at length herein, Meir: (i) made numerous written misrepresentations to Abrahami regarding the Borrowers' financial condition and authority to enter into the loan; (ii) concealed that the Borrowers had just defaulted on a $43 million senior loan from another lender,

2

Monroe Capital ("Monroe"); (iii) provided fraudulent "assignments" of LLC membership interests as the purported "collateral" for the loan; and (iv) provided a fraudulent loan guaranty from HFZ's owner, Ziel Feldman ("Feldman"), whose signature was forged.

8.      The fraud was brazen in all its parts.  Just three weeks prior to the Abrahami loan closing on September 8, 2020, Monroe sent the Borrowers a notice of default and acceleration regarding its senior loan. Meir personally received a copy of the Monroe default notice. Since Meir knew he would not get the money from Abrahami if he disclosed the defaulted Monroe Loan, he conspired to conceal it.[1]

9.      Meir knew that disclosure of the defaulted Monroe loan would derail the contemplated Abrahami transaction.  Meir knew the Monroe loan agreement prohibited the contemplated Abrahami loan, and that Monroe's consent would be required (and of course impossible to obtain given the recent default) for the Borrowers to lawfully enter into the Abrahami loan.

10.      The Abrahami loan agreement, prepared by Meir's then lawyer Sean Garahan ("Garahan") contained numerous false representations (made by the Borrowers through Meir) concerning the Borrowers' financial condition and their authority to enter in the loan.  Meir knew that these representations were false and that they would be relied on by Abrahami in making the loan.

11.      Indeed, the Borrowers agreed that their representations in the loan agreement "shall be deemed to have been relied upon by [Abrahami]" notwithstanding any investigation Abrahami

---

[1] Meir also failed to disclose that, at the time of the Loan, the Borrowers' parent company (HFZ) had recently defaulted on a separate $113 million loan from Monroe made in 2017.

might conduct.    The Borrowers thus agreed that Abrahami could reasonably rely on their representations.

12.    Beyond the undisclosed Monroe loan default, Meir caused the Borrowers to execute and deliver fraudulent "assignments" of certain LLC membership interests, as Abrahami's (purported) collateral for the loan. These assignments required the consent of the Borrowers' joint venture partner, Reich Bros LLC, because it was the co-owner of these assigned interests. Meir knew that Reich Bros' consent was required, but did not inform Reich Bros about the Abrahami loan, much less obtain its consent to the assignments.    Instead, the Borrowers (again, acting through Meir) made false representations in the Abrahami loan agreement that the Borrowers had obtained all consents needed for the Abrahami loan.

13.    Meir also provided Abrahami with a fraudulent loan guaranty that bore the forged signature of Feldman, the owner and Chairman of HFZ.    Meir pressured Feldman's assistant to forge Feldman's signature and to prepare a fake notarization.    When questioned about this during a recent Rule 2004 Examination, Meir invoked his Fifth Amendment right against self-incrimination and refused to answer the question.

14.    Following the closing and Abrahami's funding the Loan, Meir essentially immediately stole the loan proceeds.    He used them to pay himself and other debts, and not for any purpose permitted by the loan agreement.    The entire transaction was a fraud. Borrowers defaulted on the very first payment and have not repaid a cent of the $30 million they fraudulently induced Abrahami to part with.

## FACTUAL BASIS FOR CLAIMS

**1.      Meir Defrauds Abrahami into Making A $30 Million "Loan"**

15.      Pursuant to the terms of a Loan Agreement dated September 8, 2020 (the "Loan Agreement"), Abrahami loaned the Borrowers the amount of $30,000,000 (the "Loan"). A true and correct copy of the Loan Agreement is attached hereto as **Exhibit "A."**

16.      As set forth in the Loan Agreement, the Borrowers were supposed to use the Loan proceeds to invest in certain industrial properties the Borrower indirectly owned, or, with Abrahami's approval, acquire other industrial real estate properties.

17.      Meir executed the Loan Agreement on the Borrowers' behalf, as each of their (claimed) "Authorized Signatory."

18.      Meir held himself out to Abrahami as the "Managing Principal" of HFZ, the Borrowers' ultimate parent company.

19.      Meir acted on behalf of the Borrowers and was the principal negotiator for the Borrowers in connection with the Loan.

20.      Meir had numerous communications with Abrahami's agents concerning the Loan, both prior to and after the closing.

21.      Getting the money quickly was critical to Meir.  Meir pushed hard to close the deal within a week of the time the parties had agreed on basic terms.  The terms of the deal were predicated upon timing, and the Loan Agreement states: "Time is of the essence of each provision of this Agreement and the other Loan Documents."

22.      Meir and the Borrowers made the following representations to Abrahami in the Loan Agreement.

23.     The Borrowers represented to Abrahami, in Section 4.1.2 of the Loan Agreement ("Authority; Enforceability"), that "Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower, the JV[2] and any Subsidiary[3] of any of the foregoing party thereto and constitute the legal, valid and binding obligations of such Persons enforceable against such Persons in accordance with their respective terms…."

24.     The Borrowers represented to Abrahami, in Section 4.1.3 of the Loan Agreement ("No Conflicts"), that "[t]he execution, delivery and performance of this Agreement and the other Loan Documents by Borrower, JV, each Subsidiary of any of the foregoing will not … conflict with or result in a breach of…any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which such Person is a party or by which any of such Person's property or assets is subject…."

25.     The Borrowers further represented to Abrahami, in Section 4.1.3, that "[a]ny consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower, JV, each Subsidiary of any of the foregoing of this Agreement or any other Loan Documents to which it is a party has been obtained and is in full force and effect."

---

[2]   "JV" is defined as "each of HFZ Reich Holdings, LLC…and HFZ Reich Properties, LLC…, individually or collectively."  These entities were created as part of the joint venture between HFZ and Reich Bros. HFZ Reich Properties was the assigning entity of two of the Purported Assignments (defined below) allegedly made to Abrahami in connection with the Loan.

[3]   "Subsidiary" is defined as "any corporation, partnership, limited liability company, association, joint venture or other business entity in which Borrower's [sic] own a direct or indirect ownership interest; provided, however, for purposes of this Agreement, the term 'Subsidiary' shall only include any Person that owns a direct or indirect interest in any of the Secured Properties, including, without limitation each JV and Property Owner."

26. The Borrowers represented to Abrahami, in Section 4.1.6 of the Loan Agreement ("Solvency"), that "Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower)."

27. The Borrowers represented to Abrahami, in Section 4.1.10 of the Loan Agreement ("Financial Information; Disclosure"), that "[a]ll information submitted to [Abrahami]…: (a) are accurate, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower, JV, each Subsidiary of any of the foregoing, each Constituent Entity and the Property as of the date of such reports (as applicable)…(d) do not omit to state any material fact necessary to make statements contained herein or therein misleading. Borrower has disclosed to [Abrahami] all material facts that could cause any information provided to [Abrahami] or any representation or warranty made in any of the Loan Documents concerning Borrower, JV, any Subsidiary of any of the foregoing, any Constituent Entity or the Property, to be materially misleading."

28. The Borrowers further represented, in Section 4.1.10, that "No statement of fact made by any Borrower Party in any of the Loan Documents to which such Person is a party contains any untrue statement of material fact or omits to state any material fact presently known to such Person and necessary to make statements contained herein or therein not misleading."

29. The Borrowers also represented to Abrahami, in Section 4.1.13 of the Loan Agreement ("Underlying Loan Matters"), that the information provided concerning "Underlying

Loans"[4] was accurate "in all material respects" and disclosed "all Underlying Loans in effect." The Borrowers further represented that: "No default or Underlying Loan Event of Default has occurred under the Underlying Loan Documents which remains uncured or un-waived. True, correct and complete copies of the Underlying Loan Documents have been provided to [Abrahami] by Borrower."

30.     In addition, the Borrowers promised, in Section 5.1.12(b) of the Loan Agreement ("Compliance with JV Agreements"), that "Borrower shall: (i) diligently perform and observe all of the terms, covenants and conditions of the limited liability company operating agreement of each JV (each, a "JV Agreement") on the part of Borrower to be performed and observed within any applicable notice and cure periods under such JV Agreement and (ii) not agree to any modification or amendment to any JV Agreement, in each case without the prior written approval of Lender, including without limitation any Transfer by Reich, to the extent such approval or consent of Borrower is required under such JV Agreement."

31.     The Borrowers also promised, in Section 5.2.1 of the Loan Agreement ("Liens; Indebtedness"), that the "Borrower shall not (directly or indirectly) create, incur, assume, or allow to exist any Indebtedness with respect to the Borrower, JV, any Subsidiary of any of the foregoing or any Constituent Entity, other than Permitted Indebtedness."  The only "Permitted Indebtedness" was the Loan.

32.     The Borrowers also promised, in Section 2.1.1 of the Loan Agreement ("Initial Advance and Loan Proceeds"), that "Borrower shall use the proceeds of the Loan for: (a) the

---

[4]   "Underlying Loans" is defined as "each mortgage loan or mezzanine loan secured in whole or in part, directly or indirectly, by all or any portion of a Property or any Subsidiary of any JV."  The only "Underlying Loans" disclosed in the agreement were the three underlying mortgage loans with respect to each property. The Monroe Loan, which was" "directly or indirectly" secured "by any portion of a Property or any Subsidiary of any JV" should have been disclosed because, among other reasons, it was an "Underlying Loan" as defined in the agreement.

acquisition and/or recapitalization of the Permitted Investments of Borrower existing as of the Closing Date, and (b) for the acquisition and/or improvement of Permitted Investments (each of the foregoing, "Permitted Uses"), in accordance with the Business Plan."

33.     Most, if not all the written representations made by Meir purportedly on behalf of the Borrowers as set forth above, were materially false.  Meir knew these representations were false when they were made, and they were made for the purpose of inducing Abrahami to make the Loan. When questioned about these false representations in the Loan Agreement during his Rule 2004 examination, Meir invoked his Fifth Amendment right against self-incrimination and refused to answer the questions.

34.     In making the Loan, Abrahami reasonably relied on the written representations in the Loan Agreement.  In fact, the parties agreed that Abrahami was reasonably relying on the written representations in the Loan Agreement, regardless of any investigation Abrahami might conduct on his own.  Section 4.2 of the Loan Agreement ("Survival of Representations") states, in relevant part: "All representations, warranties, covenants, and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by [Abrahami] notwithstanding any investigation heretofore or hereafter made by [Abrahami] or on its behalf."

**2.     Meir Provides Fraudulent "Assignments" As Purported Collateral**

35.     In connection with the Loan, the Borrowers purportedly directed certain subsidiary entities to assign to Abrahami their membership interests in limited liability companies which owned certain industrial real estate properties.  These assignments were to be held in escrow and released to Abrahami if the Borrowers defaulted on the Loan and were Abrahami's purported collateral for the Loan.

36.    These subsidiary companies were part of a joint venture between HFZ and Reich Bros LLC ("Reich Bros").  Prior to its dealings with HFZ, Reich Bros owned and managed a portfolio of industrial real estate properties.  In July 2018, Reich Bros and HFZ entered a joint venture and, in connection therewith, made certain operating agreements to govern the "HFZ-Reich" entities that owned and controlled the underlying properties.

37.    Set forth below is the organizational structure of the HFZ-Reich entities relevant to the Loan, which was attached as Schedule I to the Loan Agreement:



38.    As shown above, one of these "HFZ-Reich" companies is HFZ Reich Properties, LLC.  HFZ Reich Properties is the subsidiary of HFZ Acquisitions (one of the Borrowers to the Loan).

10

39.     At the time of the Loan, HFZ Reich Properties (indirectly) owned, as relevant here, industrial real properties located at 500 Bailey Avenue, Buffalo, New York 14210 (the "500 Bailey Property") and 707 Spence Lane, Nashville, Tennessee 37217 (the "707 Spence Lane Property").

40.     A subsidiary of HFZ Reich Properties, 500 Bailey LLC, was the fee owner of the 500 Bailey Property.  A separate subsidiary of HFZ Reich Properties, 707 Spence Lane LLC, was the fee owner of the 707 Spence Lane Property.

41.     Another of these "HFZ-Reich" companies was HFZ Reich Holdings, LLC. HFZ Reich Holdings is the subsidiary of HFZ Portfolio (the other Borrower to the Loan).

42.     At the time of the Loan, HFZ Reich Holdings (indirectly) owned, as relevant here, an industrial real property located at 1100 Milwaukee Avenue, South Milwaukee, Wisconsin 53172 (the "1100 Milwaukee Property").  The fee owner of 1100 Milwaukee Property was 1100 Milwaukee LLC, which was owned by HFZ Member 1100 LLC, which in turn was owned by HFZ Reich Holdings.

43.     In connection with the Loan, HFZ Reich Properties purported to assign to Abrahami (at the purported direction of the HFZ Acquisitions Borrower) 100% of its interests in both Buffalo Bailey LLC (the "the Purported Buffalo Assignment") and 707 Spence Lane LLC (the "Purported Spence Lane Assignment").

44.     In connection with the Loan, Member 1100 LLC purported to assign to Abrahami (at the purported direction of HFZ Acquisitions) 100% of its interests in 1100 Milwaukee Ave, LLC (the "1100 Milwaukee Purported Assignment" and, together with the Purported Buffalo Assignment and the Purported Spence Lane Assignment, the "Purported Assignments").

45.     Meir executed each of the Purported Assignments, allegedly on behalf of the respective assignors.

11

46.     Pursuant to the operating agreements governing the assigning entities, the Purported Assignments required - Reich Bros' consent.

47.     Meir knew the Purported Assignments required the Reich Bros' consent.

48.     Garahan, Meir's lawyer, expressly informed Meir by email on September 2, 2020 of this, six days before the Loan closed.  Garahan wrote to Meir: "I reviewed the HFZ/Reich JV agreements and note that under the HFZ Reich Properties LLC Agreement, the following are **Unanimous Decisions** [emphasis in original] that require Reich Bros' consent:

> 4.5.1 Amend this Agreement, the Certificate or any other organizational or governing documents of the Company or any Subsidiary in any way that either (a) materially adversely affects Reich Member, or (b) has a disproportionate effect on the Members' economic rights and/or obligations hereunder;
>
> 4.5.2 Admit new members to the Company or any Subsidiary, or cause the Company or any Subsidiary to issue additional Membership Interests to any third party to an existing Member;
>
> 4.5.3 Undertake any act that would cause a change in the Members' Percentage Interests disproportionate to the Percentage Interests set forth in Exhibit B;

49.     In this same email, Garahan also advised Meir that "all decisions under the HFZ Reich Holdings LLC Agreement, are **Unanimous Decisions** [emphasis in original] that require Reich Bros' consent. Accordingly, granting the assignment and admitting [Abrahami] as a member of a [Borrower] Subsidiary requires Reich Bros' consent."  (Emphasis added.)

50.     The operating agreements governing the assigning entities also state that any unauthorized transfer of membership interests shall be null and void.

51.     Meir did not seek or obtain Reich Bros' consent for the Purported Assignments, nor did he even inform Reich Bros about the Loan or the Purported Assignments.

52. The failure to obtain Reich Bros' consent to the Purported Assignments means the Borrowers and Meir falsely represented to Abrahami that the Borrowers had "taken all necessary action to authorize the execution, delivery and performance of" the Loan Agreement and the Purported Assignments. (Sec. 4.1.2).

53. It also means Meir falsely represented that the Loan Agreement and the Purported Assignments "have been duly executed and delivered" and "constitute the legal, valid, and binding obligations" of the Borrowers and the assignors of the Purported Assignments. When questioned about these false representations during his Rule 2004 examination, Meir invoked his Fifth Amendment right against self-incrimination and refused to answer the questions.

54. In fact, the unauthorized Purported Assignments were not legally valid. They were, by the terms of the operating agreements of the assignors, null and void.

55. The intentional failure to notify Reich Bros about the Loan, much less seek their consent for the Purported Assignments, also means Meir (through the Borrowers' veil) falsely represented to Abrahami that: (i) the Purported Assignments "will not … conflict with or result in a breach of" any agreement or instrument to which the Borrowers or the assignors "is a party or by which any of such Person's property or assets is subject…" (Sec. 4.1.3).

56. In fact, the unauthorized Purported Assignments conflicted with, and were prohibited by, the operating agreements of the assignors.

57. Meir knew the foregoing representations were false at the time they were made. And these misrepresentations were drafted and made for the purpose of inducing Abrahami to make the Loan.

58.     In making the Loan, Abrahami reasonably relied on the written representation in the Loan Agreement, including the written representations concerning authorization and consents for the Purported Assignments.

**3.      Meir Concealed Senior Defaulted Indebtedness to Monroe Capital**

59.     On October 30, 2018, approximately two years prior to the Loan, the Borrowers received a loan from Monroe[5] in the aggregate principal amount of $43,466,019.00 (the "Monroe Loan").

60.     The Monroe Loan was secured by a lien against "all assets" of the Borrowers.

61.     Garahan had represented the Borrowers in 2018 and 2019 while he was an attorney at Norton Rose Fulbright LLP in connection with drafting and negotiation of the Monroe Loan, and subsequent amendments thereto (the "Monroe Loan Agreement.")

62.     Garahan even used the Monroe Loan Agreement as the template for the Loan Agreement.  The two agreements have the same structure and contain numerous verbatim provisions.

63.     Meir knew about the Monroe Loan when he negotiated the Loan Agreement in August and September of 2020.

64.     The Monroe Loan was in default when the Loan closed.

65.     Meir knew the Monroe Loan was in default when he was negotiating the Loan and when it ultimately closed, and he actively concealed this information from Abrahami.[6]

---

[5]  "Monroe" refers, individually and collectively, to MC Asset Management (Corporate), LLC and MC Asset Management (Industrial), LLC, in their respective capacities as administrative agent (as successor-in-interest to Monroe Capital Advisors, LLC).

[6]  Meir was also aware, but did not disclose to Abrahami, that Monroe had recently accelerated a defaulted $113 million loan (the "Monroe Corporate Loan") made to HFZ, the Borrowers' parent company.  Meir had received a copy of the default notice for the Monroe Corporate Loan on August 14, 2020.

66. Meir knew that he had to conceal the defaulted Monroe Loan from Abrahami, with whom he had been discussing a possible loan to the Borrowers, or else Abrahami would not make the Loan.

67. On Sunday August 23, 2020, four days after receiving the default notice for the Monroe Loan, Meir instructed Garahan of the "need to start drafting docs" for the Loan. Meir emphasized to Garahan that he was "looking to close by Thursday/Friday" (*i.e.*, less than a week).

68. The original version of the Loan Agreement was drafted by Garahan on August 24, 2020 and included references to the Monroe Loan as the "Existing Loan." After receiving the draft Loan Agreement, Meir instructed Garahan to remove any references to Monroe or the Monroe Loan.

69. By email dated August 25, 2020, Garahan confirmed to Meir that "per your request, we have removed all references to Monroe and 'existing loan'" in the draft Loan Agreement.

70. When questioned about his contemporaneous correspondence with Garahan conspiring to conceal the Monroe Loan during his Rule 2004 examination, Meir invoked his Fifth Amendment right against self-incrimination and refused to answer the questions.

71. Later that day (August 25, 2020), Garahan emailed the "initial draft" of the Loan Agreement to Abrahami's Israeli counsel, Shachar Shimony, among others. This version of the agreement, drafted by Garahan, contains no reference to Monroe or the Monroe Loan.

72. Garahan and Meir discussed the need to conceal the Monroe Loan from Abrahami. For example, on September 3, 2020, Garahan advised Meir, "We will need to limit the representation as to Events of Default under any Loans to the property-level loans. Otherwise, we would need to disclose the Monroe default."

15

73.     Likewise, Meir knew that he had to conceal the Loan from Monroe, as the Monroe Loan did not permit, without Monroe's consent, the Borrowers to incur additional indebtedness such as the Loan.  The Monroe Loan Agreement required the Borrowers to obtain Monroe's consent prior to entering into the Loan, and Meir knew this, because he had been personally involved in the negotiation of the Monroe Loan.

74.     For the same reasons, Meir also knew the Monroe Loan Agreement required the Borrowers to obtain Monroe's consent to make the Purported Assignments.

75.     Despite knowing that Monroe's consent was required, Meir neither sought nor obtained Monroe's consent to enter into the Loan.

76.     Despite knowing that Monroe's consent was required, Meir neither sought nor obtained Monroe's consent to make the Purported Assignments to Abrahami and had no communication at all with Monroe concerning the Loan.

77.     Abrahami was not aware of the Monroe Loan at the time he made the Loan.

78.     Abrahami would not have made the Loan had he known about the Monroe Loan.

79.     Abrahami would not have made the Loan had he known the Monroe Loan was in default.

80.     Meir's failure to notify Monroe of, or obtain its consent for, the Loan, means Meir/the Borrowers misrepresented to Abrahami that: (i) they "had taken all necessary action to authorize the execution, delivery and performance of" the Loan Documents (Sec. 4.1.2); (ii)  the Loan Agreement "will not…conflict with or result in a breach of" any agreement or instrument to which the Borrowers "is a party or by which any of such Person's property or assets is subject…" (Sec. 4.1.3); and (iii) any required consent "has been obtained and is in full force and effect."  (Sec. 4.1.3)

81.     Meir's failure to disclose, and his affirmative actions to conceal, the Monroe Loan means Meir/the Borrowers also misrepresented to Abrahami that: (i) the Borrowers were solvent and would remain so (Sec. 4.1.6); and (ii) the Borrowers would not incur or allow indebtedness other than the Loan. (Sec. 5.2.1).

82.     It also means Meir/the Borrowers misrepresented that the Borrower information they had provided to Abrahami: (i) was "accurate, complete and correct in all material respects;" (ii) "accurately represent[ed] the financial condition of Borrower, JV, each Subsidiary of any of the foregoing;" and (iii) did "not omit to state any material fact necessary to make statements contained herein or therein not misleading.  Borrower has disclosed to [Abrahami] all material facts that could cause any information provided to [Abrahami] or any representation or warranty made in any of the Loan Documents concerning Borrower, JV, any Subsidiary of the foregoing, any Constituent Entity or the Property, to be materially misleading."  (Sec. 4.1.10).

83.     By his concealment of the Monroe Loan, Meir/the Borrowers also misrepresented that they had disclosed all "Underlying Loans" (which the Monroe Loan constituted) and material information relating thereto, and that no such loans were in default. (Sec. 4.1.13).

84.     Meir knew the foregoing representations were false at the time they were drafted and made, and they were drafted and made for the purpose of inducing Abrahami to make the Loan. When questioned about these false representations in the Loan Agreement and he contemporaneous knowledge of their falseness during his Rule 2004 examination, Meir invoked his Fifth Amendment right against self-incrimination and refused to answer the questions.

85.     In making the Loan, Abrahami reasonably relied on the written representations in the Loan Agreement, including the written representations concerning the Borrowers' indebtedness and financial condition.

**4.      Meir Also Concealed A $3 Million Loan to One of The Borrowers**

86.      On July 7, 2020, two months prior to the Loan, HFZ Portfolio (one of the Borrowers to the Loan) borrowed $3 million from an entity named G-WB Portfolio Holdings Inc. (the "Undisclosed G-WB Loan").

87.      Meir executed the loan documents for the Undisclosed G-WB Loan on behalf of the HFZ Portfolio, allegedly as its "Authorized Signatory."

88.      The Undisclosed G-WB Loan bore "a fixed interest payment of $300,000," had a 25% default interest rate, and called for repayment of all principal and interest by July 14, 2020 – *seven days after the loan was made*.

89.      Meir did not disclose to Abrahami any information concerning the Undisclosed G-WB Loan.

90.      Abrahami did not know about the Undisclosed G-WB Loan at the time he made the Loan.

91.      The Undisclosed G-WB Loan was in default at the time of the Loan.

92.      On September 9, 2020 (the day after the Loan closed), Meir used $4 million of the Loan proceeds to repay the Undisclosed G-WB Loan.

93.      Meir/the Borrowers did not disclose to Abrahami, at any time, that proceeds of the Loan would be used (or had been used) to pay off the Undisclosed G-WB Loan.

94.      Through their concealment of the Undisclosed G-WB Loan, the Borrowers (through Meir) misrepresented to Abrahami that the Borrower information they had provided to Abrahami: (i) was "accurate, complete and correct in all material respects;" (ii) "accurately represent[ed] the financial condition of Borrower, JV, each Subsidiary of any of the foregoing;" and (iii) did "not omit to state any material fact necessary to make statements contained herein or

18

therein not misleading. Borrower has disclosed to [Abrahami] all material facts that could cause any information provided to [Abrahami] or any representation or warranty made in any of the Loan Documents concerning Borrower, JV, any Subsidiary of the foregoing, any Constituent Entity or the Property, to be materially misleading." (Sec. 4.1.10).

95.    Meir knew the foregoing representations were false at the time they were drafted and made, and they were made for the purpose of inducing Abrahami to make the Loan.

96.    In making the Loan, Abrahami relied on the written representations in the Loan Agreement, including the written representations concerning the Borrowers' indebtedness and financial condition.

**5.    Meir Forged a Loan Guaranty Provided to Abrahami**

97.    As additional security for the Loan, Meir executed a Carveout Guaranty dated September 8, 2020 in favor of Abrahami (the "Carveout Guaranty"). The Carveout Guaranty was also purportedly executed by Feldman, jointly and severally with Meir. A true and correct copy of the Carveout Guaranty is attached hereto as **Exhibit "B."**

98.    By the Carveout Guaranty, Meir agreed in Section 2.1 therein to irrevocably and unconditionally guarantee to Abrahami the payment and performance of the Loan obligations. Meir further agreed to be irrevocably and unconditionally liable to Abrahami for payment and performance of all "Carveout Obligations," defined therein to mean "all losses actually incurred by Lender (such losses to include, without limitation, the failure to recover any or all Loan Obligations) resulting from any of the following: (i) any fraud or intentional misrepresentation by Borrower in connection with the Loan; and (ii) the misapplication or conversion by Borrower of any monies in contravention of any provision of the Loan Documents, including, without limitation, any Revenue." (Emphasis added.)

99. HFZ fired Meir in December 2020.

100. HFZ contends it did not know about, or authorize Meir to enter into, the Loan on behalf of the Borrowers.

101. HFZ contends that Meir did not have the authority to enter into the Loan on behalf of the Borrowers, and that HFZ was defrauded by the fact Meir purported to enter into the Loan on behalf of the Borrowers.

102. HFZ and Feldman, HFZ's owner and chairman, also contend Meir forged Feldman's signature on a personal guaranty, allegedly made by Feldman in favor of Abrahami, in connection with the Loan (the "Forged Guaranty").

103. On September 7, 2020, Meir sent the Forged Guaranty to Abrahami for the purpose of inducing him to make the Loan.

104. Meir pressured Feldman's assistant, Anna Jaszczuk, into forging Feldman's signature on the Forged Guaranty.

105. On September 7, 2020, Meir emailed the signature page of the Forged Guaranty to Jaszczuk and instructed her to "Please call me when you in front of a computer."

106. Also on September 7, 2020, Jaszczuk messaged Garahan regarding the Forged Guaranty to "double check if notary date should be today". Garahan replied, "Yes that's fine to have the notary dated today."

107. Garahan should not have any input or influence on when a notarization, if real, was "dated." If real, it would be dated as of the notarization.

108. In addition, Jaszczuk has previously testified, in a sworn Affidavit, that Meir pressured her, on at least one other occasion involving a different transaction, to forge Feldman's signature on loan documents.

109.    Jaszczuk has refused to testify about the Forged Guaranty.  At deposition in another matter, she invoked her Fifth Amendment right against self-incrimination in response to nearly all questions.

110.    Meir knew that Feldman did not know about or execute the Forged Guaranty.

111.    Neither Meir (Feldman's partner) nor Garahan (Feldman's lawyer) had any communications with Feldman, prior to closing, concerning the Loan or the Forged Guaranty, which represented a potential $30 million personal liability for Feldman.

112.    Meir pressured Feldman's assistant, Anna Jaszczuk, to forge Feldman's name on the Forged Guaranty, as he had done on at least one other occasion.  Thus, the Forged Guaranty was created at Meir's direction.

113.    In his Rule 2004 examination, Meir repeatedly invoked the Fifth Amendment and declined to answer questions concerning whether he signed the Carveout Guaranty, whether Feldman's signature was authentic, whether he forged Feldman's signature, who completed the notary blocks, whether the notary was present, and whether he pressured Feldman's assistant to forge Feldman's signature.

114.    The Forged Guaranty was created and sent to Abrahami, on September 7, 2020, for the purpose of inducing him to make the Loan.

115.    The creation, and transmission to Abrahami, of the Forged Guaranty is *prima facie* fraud.

116.    By the creation and dissemination of the Forged Guaranty, the Borrowers (through Meir) misrepresented to Abrahami that "Borrower has taken all necessary action to authorize the execution, delivery and performance of" the Loan Agreement and the Loan Documents." (Sec. 4.1.2).

117.    In making the Loan, Abrahami reasonably relied on the Forged Guaranty that had been delivered to him, which bore Feldman's purported signature and a purported notarization thereof.

118.    Abrahami would not have made the Loan had he known about the Forged Guaranty.

**6.    Meir Converted the Loan Proceeds**

119.    By notice dated March 4, 2021 (the "Default Notice"), Abrahami notified the Borrowers that they were in default under the Loan Agreement, by reason of: (i) Borrowers' failure to make required payments under the Loan Agreement; and (ii) the transfer, or purported transfer, of certain assets of the Borrowers.

120.    By the Default Notice, Abrahami accelerated the Loan and demanded payment of all amounts due thereunder by March 9, 2021.

121.     The Borrowers did not respond to the Default Notice and have not paid any amounts owed to Abrahami.

122.    The Borrowers did not, as required by the Loan Agreement, use Loan proceeds to invest in the underlying properties or, with Abrahami's permission, acquire other properties, as required by the Loan Agreement.

123.    Instead, Meir transferred $2.3 million of the Loan proceeds into his own personal bank account (shared with his wife).

124.    The Loan amount, $30,000,000, was wired to HFZ Portfolio's bank account on September 8, 2020.  The very next day – September 9, 2020 – approximately $7,250,000 was transferred, at Meir's direction, to the HFZ bank account.

125.    On that same date, September 9, 2020, two wire transfers in the amount of $250,000 and one in the amount of $1,800,000 (totaling $2.3 million) were made, at Meir's direction, from

the HFZ bank account in the name of NAF Construction Management LLC ("NAF Construction"). NAF Construction was, as Meir testified at deposition on December 8, 2022, "a construction management arm of HFZ".

126. The same date (September 9, 2020), those funds totaling $2.3 million were then transferred, at Meir's direction, from the NAF Construction account to an account held by Meir and his wife.

127. Meir has claimed that this $2.3 million represented repayment of a "loan" he had made to HFZ earlier in 2020, for which there is no written record.

128. Meir also used the Loan proceeds to pay off various undisclosed debts. For example, on September 9, 2020 (one day after the Loan closed) he wired G-WB Holdings $4 million as repayment for the Undisclosed G-WB Loan.  Also, on September 9, 2020, Meir wired over $110,000 to his friend, Matthew Ammirati, allegedly for payment of (another) undisclosed loan, and sent another $92,000 to Ammirati through an entity named Winner Cycles, LLC.

129. Beyond this, Meir testified that he had no knowledge of what happened to the Loan proceeds.

130. Abrahami wired the $30 million Loan proceeds to HFZ Portfolio on September 8, 2020. Just sixteen days later, it was entirely gone – by September 24, 2020, the HFZ Portfolio account had a balance of just $52.25.

131. In his Rule 2004 examination, Meir invoked his Fifth Amendment right against self-incrimination and refused to answer questions concerning where the Loan proceeds were deposited, whether they were deposited into Borrower accounts, whether he had ownership or signing authority over accounts receiving proceeds, whether he converted proceeds to his or his wife's personal accounts, whether proceeds were used for personal debts or purchases, and

23

whether, within sixteen days of funding, the HFZ Portfolio account had been reduced to a balance of $52.25.

132.    The Loan proceeds were not used for any purpose permitted by the Loan Agreement.

133.    Meir never intended to use the Loan proceeds for any purpose permitted by the Loan Agreement, but rather to enrich himself and pay off his own personal debts.

**7.      Monroe's Foreclosure of the Monroe Loan**

134.    On November 25, 2020, Monroe sent Daniel Dwyer ("Dwyer"), of Meister Seelig & Fein LLP, who had acted as Abrahami's domestic counsel in the Loan transaction at Meir's introduction, a notice concerning the Loan (the "November 25 Notice").  The November 25 Notice asserted, among other things, that: (i) the Monroe Loan were in default at the time Abrahami made the Loan; (ii) the Loan was not permitted by the Monroe Loan; (iii) the Assignments were not permitted by the Monroe Loan; and (iv) a public UCC sale of certain assets of the Borrowers, including, according to Monroe Capital, the limited liability company interests that were the purported collateral for the Loan, was scheduled for December 2, 2020.

135.    By the November 25 Notice, Monroe also advised that it was "deeply concerned that the Borrower and its subsidiaries appear to have engaged in conduct aimed at fraudulently transferring certain valuable assets after an acceleration of the [Monroe Loan]."

136.    Upon receiving the November 25 Notice accusing Meir of defrauding both Monroe and Abrahami, Dwyer did not send it Abrahami, despite knowing that this was critical information. Instead, that same day Dwyer sent the November 25 Notice to Garahan, the lawyer for Meir (the accused fraudster).

24

137. On November 25, 2020, Monroe also sent the law firm Holland & Knight LLP ("H&K") a "Notice In Connection With Misconduct Related to HFZ Capital Group LLC," hereafter referred to as the "Misconduct Notice."

138. Monroe sent the Misconduct Notice to the attention of Garahan and to H&K's Managing Partner in Tampa, Florida.

139. The Misconduct Notice states, among other things, that "[i]n light of [Garahan's] substantial role in the drafting, negotiation and origination of the [Monroe Loan] (prior to [Garahan's] transfer to HK), we expect that you are aware that the [Loan] was clearly not permitted" under the terms of the Monroe Loan.

140. The Misconduct Notice to H&K also states that at no point in time did the Borrowers seek Monroe's consent to enter into the Loan, and that Monroe Capital "certainly did not provide such consent."

141. The Misconduct Notice to H&K further states: "It is clear to [Monroe Capital] that the [Loan] was unlawful and entered into in an intentional attempt to frustrate creditors and misappropriate [loan] proceeds. Please advise us if we have misunderstood or misstated your role in providing legal services with respect to this improper conduct. We are deeply concerned that a firm of HK's reputation was involved in this fraudulent transaction."

142. On December 16, 2020 Monroe sent a second notice (the "December 16 Notice") to Dwyer, claiming that Monroe was the winning bidder at a December 2 UCC Sale, "of all right, title, and interest of Borrower in and to the Portfolio," which included the LLC Interests that were the subject of the Purported Assignments.

143. Dwyer did not forward the November 25 Notice or the December 16 Notice to Abrahami until December 18, 2020. Prior to this time, Abrahami was unaware of the Monroe Loan.

**8.     Abrahami's Actions to Protect Himself in Connection with the Loan**

144. Abrahami is a very successful tech executive whose professional background is software coding. He is not a professional investor in real estate or any other asset class. He is not a lawyer. He resides in Israel, is an Israeli citizen, and has never resided in the U.S.

145. Abrahami took a number of steps to protect himself in connection with the Loan, which was a large investment of his personal funds.

146. Abrahami hired both Israeli counsel (Shachar Shimony), who was unfamiliar with the UCC or U.S. law, and U.S. counsel (Dwyer at MSF), recommended by Meir, to represent him in the transaction. Abrahami is not familiar with U.S. law and relied on his U.S. legal counsel to protect his interests as a lender.

147. Abrahami secured numerous specific written representations from the Borrowers.

148. Abrahami had the Borrowers agree that their representations "shall be deemed to have been relied upon by [Abrahami] notwithstanding any investigation" made by Abrahami.

149. Abrahami obtained loan guaranties (the Carveout Guaranty) from the purported principals of HFZ (Meir and Feldman), or at least a purported guaranty in the case of Feldman, pursuant to which Meir and Feldman are personally liable for the debt if any misrepresentations were made to Abrahami.

150. Abrahami received (purported) assignments of LLC membership interests in companies that owned industrial real estate with an equity value greater than his loan amount.

26

151.     These underlying properties were the collateral for his loan, and Abrahami understood that the assignment (in escrow) to him of controlling LLC interests for each property would give him straightforward protection in the event of a default.

152.     Because the industrial real estate properties were the key collateral for the loan, Abrahami had his representatives obtain and review property appraisals, leases, financials, and other documents concerning those properties.  Since ownership of the underlying properties was his (purported) collateral for the loan, this property-level information was the focus of the due diligence conducted by his representatives on his behalf.

153.     When questioned during his Rule 2004 Examination as to each aspect of the Loan, the truthfulness of representations made by Meir and the Borrowers, the veracity of the Purported Assignments, and the genuineness of the Feldman guaranty and Feldman's purported signature, Meir invoked his Fifth Amendment right against self-incrimination and repeatedly refused to answer the questions.

### 9.   Meir's  Misconduct in this Bankruptcy Case

154.     Meir filed the above-captioned Chapter 7 bankruptcy case styled *In re: Nir Meir*, Case No. 24-11047-LMI, in the United States Bankruptcy Court for the Southern District of Florida, Miami Division on February 1, 2024.

155.     Drew M. Dillworth ("Trustee") was appointed as the Chapter 7 Trustee to administer Meir's estate. Main Case ECF 2.

156.     In his initial Schedules, Meir disclosed total assets of $50.00, and total liabilities of $29,815,581.75. *See* Main Case ECF 1 at 9.

157.     Meir has never amended his initial Schedules.

158. Among those liabilities, Meir scheduled his debt to Abrahami on the Carveout Guaranty, in an "Unknown" amount. Main Case ECF 1 at 21.

159. Abrahami timely filed his Proof of Claim No. 7 on July 30, 2025, asserting a claim in the amount of $8,502,007.30 based on Meir's obligations under the Carveout Guaranty and the fraud described at length herein.

160. No party has objected to Abrahami's claim.

161. Due in part to his incarceration for large time swaths in this case, Meir's initial meeting of creditors was delayed several times, ultimately taking place on November 5, 2024. Main Case ECF 89, 94.

162. On or about May 12, 2025, the Trustee, together with Abrahami and other creditors of Meir, noticed Meir's Rule 2004 examination including for the production of documents and records. *See* Main Case ECF 153, 154, 155.

163. Meir served his responses to those requests on or about June 4, 2025. Main Case ECF 159, 161. In connection with those responses, Meir produced limited documents. He refused to produce other documents within his custody, possession or control, including voluminous documents held by his pre-petition criminal defense counsel. Instead, he demanded that the Trustee and creditors subpoena his pre-petition counsel for those records.

164. Meir, with intent to hinder, delay, or defraud creditors including without limitation Abrahami, transferred, removed, destroyed, mutilated, or concealed property of the estate within one year before the filing of the petition or after the filing of the petition. Meir transferred property including gold bullion, luxury jewelry, wine and other luxury items to friends, business acquaintances and others known or unknown, with the intent to convert such property to cash and hide that cash so as to be unavailable to the Trustee or creditors for recovery.

28

165.    Meir also testified that he did not have any storage units. However, the Trustee has located and identified several pallets of personal property held by Good Greek Moving and Storage, which Meir had previously failed and refused to disclose or identify.

166.    In his Rule 2004 examination testimony and responses to Rule 2004 requests for production, Meir admitted to his abject failure to keep and maintain records of his acquisition and disposition of property including luxury personal property and jewelry, watches, gold bullion, wine, and other property known and unknown. By virtue of his failure to keep records of his luxury personal property, the Trustee and creditors including Abrahami have been unable to identify recoverable property of the estate to be administered for the benefit of Meir's creditors.

167.    Furthermore, Meir failed to produce numerous records when initially requested by the Trustee, Abrahami and others, only to produce them from his laptop computer during his Rule 2004 examination. Meir admitted he had the same laptop and records when initially requested, but could not explain why they were not initially produced. Meir has refused to comply with Abrahami's request to produce complete copies of the contents of that computer, despite indication, including Meir's own testimony, that documents pertaining to the fraud Meir perpetrated against Abrahami were maintained on that computer.

168.    Meir has been unable to satisfactorily explain where his luxury personal property was dissipated, the amounts he recovered in sales of such property, and the use or dissipation of the proceeds. Meir testified that he sold luxury watches, jewelry, gold bullion, and wine but did not keep any receipts. He could not or would not testify as to how much he received in selling such assets, or where those proceeds were deposited.

29

169.    Meir's Rule 2004 Examination took place on February 26-27, 2026. Both the Trustee and Abrahami reserved for further examination if additional records that Meir had failed to disclose could be located.

**FIRST CLAIM FOR RELIEF**
**(FRAUD)**

170.    Abrahami repeats and realleges the allegations contained in paragraphs 1 through 169.

171.    As described in detail above, Debtor made numerous material misrepresentations in the Loan Agreement.  These written misrepresentations, contained in various sections of the Loan Agreement (including Sections 4.1.2, 4.1.3, 4.1.6, 4.1.10, 4.1.13, 5.1.12(b), 5.2.1, 2.1.1, among others), included: (i) that the Borrowers had proper authorization and requisite consents for the Loan; (ii) that all the Loan documents, including the Purported Assignments and the Forged Guaranty, were properly authorized and validly executed; (iii) that the Loan would be fully enforceable; (iv) that the Loan would not conflict with other agreements of the Borrowers or their subsidiaries; (v) the financial condition of the Borrowers, including their indebtedness, solvency and other loans; (vi) that all information provided to Abrahami was complete and accurate; (vii) that the Borrowers had disclosed to Abrahami all material information; and (viii) that the Loan proceeds would be used to invest in certain industrial properties the Borrower indirectly owned, or, with Abrahami's approval, acquire other industrial real estate properties.

172.    Debtor executed the Carveout Guaranty, by which he agreed to irrevocably and unconditionally guaranty payment and performance of "all losses actually incurred by Lender (such losses to include, without limitation, the failure to recover any or all Loan Obligations) resulting from any of the following: (i) any fraud or intentional misrepresentation by Borrower in connection with the Loan; and (ii) the misapplication or conversion by Borrower of any monies in

30

contravention of any provision of the Loan Documents, including, without limitation, any Revenue." (Emphasis added.)

173. The Debtor's written misrepresentations were false, by reason of, among other things, the defaulted Undisclosed HFZ Portfolio Loan, the defaulted Monroe Loan, the failure to obtain all consents for the Loan, including the consent of Monroe or of Reich Bros, the delivery to Abrahami of the unauthorized purported Assignments, and the delivery to Abrahami of the Forged Guaranty.

174. Debtor knew the foregoing written representations in the Loan Agreement were false at the time they were drafted and at the time they were made.

175. The false representations in the Loan Agreement were made by Debtor, for the purpose of inducing Abrahami to make the Loan.

176. Abrahami reasonably relied on the written representations made to him in the Loan Agreement. Abrahami's reasonable reliance on the written representations made in the Loan Agreement was established by contract. The Borrowers (acting through Debtor) agreed that Abrahami could rely on their representations and that such representations "shall be deemed to have been relied upon by [Abrahami]" regardless of any investigation conducted by Abrahami or on his behalf (Loan Agreement, Section 4.2).

177. Abrahami's reliance on the written representations in the Loan Agreement was also reasonable based on the other actions taken by Abrahami to protect himself (as set forth above), including: (i) securing (purported) loan guaranties from HFZ's principals; (ii) obtaining (purported) assignments of the ownership rights to valuable commercial real estate properties as (purported) collateral; (iii) conducting diligence on the value/financial condition of those underlying properties; and (iv) hiring U.S. legal counsel to ostensibly protect his interests.

31

178.    If Abrahami had known of the falsity of any of the written representations made to him in connection with the Loan by Borrowers (acting through Debtor), he would not have made the Loan.

179.    Debtor also defrauded Abrahami by preparing, or causing to be prepared, the purported Assignments and delivering them to Abrahami.

180.    The purported Assignments were not valid because they lacked the needed consent of Reich Bros.

181.    Debtor knew, or was reckless in not knowing, the Purported Assignments were not valid at the time they were delivered to Abrahami at closing.

182.    Debtor delivered the Purported Assignments at closing for the purpose of inducing Abrahami to make the Loan.

183.    Abrahami reasonably relied on receipt of the Purported Assignments in making the Loan.

184.    Abrahami would not have made the Loan if he had known Reich Bros had not consented to the Purported Assignments.

185.    Debtor also defrauded Abrahami by causing the Forged Guaranty to be prepared and delivering it to Abrahami.

186.    The delivery to Abrahami of the Forged Guaranty was *prima facie* fraud.

187.    Debtor knew Feldman did not sign the Forged Guaranty.

188.    Debtor arranged for the delivery of the Forged Guaranty to Abrahami at closing for the purpose of inducing him to make the Loan.

189.    Abrahami reasonably relied on receipt of the Forged Guaranty in making the Loan.

190.    If Abrahami had known that Feldman did not sign the Forged Guaranty, he would not have made the Loan.

191.    As a result of Debtor's fraudulent conduct described herein, Abrahami has suffered actual and ascertainable damages in an amount to be proven at trial, consisting of the unrecovered amount of Abrahami's $30 million loan to Borrowers, plus consequential and punitive damages (the "Debt").

**SECOND CLAIM FOR RELIEF**
**EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(A) – FALSE PRETENSES, FALSE REPRESENTATONS, FRAUD**

192.    Abrahami repeats and realleges each and every averment set forth in paragraphs 1 through 169 above.

193.    As described in detail above, Debtor made numerous material misrepresentations in the Loan Agreement.  These written misrepresentations, contained in various sections of the Loan Agreement (including Sections 4.1.2, 4.1.3, 4.1.6, 4.1.10, 4.1.13, 5.1.12(b), 5.2.1, 2.1.1, among others), included: (i) that the Borrowers had proper authorization and requisite consents for the Loan; (ii) that all the Loan documents, including the Purported Assignments and the Forged Guaranty, were properly authorized and validly executed; (iii) that the Loan would be fully enforceable; (iv) that the Loan would not conflict with other agreements of the Borrowers or their subsidiaries; (v) the financial condition of the Borrowers, including their indebtedness, solvency and other loans; (vi) that all information provided to Abrahami was complete and accurate; (vii) that the Borrowers had disclosed to Abrahami all material information; and (viii) that the Loan proceeds would be used to invest in certain industrial properties the Borrower indirectly owned, or, with Abrahami's approval, acquire other industrial real estate properties.

194.    The above-described representations were false.

33

195.    In fact, (i) the Borrowers did not have proper authorization and requisite consents for the Loan, and had not even sought such authorizations or consents; (ii) the Loan documents, including the Purported Assignments and the Forged Guaranty, were not properly authorized nor validly executed by a person with authority to bind the Borrowers; (iii) the Loan may not be fully enforceable; (iv) the Loan conflicted with other agreements of the Borrowers or their subsidiaries including without limitation, the pre-existing Monroe Loan; (v) the Loan misrepresented the financial condition of the Borrowers, including without limitation by omitting prior indebtedness, defaults under prior indebtedness, and the Borrowers' solvency; (vi) information provided to Abrahami was significantly incomplete and largely inaccurate; (vii) the Borrowers did not disclose to Abrahami all material information; and (viii) the Loan proceeds were never intended to be used as represented, instead they were to be converted by Meir for his own personal use.

196.    Debtor knew these pretenses and representations were false at the time they were made. Contemporaneous emails by the Debtor reflect active concealment of the Monroe Loan and conspiring to forge Feldman's signature on the Carveout Guaranty, among others.

197.    Debtor used these false pretenses with intent to induce Abrahami to extend the Loan to the Borrowers.

198.    Debtor used these false representations with intent to induce Abrahami to extend the Loan to the Borrowers.

199.    Debtor used actual fraud with intent to induce Abrahami to extend the Loan to the Borrowers.

200.    In deciding to extend the Loan to the Borrowers, Abrahami reasonably relied on the false pretenses and the false and misleading representations made by Debtor.

34

201.    Abrahami's reliance on Defendant's representations was justifiable. Abrahami engaged U.S. counsel to represent him in connection with the Loan negotiations and transactions, and took further actions as described herein to protect himself in connection with the Loan.

202.    As a proximate result of Plaintiff's reliance on Defendant's false representations, Plaintiff sustained damages, including without limitation, the dissipation of the Loan proceeds and inability to recover same.

203.    Based on the foregoing, Debtor's Debt to Abrahami is one for money, property, or services obtained by false pretenses, false representations, or actual fraud.

204.    Debtor's Debt to Abrahami is, therefore, excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

## THIRD CLAIM FOR RELIEF
### EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(B) – FALSE STATEMENT OF FINANCIAL CONDITION

205.    Abrahami repeats and realleges each and every averment set forth in paragraphs 1 through 169 above.

206.    At all relevant times, the Debtor held a position of authority with the Borrowers and acted with actual authority on their behalf.

207.    As detailed above, Debtor made multiple written representations in the Loan Agreement concerning the financial condition of the Borrowers including, without limitation, that Borrowers did not have any pre-existing debt and was not in default under any pre-existing debt obligations.

208.    The written statements were materially false.

209.    In fact, the Borrowers had, among other undisclosed debts, the pre-existing Monroe Loan, which was already in default.

35

210.    Debtor made these false written statements with intent to deceive Abrahami.

211.    Contemporaneous emails from Debtor instructed his counsel to omit references to the Monroe Loan from the Loan Agreement so that they were not disclosed to Abrahami.

212.    Abrahami reasonably relied on these written statements. The Loan Agreement itself contains Debtor's acknowledgement that Abrahami would rely on these written representations.

213.    As a proximate result of Abrahami's reliance on Debtor's false written statements, Abrahami sustained damages, including without limitation, the dissipation of the Loan proceeds and inability to recover same.

214.    Based on the foregoing, Debtor's Debt to Abrahami is one for money, property, or services obtained by use of a statement in writing: (i) that is materially false; (ii) respecting an insider's financial condition; (iii) on which the creditor reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive, and is, therefore, excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B).

**FOURTH CLAIM FOR RELIEF**
**EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(4) – EMBEZZLEMENT, LARCENY**

215.    Abrahami repeats and realleges each and every averment set forth in paragraphs 1 through 169 above.

216.    Debtor committed embezzlement or larceny as to Abrahami.

217.    As detailed above, Debtor fraudulently obtained Abrahami's money (the Loan proceeds) with the intent to use the Loan proceeds for his personal benefit, caused the Borrowers to commit a first payment default and proceeded to use the Loan proceeds for his personal benefit without Abrahami's consent, notwithstanding Debtor's express representation and assurance to Abrahami that the Loan proceeds would only be used for the benefit of the Borrowers.

36

218.     As a proximate result of Debtor's embezzlement and/or larceny, Abrahami sustained damages, including without limitation, the dissipation of the Loan proceeds and inability to recover same.

219.     Based on the foregoing, Debtor's Debt to Abrahami is one for embezzlement and larceny, and is, therefore, excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

### FIFTH CLAIM FOR RELIEF
### EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(6) – WILLFUL & MALICIOUS INJURY

220.     Abrahami repeats and realleges each and every averment set forth in paragraphs 1 through 169 above.

221.     Debtor caused injury to Abrahami or to Abrahami's property.

222.     The injury caused by Debtor was willful and malicious.

223.     In light of Debtor's fraud, lies, misrepresentations, first payment default, knowledge that the Borrowers were in default on the Monroe Loan and the Undisclosed HZF Portfolio Loan, knowledge that the Loan proceeds would not be used in the manner required by the Loan Agreement but instead would be used to for his personal benefit and to pay the Undisclosed HZF Portfolio Loan, knowledge that the Borrowers would be unable to repay the Loan, and knowledge that the Forged Guaranty and the Assignments were unenforceable, Debtor was well aware that Abrahami would have substantial difficulty in recovering the amount due to him for the Loan.

224.     As a proximate result of Debtor's willful and malicious injury, Abrahami sustained damages, including without limitation, the dissipation of the Loan proceeds and inability to recover same.

37

225. Based on the foregoing, Debtor's Debt to Abrahami is one for willful and malicious injury, and is, therefore, excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

**SIXTH CLAIM FOR RELIEF**
**DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

226. Abrahami repeats and realleges the allegations set forth in paragraphs 1 through 169 as if fully set forth herein.

227. Meir is not entitled to a discharge in this bankruptcy case.

228. Meir, with intent to hinder, delay, or defraud creditors including without limitation Abrahami, transferred, removed, destroyed, mutilated, or concealed property of the estate within one year before the filing of the petition or after the filing of the petition.

229. Meir should be denied his discharge under § 727(a)(2). Meir transferred property including gold bullion, luxury jewelry, wine and other luxury items to friends, business acquantances and others known or unknown, with the intent to convert such property to cash and hide that cash so as to be unavailable to the Trustee or creditors for recovery.

230. Meir also testified that he did not have any storage units. However, the Trustee has located and identified several pallets of personal property held by Good Greek Moving and Storage, which Meir failed and refused to disclose or identify.

231. Meir should be denied his discharge for failure to keep records under § 727(a)(3). Meir, in his Rule 2004 examination testimony and responses to Rule 2004 requests for production, has admitted an abject failure to keep and maintain records of his acquisition and disposition of property including luxury personal property and jewelry, watches, gold bullion, wine, and other property known and unknown. By virtue of his failure to keep records of his luxury personal property, the Trustee and creditors including Abrahami have been unable to identify recoverable property of the estate to be administered for the benefit of Meir's creditors.

232.    Furthermore, Meir failed to produce numerous records when initially requested by the Trustee, Abrahami and others, only to produce them from his laptop computer during his Rule 2004 examination. Meir admitted he had the same laptop and records when initially requested, but could not explain why they were not initially produced. Meir has refused to comply with Abrahami's request for production of complete copies of the contents of that computer, despite indication, including Meir's own testimony, that documents pertaining to the fraud Meir perpetrated against Abrahami were maintained on that computer.

233.    Meir should be denied his discharge for failure to explain loss of assets under § 727(a)(5). Meir has been unable to satisfactorily explain where his luxury personal property was dissipated, the amounts he recovered in sales of such property, and the use or dissipation of the proceeds. Meir testified that he sold luxury watches, jewelry, gold bullion, and wine but did not keep any receipts. He could not or would not testify as to how much he received in selling such assets, or where those proceeds were deposited.

234.    As a result of the foregoing conduct, Defendant should be denied a discharge pursuant to 11 U.S.C. § 727.

**WHEREFORE**, Abrahami requests entry of judgment against Debtor:

(a)    on his First Claim for Relief, in an amount consisting of the unrecovered amount of Abrahami's $30 million loan to Borrowers, plus consequential and punitive damages (the "Debt");

(b)    on his Second Claim for Relief, determining that the Debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

(c)    on his Third Claim for Relief, determining that the Debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B);

39

(d)    on his Fourth Claim for Relief, determining that the Debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4);

(e)    on his Fifth Claim for Relief, determining that the Debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6);

(f)    on his Sixth Claim for Relief, denying a discharge to the Debtor, under § 727(a);

(g)    for costs and disbursements; and

(h)    granting such other further and different relief as the Court deems just and proper.

Dated:  June 24, 2026

LIEBLER, GONZALEZ & PORTUONDO

By:_____*Mark E. Steiner*_____
Mark E. Steiner
Florida Bar No. 28513
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, Florida 33130
(305) 379-0400
mes@lgplaw.com

*Attorneys for Plaintiff*
*Avishai Abrahami*

ZEICHNER ELLMAN & KRAUSE LLP

By:_____*Kevin Badkhshan*_____
Michael E. Sims
Kevin Badkhshan (admitted *Pro Hac Vice*)
730 Third Avenue
New York, New York 10017
(212) 223-0400
msims@zeklaw.com
kbadkhshan@zeklaw.com

*Attorneys for Plaintiff*
*Avishai Abrahami*