# EXHIBIT A

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 2 of 116

---

# LOAN AGREEMENT

Dated as of September 8th, 2020

Between

**HFZ MEMBER RB PORTFOLIO LLC** and **HFZ MEMBER RB ACQUISITIONS LLC,**
collectively, as Borrower

and

**Abrahami Avishai**
as Lender

---

77961574

P-02887-ESI_00002120

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION...........................................1

SECTION 1.1. Definitions ................................................................................................1
SECTION 1.2. Principles of Construction ......................................................................15

ARTICLE II GENERAL TERMS .................................................................................... 15

SECTION 2.1. The Loan .................................................................................................15
SECTION 2.2. Interest Rate ............................................................................................16
SECTION 2.3. Loan Payment .........................................................................................20
SECTION 2.4. Prepayments ............................................................................................22
SECTION 2.5. Release on Payment in Full ....................................................................22

ARTICLE III CASH MANAGEMENT ............................................................................ 22

SECTION 3.1. Deposit of Revenues ...............................................................................22

ARTICLE IV REPRESENTATIONS AND WARRANTIES ......................................... 23

SECTION 4.1. Borrower Representations........................................................................23
SECTION 4.2. Survival of Representations ....................................................................28
SECTION 4.3. Purchase Agreements.  ...........................................................................28
SECTION 4.4. Management Agreements.  ......................................................................28
SECTION 4.5. Leases.......................................................................................................28

ARTICLE V BORROWER COVENANTS....................................................................... 29

SECTION 5.1. Affirmative Covenants ............................................................................29
SECTION 5.2. Negative Covenants .................................................................................37

ARTICLE VI INSURANCE; CASUALTY AND CONDEMNATION...................................... 43

SECTION 6.1. Insurance ..................................................................................................43
SECTION 6.2. Casualty....................................................................................................44
SECTION 6.3. Condemnation ..........................................................................................44
SECTION 6.4. Application of Net Proceeds ....................................................................44

ARTICLE VII RESERVED .............................................................................................. 45

ARTICLE VIII EVENTS OF DEFAULT; REMEDIES.................................................... 46

SECTION 8.1. Events of Default .....................................................................................46
SECTION 8.2. Remedies..................................................................................................47
SECTION 8.3. Lender Directed Remedies.......................................................................50

77961574

P-02887-ESI_00002120

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 4 of 116

ARTICLE IX RESERVED ..................................................................................................50

ARTICLE X MISCELLANEOUS ........................................................................................50

SECTION 10.1. Survival ....................................................................................................50
SECTION 10.2. Lender's Discretion...................................................................................50
SECTION 10.3. Governing Law .........................................................................................51
SECTION 10.4. Modification, Waiver in Writing ..............................................................52
SECTION 10.5. Delay Not a Waiver...................................................................................52
SECTION 10.6. Notices Generally......................................................................................52
SECTION 10.7. Trial by Jury ..............................................................................................53
SECTION 10.8. Headings....................................................................................................54
SECTION 10.9. Severability ...............................................................................................54
SECTION 10.10. Preferences ..............................................................................................54
SECTION 10.11. Waiver of Notice .....................................................................................54
SECTION 10.12. Remedies of Borrower .............................................................................54
SECTION 10.13. Expenses; Indemnity ...............................................................................54
SECTION 10.14. Schedules Incorporated ...........................................................................56
SECTION 10.15. Offsets, Counterclaims and Defenses .....................................................56
SECTION 10.16. No Joint Venture or Partnership; No Third Party Beneficiaries .....................57
SECTION 10.17. Publicity ..................................................................................................57
SECTION 10.18. Waiver of Marshalling of Assets .............................................................57
SECTION 10.19. Conflict; Construction of Documents; Reliance ..............................................58
SECTION 10.20. Brokers and Financial Advisors ...............................................................58
SECTION 10.21. Prior Agreements .....................................................................................58
SECTION 10.22. Time is of the Essence ..............................................................................58
SECTION 10.23. Certain Additional Rights of Lender (VCOC) .....................................................58
SECTION 10.24. Duplicate Originals, Counterparts..............................................................59
SECTION 10.25. Successors and Assigns Generally ...........................................................59
SECTION 10.26. Assignments by Lenders ..........................................................................59
SECTION 10.27. Register ....................................................................................................60
SECTION 10.28. Participations............................................................................................60
SECTION 10.29. Limitations Upon Participant Rights.........................................................60
SECTION 10.30. Certain Pledges ........................................................................................61
SECTION 10.31. Limitation on Liability.. ...........................................................................61

77961574

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 5 of 116

**SCHEDULES**

Exhibit A        -        Information on the Underlying Loans
Exhibit B        -        Reserved
Exhibit C        -        Form of Officer's Certificate
Exhibit D        -        Form of Assignment and Assumption Agreement
Exhibit E        -        Secured Properties
Exhibit F                 Form of Assignment
Exhibit G                 Form of Escrow Agreement
Exhibit H                 Form of Non-Recourse Carveout Guaranty


Schedule I        -        Organizational Structure
Schedule II       -        Schedule of Existing Guaranty Obligations
Schedule 4.3             Purchase Agreements
Schedule 4.4             Management Agreements
Schedule 4.5             Leases

-iii-

77961574

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 6 of 116

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of September 8th, 2020 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), is made by and between **Abrahami Avishai**, an individual bearing an Israeli passport no. 39024532 with an address at Dizengoff 55 TLV Israel as Lender (including each permitted assignee which becomes a Lender pursuant to the terms of the Agreement and their respective successors, "**Lender**") and **HFZ MEMBER RB PORTFOLIO LLC**, a Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file number 6970777 ("**Portfolio Borrower**") and **HFZ MEMBER RB ACQUISITIONS LLC** a Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file number 6992942 ("**Acquisition Borrower**"), (individually and collectively, as the context requires, jointly and severally, "**Borrower**").

## RECITALS

**WHEREAS**, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

**WHEREAS**, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms and conditions of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE I

### DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**SECTION 1.1. Definitions**. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Acquisition Borrower**" has the meaning set forth in the introductory paragraph hereto.

"**Acquisition Borrower Operating Agreement**" means that certain Amended and Restated Limited Liability Company Agreement of Acquisition Borrower effective as of July 28, 2020.

"**Affiliate**" means, as to any Person, any other Person that: (a) directly or indirectly owns ten percent (10%) or more of the Equity Interests in such Person, and/or (b) is in Control of, is Controlled by or is under common Control with such Person, and/or (c) is a director, partner, officer or employee of such Person or of an Affiliate of such Person and/or (d) is the spouse, issue, parent or officer of such Person or an Affiliate of such Person.

"**Affiliate Agreement**" has the meaning set forth in Section 5.1.12(f).

-1-

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 7 of 116

"**Affiliated Indemnitors**" means the Persons that are Affiliates of Borrower that have executed and delivered a Completion Guaranty, a Payment Guaranty or an Ordinary Guaranty.

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Aggregate Payments**" means the sum of all payments of Interest and Revenue received by the Lender from Borrower.

"**Approved Accounting Method**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession, to the extent such principles are applicable to the facts and circumstances on the date of determination, consistently applied.

"**Assignment**"  means the assignment of 100% of the interests in: (i) 1100 Milwaukee Ave, LLC **a** Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file  number 6923977 from HFZ Member 1100 LLC a Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file  number 6970774; (ii) 707 Spence Lane LLC a Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file  number 7342222 from HFZ Reich Properties LLC a Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file number 6992389 ("**HFZ Reich**") and (iii) Buffalo Bailey LLC a Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file number 7609790 from HFZ Reich in the form of Exhibit F to be held in escrow subject to release at Lender's direction in connection with an Event of Default as specified in the Escrow Agreement.

"**Bankruptcy Action**" means with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due or (f) such Person commencing (or have commenced against it) a proceeding for the dissolution or liquidation of it.

"**Bankruptcy Code**" means 11 U.S.C. § 101 et seq., as the same may be amended from time to time.

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 8 of 116

"**Borrower**" has the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"**Borrower Operating Agreement**" means individually and collectively, as the context requires, Acquisition Borrower Operating Agreement and/or Portfolio Borrower Operating Agreement.

"**Borrower Party**" means, individually and collectively, Borrower, any Affiliate of any of the foregoing, and any officers, directors, employees, or agents of any of the foregoing.

"**Business Day**" means any day other than a Saturday, Sunday or any other day on which national banks in New York, New York, are not open for business.

"**Business Plan**" means such business plan and budget approved by Lender in writing in connection with its approval of any acquisition or refinancing of any Permitted Investment, including, without limitation, any Property, which business plan or budget shall include a leasing plan, proposed capital expenditures for the Property or Permitted Investment, as applicable as well as any other information reasonably requested by Lender.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all other ownership interests, including membership interests in limited liability companies, in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Closing Date**" means the date of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Completion Guaranty**" means a guaranty of completion, a carry guaranty or similar guaranty of the completion of construction, cost overruns, "out-of-balance" deficiency payments, debt service, real estate tax, insurance, operating expense and other carry costs payments during the course of construction incurred by Borrower, JV, any Subsidiary of JV or any Affiliated

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 9 of 116

Indemnitor related solely to Permitted Indebtedness, but excludes: (a) any Payment Guaranty and (b) any Ordinary Guaranty.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Constituent Entity**" shall mean each Subsidiary and their respective direct and indirect members and partners specified as "Constituent Entities" on Schedule I; provided, however, a Constituent Entity shall not include any entity that is not directly or indirectly Controlled by HFZ.

"**Contribution Agreements**" means indemnification, guaranty, "back-to-back" or other agreements pursuant to which a Borrower Party indemnifies and/or guarantees the payment of its allocable share of any guaranty liability under a Payment Guaranty, Ordinary Guaranty or a Completion Guaranty provided to an Underlying Lender by a Person that is not a Borrower Party in connection with any Property.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise. "**Controlled**" and "**Controlling**" shall have correlative meanings.

"**Debt**" means the Outstanding Principal Balance, together with all interest accrued and unpaid thereon, and all other sums (including either the Minimum Yield Payment or the Maximum Yield Payment, as applicable) due from Borrower under the Loan Documents to which it is a party.

"**Default**" means the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" means a rate per annum equal to the lesser of: (a) the Maximum Legal Rate and (b) five percent (5%) above the Interest Rate.

"**Eligible Account**" means a separate and identifiable account from all other funds held by the holding institution that is either: (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least $50,000,000.00 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" means Wells Fargo Bank, N.A., or another depository institution or trust company selected by Lender that is insured by the Federal Deposit Insurance Corporation

-4-

P-02887-ESI_00002120

the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's, and "F-1" by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of letters of credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A" by Fitch and S&P and "A2" by Moody's.

"**Embargoed Person**" means any Person (a) that is subject to trade restrictions under United States law, including the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated under any such United States laws, with the result that transacting business with such Person (whether directly or indirectly) is or would be prohibited by law; (b) that is listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (as amended or supplemented, the "**Executive Order**") or any other Prescribed Laws; (c) that is owned or Controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order or any other Prescribed Laws; (d) with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order and any other Prescribed Laws; (e) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order or any other Prescribed Laws; (f) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; (g) that is named on any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, or on any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order of the President of the United States of America; (h) that has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any violation of Prescribed Laws, or is currently under investigation by any Governmental Authority for alleged criminal activity or (i) who is an Affiliate of a Person listed in clauses (a) through (h) above.

"**Equity Interests**" means: (a) partnership interests (general or limited) in a partnership; (b) membership interests in a limited liability company; (c) shares or stock interests in a corporation and (d) the beneficial ownership interests in a trust.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means Meister Seelig & Fein.

"**Escrow Agreement**" means an escrow agreement in the form of <u>Exhibit G</u> pursuant to which the Assignment will be held.

"**Event of Default**" has the meaning set forth in <u>Section 8.1</u> hereof.

-5-

P-02887-ESI_00002120

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Lender or required to be withheld or deducted from a payment to a Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.2.3(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Lender's failure to comply with Section 2.2.3(b) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Extension Period**" has the meaning set forth in Section 2.3.1(b) hereof.

"**FATCA**" means: (a) Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to the foregoing and (b) any similar law adopted by any non-U.S. Governmental Authority pursuant to an intergovernmental agreement between such non-U.S. jurisdiction and the United States.

"**Fitch**" means Fitch, Inc.

"**Governmental Authority**" means any court, board, agency, bureau, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise), whether now or hereafter in existence.

"**HFZ Replacement Principal**" means in the event of Ziel Feldman's and Helene Feldman's death or incapacity, Nir Meir or such other person as reasonably approved by Lender.

"**Indebtedness**" means for any Person, on a particular date, the sum (without duplication) at such date of: (a) all indebtedness or liability of such Person (including amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations for which such Person is liable); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; (g) obligations secured by any liens granted by such Person, whether or not the obligations have been assumed or are those of any other Person and (h) without duplication of the foregoing, any

-6-

P-02887-ESI_00002120

contingent obligations of such Person (determined in accordance with the Approved Accounting Method).

"**Indemnified Party**" has the meaning set forth in Section 10.13(b) hereof.

"**Indemnified Taxes**" means: (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Initial Advance**" has the meaning set forth in Section 2.1.2 hereof.

"**Interest Accrual Period**" means: (a) initially, from the Closing Date through September 30, 2020 and (b) thereafter, each calendar quarter.

"**Interest Rate**" means eight and one-half percent (8.5%) per annum.

"**JV**" means each of HFZ Reich Holdings, LLC **a Delaware limited liability company with an address of** 600 Madison Avenue, 15th Floor New York, New York 10022 **and Delaware file  number** 6987164 ("**Existing JV**") and HFZ Reich Properties, LLC **a Delaware limited liability company with an address of** 600 Madison Avenue, 15th Floor New York, New York 10022 **and Delaware file  number** 6992389 ("**Acquisition JV**"), each a Delaware limited liability company, individually or collectively, as the context may require.

"**JV Agreement**" has the meaning set forth in Section 5.1.12(b) hereof.

"**JV Agreement Event of Default**" has the meaning set forth in Section 5.1.12(c) hereof.

"**Legal Requirements**" means all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, building codes, land laws, judgments, decrees and injunctions of Governmental Authorities affecting the Loan, Borrower, JV, any Subsidiary of JV or any Property, whether now or hereafter enacted and in force.

"**Lender**" has the meaning set forth in the introductory paragraph hereto, together with its successors and assigns (including the holder of a Note).

"**Lender Expense**" means all: (a) costs or expenses (including taxes) required to be paid by the Borrower Parties under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) out-of-pocket fees or charges paid or incurred by Lender in connection with Lender's transactions with any Borrower Party under any of the Loan Documents, including, fees or charges for background checks, photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, UCC and other lien searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing fees, recording fees, publication, appraisal (including periodic collateral appraisals or business valuations to the  extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement), allocated internal legal expenses, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Lender's customary fees and charges (as adjusted from time to time) and out-of-pocket costs and expenses incurred by Lender with respect to the disbursement of funds to (or the receipt of funds

-7-

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 13 of 116

from) Borrower (by wire transfer or otherwise), (d) customary charges imposed or incurred by Lender, or out-of-pocket charges paid or incurred by Lender, resulting from the dishonor of checks payable by or to any Borrower Party, (e) documented out-of-pocket costs and expenses paid or incurred by Lender to correct any default or enforce any provision of this Agreement or any other Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell a any Property, or any portion thereof, irrespective of whether a sale is consummated and (f) financial examination, appraisal, and valuation fees and expenses of Lender related to any financial examinations, appraisals, or valuation to the extent of the fees and charges.

"**Lien**" means any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting Borrower, JV, any Subsidiary of JV, any Property or any portion thereof or any interest therein, or any direct or indirect interest in Borrower, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialman's and other similar liens and encumbrances.

"**Liquidation Event**" means the occurrence of any of the following (without implying that the any of the following are permitted hereunder other than as expressly provided herein): (a) a Transfer of the Pledged Collateral or any portion thereof or interest therein; (b) any direct or indirect encumbrance of the Pledged Collateral; (c) the obtaining or refinancing of any Underlying Loan of a Secured Party or (d) sale of any Secured Property.

"**Loan**" means the loan in the maximum principal amount of the Loan Amount made by Lender to Borrower pursuant to this Agreement.

"**Loan Amount**" means Thirty Million and 00/100 Dollars ($30,000,000.00).

"**Loan Documents**" means, collectively, this Agreement, the Notes, the Assignment , the Escrow Agreement and the Non-Recourse Carveout Guaranty and all other certificates, documents, agreements or instruments now or hereafter executed and/or delivered in connection with the Loan (as each may be amended, modified, extended, consolidated or supplemented from time to time).

"**Loss**" or "**Losses**" means, with respect to any Person, all liabilities, obligations, losses, damages, fines, penalties, actions, proceedings, judgments, suits, claims, debts, costs, expenses, charges, fees, awards, amounts paid in settlement, demands, and disbursements of any kind or nature whatsoever (including reasonable attorneys' fees) of or suffered or incurred by such Person in connection with or relating to the Loan, the Property, or any other collateral for the Loan (but not including: (a) special, speculative, exemplary, or punitive damages or (b) consequential damages in the nature of alleged "lost profits" or "lost opportunities", in each case with respect to the foregoing clauses (a) and (b) except to the extent that a party seeking indemnification of such amount has paid or is required to pay such measure of damages other than as a result of (and to the extent of) its own willful misconduct or fraud).

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 14 of 116

"**Material Adverse Effect**" means a material adverse effect on: (a) the Secured Property or the value or use thereof or the Pledged Collateral or the value thereof, (b) the business, profits, management, operations or condition (financial or otherwise) of Borrower, the JV, any Subsidiary of JV, any Property Owner  or the Secured Property, (c) the enforceability, validity, perfection or priority of the lien of the Pledge Agreement or the other Loan Documents, (d) the ability of any party to the Loan Documents to perform its obligations under the Loan Documents to which it is a party or (e) the occurrence of: (i) an Underlying Loan Event of Default or (ii) an event of default or a failure to fund its share of "mandatory capital" by Borrower or any Affiliate of Borrower under a JV Agreement.

"**Maturity Date**" means the earliest to occur of: (a) the Stated Maturity Date, (b) the date that the Loans become due and payable in accordance with Section 8.1 following the occurrence of an Event of Default or (c) the date that the Debt (other than contingent indemnification obligations not yet due and payable) is paid in full.

"**Maximum Legal Rate**" means the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loan and as provided for herein or the other Loan Documents, under the laws of the state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Maximum Yield**" means $4,800,000.

"**Maximum Yield Payment**" has the meaning set forth in Section 2.4.3 hereof.

"**Minimum Yield**" means $3,600,000.

"**Minimum Yield Payment**" has the meaning set forth in Section 2.4.3 hereof.

"**Moody's**" means Moody's Investors Service, Inc.

"**Net Liquidation Proceeds**" means all amounts paid to and/or received by or on behalf of Borrower (or available for distribution) in connection with a Liquidation Event, less Lender's costs incurred in connection with the recovery thereof.

"**Net Proceeds**" means: (a) with respect to the occurrence of a Casualty, the net amount of all insurance proceeds payable under the Policies as a result of the applicable damage or destruction, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable legal fees), if any, in collecting same (but not including the proceeds of any business interruption insurance) and (b) with respect to the occurrence of a Condemnation, the net amount of any payments received from the applicable Governmental Authority on account of such Condemnation, or in any transaction or proceeding in lieu thereof, after deduction of Borrower's and Lender's reasonable costs and expenses (including reasonable legal fees), if any, in collecting same.

"**Note**" means one or more Promissory Notes made by Borrower to the order of a Lender pursuant to Section 2.2.7, as the same may be amended, restated, replaced, supplemented, extended or otherwise modified from time to time.

-9-

P-02887-ESI_00002120

"**Non-Recourse Carveout Guaranty**" means that certain guaranty in the form of <u>Exhibit H</u> executed by Ziel Feldman and Nir Meir in favor of Lender.

"**Obligations**" means, collectively, Borrower's obligations for the payment of the Debt and the performance of the obligations of Borrower contained in the Loan Documents.

"**Officer's Certificate**" means a certificate delivered to Lender by Borrower that is signed by an authorized senior officer of Borrower or of the entity that Controls Borrower, as applicable, in the form attached hereto as <u>Exhibit C</u>.

"**Ordinary Guaranty**" means an ordinary course recourse carveout, environmental indemnity or similar guaranty of Borrower, JV, any Subsidiary of JV or Affiliated Indemnitor related solely to Permitted Indebtedness, provided that, to the extent any such liability thereto is a credit-based liability, such liability, despite being contained in an Ordinary Guaranty, shall constitute a Payment Guaranty.

"**Other Connection Taxes**" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Outstanding Principal Balance**" means, as of any date, the outstanding principal balance of the Loan.

"**Portfolio Profit**" means 1.5% of the amount by which the fair market value (as calculated by the Borrowers based on appraisal of the Portfolio Properties performed no more than 30 days prior to the Maturity Date) exceeds the (i) amount of the outstanding principal balance of any loans secured by liens against the Portfolio Properties and (ii) the amount of equity invested in the Portfolio Properties. An example of this calculation is attached hereto as Exhibit I.

"**Portfolio Properties**" <u>means real property owned, directly of indirectly, by any subsidiary of the Borrowers.</u>

"**Payment Date**" means the first (1st) day of January, April, July and October of each calendar year during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"**Payment Guaranty**" means a guaranty of all or any portion of the indebtedness under any Underlying Loan incurred by Borrower, JV, any Subsidiary of JV or any Affiliated

-10-

P-02887-ESI_00002120

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 16 of 116

Indemnitor related solely to Permitted Indebtedness, but excludes: (a) any Completion Guaranty and (b) any Ordinary Guaranty (other than as specifically provided in the definition thereof).

"**Permitted Encumbrances**" means: (a) with respect to the Property, collectively: (i) the Liens and security interests created by the Loan Documents, (ii) all Liens and security interests created by the Underlying Loan Documents, to the extent the Underlying Loan was entered into in accordance with this Agreement, (iii) Liens, if any, for Property Taxes imposed by any Governmental Authority not yet due or delinquent or which are being contested by Borrower in accordance with the terms and conditions of this Agreement, (iv) such other title and survey exceptions as Lender has approved or may approve in advance in writing in Lender's commercially reasonable discretion, (v) inchoate mechanics' and materialmens' liens, or actual mechanics' and materialmens' liens provided same are discharged or bonded within thirty (30) days of the filing thereof (but in any case prior to the date on which any foreclosure or other realization thereon is scheduled to occur if sooner than such 30-day period) or which are otherwise being contested by Borrower in accordance with the terms and conditions of this Agreement, unless such lien are required to be discharged or bonded sooner by the terms of any Underlying Loan Documents and (vi) the leases entered into prior to the date hereof or after the date hereof in accordance with the terms and conditions hereof and (b) with respect to the direct or indirect Equity Interests in Borrower, the Liens of the Loan Documents.

"**Permitted Indebtedness**" means: (a) in the case of Borrower, the Debt; (b) in the case of Borrower and any Affiliated Indemnitor, (i) the guaranty obligations pursuant to the Payment Guarantees, Completion Guarantees, Ordinary Guarantees and any Contribution Agreements relating to Payment Guarantees, Ordinary Guarantees and/or Completion Guarantees listed on Schedule II in effect as of the Closing Date, (ii) Ordinary Guarantees, (iii) ordinary course Completion Guarantees that are not listed on Schedule II and that are incurred from and after the Closing Date in connection with Permitted Indebtedness and in compliance with the provisions of Section 5.2.1, (iv) ordinary course Payment Guarantees that are not listed on Schedule II and that are incurred from and after the Closing Date in connection with Permitted Indebtedness and in compliance with the provisions of Section 5.2.1 and (v) any Indebtedness incurred by one or more Subsidiaries of Borrower (including any newly formed Subsidiaries of Borrower) to refinance or recapitalize the Property in the ordinary course with the consent of Lender in accordance with any Business Plan (except, however, if Lender does not provide the Extension Notice pursuant to the terms and provisions of this Agreement, Lender's consent is no longer required with respect to any refinance or recapitalization): (A) Ordinary Guaranty and Completion Guaranty incurred in connection with such Indebtedness that complies with the provisions of Section 5.2.1 and (B) Payment Guaranty obligations incurred in connection with such Indebtedness that complies with the provisions of Section 5.2.1 and (c) in the case of any applicable Constituent Entity or Subsidiary of JV: (i) the Underlying Loans, (ii) any Indebtedness explicitly permitted pursuant to the terms of the Underlying Loan Documents (in each case of clauses (c)(i) and (c)(ii) above, without any modification thereof from and after the Closing Date that is not expressly permitted by the proviso below or that is not approved in writing by Lender); provided, however, that the following shall constitute "**Permitted Indebtedness**": (1) with respect to any Property, the applicable Constituent Entity or Property Owner shall have the right without Lender's consent to refinance any Underlying Loan on such Property in the ordinary course on customary market terms and conditions but in no event shall any such Indebtedness (including all senior, mezzanine, EB-5 or other Indebtedness) exceed

-11-

P-02887-ESI_00002120

seventy percent (70%) Loan to Value or seventy percent (70%) Loan to Cost ; (2) with respect to any Underlying Loans for the Properties, the applicable Constituent Entity shall have the right without Lender's consent, to enter into modifications (or extensions) of the Underlying Loan Documents provided that: (aa) Borrower seeks to exercise extension options that are contained in the Underlying Loan Documents; (bb) Borrower delivers to Lender notice of the terms of such proposed modifications and (cc) the terms of such modifications are in compliance with the limitations on Payment Guaranty and Completion Guaranty obligations under this Agreement.

"**Permitted Investments**" means investments in the Property that are properly disclosed in the financial records of Borrower as of the Closing Date and such other industrial real estate throughout the United States under contract to be acquired or hereafter approved by Lender in writing for acquisition by a Subsidiary of Acquisition JV.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any Governmental Authority, and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pledged Collateral**" means 100% of the membership interests in each Property Owner.

"**Policies**" shall mean the insurance policies required to be maintained pursuant to the terms of the Underlying Loan Documents, or as required pursuant to Section 6.1(a).

"**Portfolio Borrower**" has the meaning set forth in the introductory paragraph hereto.

"**Portfolio Borrower Operating Agreement**" means that certain Limited Liability Company Agreement of Portfolio Borrower dated as of July 24, 2018, as amended.

"**Prepayment Date**" has the meaning set forth in Section 2.4.1 hereof.

"**Prescribed Laws**" means, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. § 1701 et. seq., (d) the Racketeer Influenced and Corrupt Organizations Act, (e) all requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") and (f) all other Legal Requirements relating to money laundering or terrorism.

"**Property**" means the real property and improvements owned by a Property Owner.

"**Property Owner**" means each Person directly owning a Secured Property.

"**Property Taxes**" means all real estate and personal property taxes, assessments, water rates or sewer rents (excluding income taxes), now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

P-02887-ESI_00002120

"**Qualified Replacement Manager**" shall mean: (a) a reputable and experienced management organization possessing experience in managing properties similar in size, scope, use and value as the Properties and approved by Lender in its sole discretion or (b) H F Z Capital Group LLC **a New York limited liability company with an address of** 600 Madison Avenue, 15th Floor New York, New York 10022 **and New  York Department of State identification number** 2235406, or an Affiliate thereof, provided that the persons running the day-to-day operations of the Properties have experience in managing properties similar in size, scope, use and value as the Properties as determined by Lender in its sole discretion.

"**Quarterly Debt Service Payment Amount**" means, as of any Payment Date, all accrued and unpaid interest that has accrued on the Outstanding Principal Balance at the Interest Rate, in each case, for the Interest Accrual Period in effect as of the day immediately preceding such Payment Date.

"**Register**" has the meaning set forth in <u>Section 10.28</u> hereof.

"**Reich**" means Reich Bros, LLC LLC **a Delaware limited liability company with an address of 172 South Broadway, White Plains, NY, 10605 and Delaware file  number** 5359530.

"**Reich Overhead**" means those certain sums, fees or other compensation payable to Reich or any Affiliate thereof pursuant to the terms and provisions of the JV Agreement of the Acquisition JV.

"**Related Fund**" means a fund, money market account, investment or other account or other entity that is administered or managed by a Lender or an Affiliate of such Lender or an entity or an affiliate of an entity that administers or manages such Lender.

"**Restoration**" means the repair and restoration of a Property after a Casualty or Condemnation as nearly as possible to the condition the applicable Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restricted Party**" means, collectively Borrower and any Person owning or issuing any Equity Interests in Borrower and any Property Owner.

"**Revenues**" means all amounts available for distribution to Borrower in respect of the Pledged Collateral (after payment of Reich Overhead due and payable), including  in respect of Borrower's interest in any Subsidiary and  with respect to a Secured Property.

"**S&P**" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC company.

"**Secured Property**" means those properties set forth on <u>Exhibit E</u> attached hereto and made a part hereof.

"**State**" means the State of New York.

-13-

P-02887-ESI_00002120

"**Stated Maturity Date**" means August 31, 2021, subject to any extension thereof pursuant to Section 2.2.8.

"**Subsidiary**" shall mean, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity in which Borrower's own a direct or indirect ownership interest; provided, however, for purposes of this Agreement, the term "Subsidiary" shall only include any Person that owns a direct or indirect interest in any of the Secured Properties, including, without limitation each JV and each Property Owner.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Transfer**" means any sale, conveyance, transfer, lease, assignment, grant, mortgage, option, encumbrance, hypothecation, pledge, or Lien, in each case whether by operation of law or otherwise, and with respect to an entity shall include the merger of such entity with or into any other entity and the division of an entity into more than one entity.

"**Trigger Event**" means an Event of Default or a monetary Default.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**Underlying Borrower**" shall mean each borrower under the related Underlying Loan, together with its successors and permitted assigns.

"**Underlying Lender**" shall mean each lender under the related Underlying Loan Documents.

"**Underlying Loan**" shall mean each mortgage loan or mezzanine loan secured in whole or in part, directly or indirectly, by all or any portion of a Property or any Subsidiary of any JV.

"**Underlying Loan Documents**" shall mean all documents evidencing and/or securing an Underlying Loan and all documents executed and/or delivered in connection therewith, as the same may be amended, modified and/or supplemented from time to time in accordance with the terms and conditions of this Agreement.

"**Underlying Loan Event of Default**" has the meaning set forth in Section 5.1.11(c) hereof.

"**Underlying Loan Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Underlying Loan.

**SECTION 1.2. Principles of Construction**. All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" means "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings

-14-

P-02887-ESI_00002120

attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Borrower and Lender hereby acknowledge and agree that, as to any clauses or provisions contained in this Agreement or any of the other Loan Documents to the effect that Borrower (a) represents or warrants on behalf of, or covenants on behalf of, Property Owner or an Affiliate thereof, (b) shall cause Property Owner or an Affiliate thereof to act or refrain from acting, to comply with, to permit, to perform, to pay, to furnish, to cure, to remove, to observe, to deliver, to suffer, to initiate, to provide, to make available, to furnish in any manner, or (c) shall cause to occur or not to occur, or otherwise be obligated in any manner with respect to, any matters pertaining to Property Owner or an Affiliate thereof, such clause or provision is intended to mean, and shall be construed as meaning, that Borrower shall cause Property Owner or such Affiliate to take such action (and in all cases throughout the Loan Documents the words "Borrower shall" or "Borrower shall not" (or words of similar meaning) shall mean "Borrower shall cause Property Owner (or the applicable Affiliate)" or "Borrower shall not permit Property Owner (or the applicable Affiliate)" to so act or not to so act, as applicable, as the context may require (and any instance in the Loan Documents where such words already appear shall not be deemed or construed to mean that any other instance where such words do not appear were not intended to be interpreted as provided above).

# ARTICLE II

## GENERAL TERMS

**SECTION 2.1. The Loan**.

**2.1.1** **Initial Advance and Loan Proceeds**. Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make, and Borrower hereby agrees to borrow and accept, the Loan on the Closing Date in the maximum Loan Amount funded to Borrower on the Closing Date. Borrower shall be obligated to repay the full principal amount of such Loan plus any interest accrued pursuant to Section 2.2 and any Minimum Yield Payment on or prior to the Maturity Date. Any amount borrowed and repaid hereunder may not be reborrowed. Borrower shall use the proceeds of the Loan for: (a) the acquisition and/or recapitalization of the Permitted Investments of Borrower existing as of the Closing Date, and (b) for the acquisition and/or improvement of Permitted Investments (each of the foregoing, "**Permitted Uses**"), in accordance with the Business Plan.

**SECTION 2.2. Interest Rate**.

**2.2.1** **Interest and Unused Fee Calculation**.

(a) Subject to Section 2.2.2, interest on the Outstanding Principal Balance shall accrue from the Closing Date until the Debt is repaid in full at the Interest Rate, and during the continuance of an Event of Default, at the Default Rate. Interest on the Outstanding Principal Balance shall be calculated by multiplying: (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on the Interest Rate (or the Default Rate, if applicable) and a three hundred sixty (360) day year by (c) the Outstanding Principal Balance.

-15-

P-02887-ESI_00002120

**2.2.2** **Usury Savings**. This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Outstanding Principal Balance at a rate which could subject any Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

**2.2.3** **Taxes**.

(a) <u>Payment of Taxes</u>. Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Legal Requirements. If any Legal Requirement requires the deduction or withholding of any Tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Legal Requirements and, if such Tax is an Indemnified Tax, the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 2.2.3(a)</u> the applicable Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made. Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Legal Requirements any Other Taxes. Borrower shall pay to each Lender within ten (10) days after demand therefor, the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.2.3(a)</u>) payable or paid by such Lender or required to be withheld or deducted from a payment to such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by a Lender shall be conclusive absent manifest error. As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this <u>Section 2.2.3(a)</u>, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(b) <u>Status of Lender</u>. Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Loan Document shall deliver to Borrower, (i) prior to becoming a party to this agreement or obtaining any interest in the Loan, (ii) at the time or times reasonably requested by Borrower, and (iii) if any form or certification

-16-

P-02887-ESI_00002120

previously delivered expires or becomes obsolete or inaccurate in any respect, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, if reasonably requested by Borrower, any Lender shall deliver such other documentation prescribed by applicable Legal Requirements (or reasonably requested by Borrower) as will enable Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements. If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment (and solely for purposes of this clause (b), "FATCA" shall include any amendments made to FATCA after the date of this Agreement and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with FATCA). Borrowers shall, upon request of Lender, pay all actual costs incurred by Lender in connection with requests made pursuant to this section.

(c)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which it has been indemnified pursuant to this Section 2.2.3 (including by the payment of additional amounts pursuant to this Section 2.2.3(c)), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.2.3 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (c) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (c), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (c) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the indemnifying party or any other Person.

(d)     Survival. Each party's obligations under this Section 2.2.3 shall survive any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

P-02887-ESI_00002120

(e)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 2.2.5</u>, or requires Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.2.3(a)</u>, then such Lender shall (at the request of Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to such <u>Sections 2.2.3</u> or <u>2.2.5</u>, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**2.2.4    Breakage Indemnity**.  Borrower shall indemnify each Lender against any Losses which such Lender may actually sustain or incur in liquidating or redeploying deposits from third parties acquired to effect or maintain the Loan or any part thereof as a consequence of any failure to pay the Debt or any part thereof or interest accrued thereon, as and when due and payable (at the date thereof or otherwise, and whether by acceleration or otherwise).  Lender shall deliver to Borrower a statement for any such sums which it is entitled to receive pursuant to this <u>Section 2.2.4</u>, which statement shall be binding and conclusive absent manifest error.  Borrower's obligations under this Section 2.2.4 are in addition to Borrower's obligations to pay any Minimum Yield Payment to a payment or prepayment of the Outstanding Principal Balance.

**2.2.5    Legal Requirements**.

(a)    If any Change in Law shall: (i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender, (ii) subject any Lender to any Taxes (other than: (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto or (iii) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loan made by such Lender or participation therein, and the result of any of the foregoing circumstances described in clauses (i) through (iii) shall be to increase the cost to such Lender of making, converting to, continuing or maintaining the Loan or of maintaining its obligation to make any the Loan, or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, in any such case, upon request of such Lender, Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loan made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with

-18-

P-02887-ESI_00002120

respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 2.2.5(a) or (b) above and delivered to Borrower shall be conclusive absent manifest error. Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.2.5 shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrower shall not be required to compensate a Lender pursuant to this Section 2.2.5 for any increased costs incurred or reductions suffered more than twelve (12) months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the twelve-month period referred to above shall be extended to include the period of retroactive effect thereof).

**2.2.6** **Noteless Agreement**. No promissory notes shall be required to evidence the payment obligations of any Loan to Borrower; provided that, nothing herein shall prohibit a Lender from requesting a promissory note from the Borrower and, upon any such request, the Borrower shall provide such Lender with a promissory note in an amount equal to such Lender's Commitment, to the extent then outstanding, and otherwise in form and substance satisfactory to such Lender. Lender shall maintain in accordance with its usual practice an account or accounts on its books evidencing the obligations of Borrower resulting from the Loan made from time to time, including the amounts of principal and interest payable and paid to Lender hereunder. Absent manifest error, entries maintained in said accounts shall be prima facie evidence of the existence and amounts of the Loan and the payment obligations of Borrower; provided, however, that the failure of Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrower to repay the Loan. Lender, acting solely for this purpose as a non-fiduciary agent on behalf of Borrower, agrees to record the Commitments and Loans on the Register. Once recorded on the Register, no Lender's Commitment or Loan may be removed from the Register so long as it remains outstanding.

**2.2.7** **Extension**. Lender shall have a one-time right to extend the Stated Maturity Date for a period (the "**Extension Period**") of 12 months by sending written notice of such extension to Borrower no later than 150 days prior to the Stated Maturity Date (the "**Extension Notice**").

**SECTION 2.3. Loan Payment**.

**2.3.1** **Required Payments**.

(a)     On each Payment Date, beginning on January 1, 2021, Borrower shall pay to Lender an amount equal to the Quarterly Debt Service Payment Amount.

-19-

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 25 of 116

(b)      All payments received by Lender with respect to the Loan (prior to an Event of Default) shall be applied in accordance with Section 2.3.3(b).  So long as no Event of Default then exists, all payments received by Lender with respect to the Loan shall be applied by Lender to amounts due with respect to the Note on a *pro rata* and *pari passu* basis, based on the outstanding principal amount due under the Note and the interest rate applicable thereto; provided, however, that from and after an Event of Default, all payments received by Lender shall be applied by Lender to amounts due with respect to the Notes in such order and priority as Lender shall determine in its sole discretion.  Borrower shall pay the entire Debt to Lender on the Maturity Date.

**2.3.2    Late Payment Charge**.  If any principal, interest or any other sums due under the Loan Documents is not paid by Borrower by the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lenders for the loss of the use of such delinquent payment.  Any such amount shall be due and payable hereunder or the other Loan Documents to the extent permitted by applicable law.

**2.3.3    Payments Generally**.

(a)      Payments by Borrower.

(i)      All payments to be made by Borrower shall be made without set-off, recoupment, deduction, or counterclaim, except as otherwise required by law.  All payments by Borrower shall be made to Lender at Lender's address set forth in Section 10.6, and shall be made in immediately available funds, no later than 12:00 p.m. (New York City time) on the date specified herein.  Any payment received by Lender later than 12:00 p.m. (New York City time), at the option of Lender, shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)      Whenever any payment is due on a day other than a Business Day, such payment shall be made on the succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(b)      Apportionment and Application.

(i)      Except as otherwise provided in clause (b)(ii) below, funds paid to Lender shall be applied as follows:

(A)      first, to pay any Lender Expenses then due to any of the Lenders under the Loan Documents, until paid in full,

(B)      second, to pay any fees then due to any or all of the Lenders under the Loan Documents, on a ratable basis, until paid in full,

(C)      third, ratably to pay accrued interest due in respect of the Loan, until paid in full,

-20-

P-02887-ESI_00002120

(D)      fourth, ratably, to pay the applicable Minimum Yield Payment then due and owing by Borrower or its Subsidiaries, until paid in full,

(E)      fifth, to pay any other Obligations until paid in full, and

(F)      sixth, to Borrower (to be remitted by wire transfer to an account designated by Borrower) or such other Person entitled thereto under applicable law.

For purposes of the foregoing (other than clause (F)), "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Bankruptcy Action), default interest, interest on interest, and expense reimbursements, except to the extent that default or overdue interest (but not any other interest) and loan fees, each arising from or related to a default, are disallowed in any Bankruptcy Action; provided, however, that for the purposes of clause (E), "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Bankruptcy Action), default interest, interest on interest, and expense reimbursements, whether or not the same would be or is allowed or disallowed in whole or in part in any Bankruptcy Action.

(ii)      In each instance, so long as no Default or Event of Default has occurred and is continuing, this Section 2.3.3(b) shall not be deemed to apply to any payment by Borrower specified by Borrower to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement.  If an Event of Default has occurred and is continuing, Lender shall have the right to apply any funds or payment received from Borrower to the payment of the Obligations in such manner as Lender elects in its sole discretion.

SECTION 2.4. Prepayments.

2.4.1   Voluntary Prepayments.  Borrower shall have the right to prepay the Loan in whole but not  in part prior to the Stated Maturity Date.  On any Business Day, Borrower may, at its option and upon at least ten (10) days' prior written notice to Lender specifying the Business Day on which such prepayment is to be made (a "Prepayment Date") (which notice may be revoked by Borrower at any time prior to the Prepayment Date provided that Borrower shall reimburse Lender for any costs incurred by Lender as a result of such revocation), prepay the Debt in whole including the Maximum Yield, , provided that such prepayment is accompanied by all other sums due and payable under this Agreement and the other Loan Documents, including, but not limited to all of Lender's costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with such prepayment.

2.4.2   Mandatory Prepayments.  As soon as possible and not later than two (2) Business Days following receipt by any Borrower Party of any Revenues, 100% of such Revenues shall be applied to pay all amounts under Section 2.3.3(b)(i)(A)-(F), provided that from and after a Trigger Event, amounts subject to Section 2.3.3(b)(i) (F)  shall be applied as a prepayment of the Loan.

-21-

P-02887-ESI_00002120

INDEX NO. 651356/2023

RECEIVED NYSCEF: 09/22/2023

### 2.4.3    Minimum Yield.

(a)    Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, on the Maturity Date (, except as provided in Section 2.4.3(b) hereof), if the amount of the Aggregate Payments received by the Lenders are less than the sum of: (a) the Loan Amount plus (b) the Minimum Yield, the Borrowers shall make a payment to the Lenders in an amount such that after giving effect to such payment, the Aggregate Payments are at least equal to the sum of (a) the Loan Amount plus (b) Minimum Yield (such payment, the "Minimum Yield Payment").

(b)    Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, on the Maturity Date (including any Maturity Date resulting , if the amount of the Aggregate Payments received by the Lenders less than the sum of: (a) the Loan Amount plus (b) the Maximum Yield, then the  Borrowers shall pay to the Lenders, the Portfolio Profit, if any, up to an amount equal to the Loan Amount plus  the Maximum Yield (such payment, the "Maximum Yield Payment")., and, if after giving effect to the Maximum Yield Payment,  if the amount of the Aggregate Payments received by the Lenders are less than the sum of: (a) the Loan Amount plus (b) the Minimum Yield, the Borrowers shall make a payment to the Lenders in an amount such that after giving effect to such payment, the Aggregate Payments are at least equal to the sum of (a) the Loan Amount plus (b) Minimum Yield (such payment, the "Minimum Yield Payment").

(c)    The Minimum Yield Payment and the Maximum Yield Payment shall be fully earned, and due and payable, on the date of such repayment or prepayment, or on the date such repayment or prepayment is required to be made, as applicable, and non-refundable when made.  Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or any Loan Document, it is understood and agreed that if the Debt is accelerated as a result of the occurrence and continuance of any Event of Default (including by operation of law or otherwise), the Maximum Yield Payment, if any, determined as of the date of acceleration, will also be due and payable and will be treated and deemed as though the applicable Loans were prepaid as of such date and shall constitute part of the Debt for all purposes herein.  The Minimum Yield Payment or the Maximum Yield Payment, as applicable, if any, shall also be payable in the event the Debt (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means.  THE BORROWER PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING MINIMUM YIELD PAYMENT OR MAXIMUM YIELD PAYMENT, AS APPLICABLE, IN CONNECTION WITH ANY SUCH ACCELERATION.  The Borrower Parties expressly agree that: (i) the Minimum Yield Payment and Maximum Yield Payment is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the Minimum Yield Payment or the Maximum Yield Payment, as applicable shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Borrower Parties giving specific consideration in this transaction for such agreement to pay the Minimum Yield Payment or the Maximum Yield Payment, as applicable, (iv) the Borrower Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 2.4.3, (v) their agreement to pay the Minimum Yield Payment or

-22-

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 28 of 116

Maximum Yield Payment, as applicable, is a material inducement to the Lenders to make the Loan, and (vi) the Minimum Yield Payment and the Maximum Yield Payment each represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Lender and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lender or profits lost by the Lender as a result of any event giving rise to an obligation to pay the Minimum Yield Payment or Maximum Yield Payment, as applicable.  The parties hereto further acknowledge and agree that each of the Minimum Yield Payment and the Maximum Yield Payment is not intended to act as a penalty or to punish the Borrower Parties for any such repayment or prepayment.

SECTION 2.5. **Release on Payment in Full**.  Lender shall execute and deliver to or at the direction of Borrower, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest due on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Notes and this Agreement and related Loan Documents in form and content reasonably acceptable to Lender.

## ARTICLE III

## CASH MANAGEMENT

SECTION 3.1. **Deposit of Revenues**.  All Revenues distributable to Borrower, other than reserves in accordance with the Business Plan or otherwise approved by Lender to be maintained by either JV, or by any of the Constituent Entities, shall be paid to Lender in accordance with the terms and provisions of this Agreement, including Net Proceeds and Net Liquidation Proceeds.  Borrower shall (and shall cause each Constituent Entity and any requested JV and/or Subsidiary of JV to) execute and deliver to Lender such documents and agreements (including direction letters acknowledged by each of the Constituent Entities, and each requested JV and/or Subsidiary of JV making Upstream Distributions) as Lender may reasonably require in order to cause the Revenues to be paid to Lender.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.1. **Borrower Representations**.  Each Borrower represents and warrants as of the Closing Date that:

**4.1.1   Organization**.  Borrower, JV, each Subsidiary of any of the foregoing, and each Constituent Entity and each Property Owner: (a) has been duly formed and is validly existing and in good standing in the jurisdiction in which it is formed and has the requisite power and authority to own its properties and to transact the businesses in which it is now engaged and (b) is duly qualified to do business in, and is in good standing in, each other jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations. Borrower, JV, each Subsidiary of any of the foregoing, and each Constituent Entity possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged.  Borrower's

P-02887-ESI_00002120

principal place of business as of the Closing Date is the address set forth in the introductory paragraph of this Agreement.  The organizational chart attached hereto as Schedule I shows all Persons that: (i) own ten percent (10%) or more of the direct or indirect ownership interests in Borrower, JV and each Subsidiary of any of the foregoing, (ii) Control Borrower or (iii) are Constituent Entities.  As of the date hereof, Borrower is Controlled by H F Z Capital Group LLC.

4.1.2    **Authority; Enforceability**.  Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower, the JV and any Subsidiary of any of the foregoing party thereto and constitute the legal, valid and binding obligations of such Persons enforceable against such Persons in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, JV, each Subsidiary of any of the foregoing or any Constituent Entity or any Property Owner (including the defense of usury), nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject to principles of equity and bankruptcy, insolvency and other laws generally affecting creditors' rights and the enforcement of debtors' obligations), and none of Borrower, JV, any Subsidiary of any of the foregoing or any Constituent Entity or any Property Owner has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

4.1.3    **No Conflicts**.  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower, JV, each Subsidiary of any of the foregoing will not: (a) conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, any of such Person's organizational or governing documents, (b) conflict with or result in a breach of any, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of such Person pursuant to the terms of, any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which such Person is a party or by which any of such Person's property or assets is subject or (c) result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over such Person or any of such Person's properties or assets.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower, JV, each Subsidiary of any of the foregoing of this Agreement or any other Loan Documents to which it is a party has been obtained and is in full force and effect.

4.1.4    **Litigation; Judgments**.  As of the date hereof, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or threatened against or affecting Borrower, JV, any Subsidiary of any of the foregoing, any Constituent Entity, any Property Owner or the Property.  None of Borrower, JV, any Subsidiary of any of the foregoing, any Constituent Entity or any Property Owner r are in default

-24-

or violation with respect to any order, writ, injunction, decree or demand of any Governmental Authority.

**4.1.5** **Title**. Property Owner (collectively) has good and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances. There are no Liens on the direct or indirect Equity Interests in Borrower or any Property Owner (other than Permitted Encumbrances).

**4.1.6** **Solvency**. The fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will be, immediately following the making of the Loan, greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower). No petition in bankruptcy has been filed against Borrower or any Constituent Entity, and neither Borrower nor any Constituent Entity has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. None of Borrower, any Constituent Entity or any of their respective direct or indirect owners is contemplating either the filing of a Bankruptcy Action by Borrower or any Constituent Entity or the liquidation of all or a major portion of its assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or any Constituent Entity. Neither the Property, nor any portion thereof, is the subject of, and none of Borrower, JV, any Subsidiary of any of the foregoing or any Constituent Entity is a debtor in, state or federal bankruptcy, insolvency or similar proceeding. None of Borrower, JV, any Subsidiary of any of the foregoing, Constituent Entity or any Borrower Party has ever been in a state or federal bankruptcy or insolvency proceeding or convicted of a felony.

**4.1.7** **No Plan Assets**. None of Borrower, any Constituent Entity or Property Owner: (a) is, sponsors, or is obligated to contribute to an "employee benefit plan" (within the meaning of §3(3) of ERISA) which is subject to Title I of ERISA or §4975 of the Code, and none of the assets of such Person constitute "plan assets" (within the meaning of 29 C.F.R. §2510.3 101) for purposes of §3(42) of ERISA or (b) is a "governmental plan" (within the meaning of §3(32) of ERISA) or subject to any state statute regulating investments of, or fiduciary obligations with respect to, such "governmental plans" which is similar to the provisions of §406 of ERISA or §4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Agreement (including the exercise by Lender of any of its rights under the Loan Documents).

**4.1.8** **Compliance**. Borrower, each Constituent Entity and the Property (including the use thereof) comply in all material respects with all applicable Legal Requirements, including building and zoning ordinances and codes and Prescribed Laws. There has not been committed

-25-

P-02887-ESI_00002120

by Borrower or Property Owner, or to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  In the event that all or any part of the Property is destroyed or damaged, to Borrower's actual knowledge, said improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the knowledge of Borrower, threatened in writing with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

4.1.9   **Taxes**.

(a)   All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the direct or indirect transfer of the Property have been paid.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid, and, under current Legal Requirements and the Loan Documents have been validly executed and delivered and are enforceable in accordance with their respective terms by Lender (or any subsequent holder thereof), subject to principles of equity and bankruptcy, insolvency and other laws generally applicable to creditors' rights and the enforcement of debtors' obligations.

(b)   Borrower shall, and shall cause each Subsidiary to, duly and timely file (taking into account any effective extensions for filing) all income, property and other material federal, state and local tax returns and all other material tax returns, domestic and foreign, required to be filed by them and shall pay prior to being delinquent all Taxes, charges and assessments payable by them that become due, except for those being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with the Approved Accounting Method.  Borrower shall maintain its status as an entity disregarded from its owner as defined in Treasury Regulation Section 301.7701-3(b)(1)(ii).  Borrower will not file a consolidated federal income tax return with any corporation.

4.1.10  **Financial Information; Disclosure**.  All information submitted to Lender (including all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof, and all statements of fact made in this Agreement or in any other Loan Document): (a) are accurate, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower, JV, each Subsidiary of any of the foregoing, each Constituent Entity and the Property as of the date of

P-02887-ESI_00002120

such reports (as applicable), (c) to the extent prepared, audited or reviewed by an independent certified public accounting firm, have been prepared, audited or reviewed in accordance with the Approved Accounting Method throughout the periods covered (except as disclosed therein) and (d) do not omit to state any material fact necessary to make statements contained herein or therein not misleading. Borrower has disclosed to Lender all material facts that could cause any information provided to Lender or any representation or warranty made in any of the Loan Documents concerning Borrower, JV, any Subsidiary of any of the foregoing, any Constituent Entity or the Property, to be materially misleading. No statement of fact made by any Borrower Party in any of the Loan Documents to which such Person is a party contains any untrue statement of a material fact or omits to state any material fact presently known to such Person and necessary to make statements contained herein or therein not misleading.

       **4.1.11** <u>**Certain Regulations**</u>. Borrower is not: (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money; (d) a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System or (e) a "foreign person" within the meaning of § 1445(f)(3) of the Code. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for other than commercial purposes or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

       **4.1.12** <u>**Embargoed Person; Prescribed Laws**</u>. As of the date hereof (and as of any subsequent date on which this representation is re-made or deemed to be re-made): (a) none of Borrower, JV, any Subsidiary of any of the foregoing or Constituent Entity and none of the funds or other assets of Borrower, JV, any Subsidiary of any of the foregoing or Constituent Entity constitute property of, or are beneficially owned (directly or indirectly) by, any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, JV, each Subsidiary of any of the foregoing or Constituent Entity, as applicable, with the result that the investment in Borrower, JV, each Subsidiary of any of the foregoing or Constituent Entity, as applicable (whether directly or indirectly), is or would be prohibited by law or the Loan is or would be in violation of law; (c) none of the funds of Borrower, JV, any Subsidiary of any of the foregoing or Constituent Entity, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, JV, any Subsidiary of any of the foregoing or Constituent Entity, as applicable (whether directly or indirectly), is or would be prohibited by law or the Loan is or would be in violation of law; (d) none of the Persons that own a direct or indirect ownership interest in Borrower: (i) is a government or representative of a jurisdiction or a financial institution that has been designated by the U.S. Secretary of the Treasury under Section 311 of the USA Patriot Act as of primary money laundering concern (a list of these jurisdictions and financial institutions can be found on the Financial Crimes Enforcement

-27-

P-02887-ESI_00002120

Network website at www.fincen.gov.) and (ii) resides or has a place of business in, or is organized under the laws of, a country or territory subject to economic sanctions administered or enforced by OFAC or which is designated as a non-cooperative country or territory by the Financial Action Task Force on Money Laundering (which list of non-cooperative countries and territories can be found on the FATF web site); (e) no portion of the Property has been or will be purchased with proceeds of any illegal activity; (f) Borrower, JV, each Subsidiary of any of the foregoing and Constituent Entity are (and have always been) operated under policies, procedures and practices, if any, that are in compliance with the Prescribed Laws and available to Lender for review and inspection during normal business hours and upon reasonable prior notice and (g) none of Borrower, JV, any Subsidiary of any of the foregoing, Constituent Entity or any Person that Controls them is in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency or office of the United States, nor any official of any State, claiming a violation or possible violation of Prescribed Laws.

4.1.13 **Underlying Loan Matters**.  Exhibit A accurately reflects: (a) in all material respects the matters described therein in respect of the Underlying Loans (including the Underlying Loan Outstanding Principal Balance and the name of each Underlying Lender and Underlying Borrower) and (b) all Underlying Loans in effect.  No default or Underlying Loan Event of Default has occurred under the Underlying Loan Documents which remains uncured or un-waived.  True, correct and complete copies of the Underlying Loan Documents have been provided to Lender by Borrower.

4.1.14 **Underlying Guaranty Obligations**.  Schedule II accurately reflects in all material respects the Payment Guaranty, Completion Guaranty and Contribution Agreement obligations of Borrower and each Affiliated Indemnitor in effect as of the Closing Date.

SECTION 4.2. **Survival of Representations**.  Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 hereof and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

SECTION 4.3. **Purchase Agreements**.  Attached hereto as Schedule 4.3 is a true, correct and complete list of all purchase agreements relating to pending acquisitions or sale of properties (collectively, the "**Purchase Agreements**").  True, correct and complete copies of the Purchase Agreements have been provided to Lender by Borrower and there exists no default by Borrower or any of its Affiliates or Subsidiaries thereunder, nor, to the knowledge of Borrower, any defaults by any third party to such Purchase Agreements.

SECTION 4.4. **Management Agreements**.  Attached hereto as Schedule 4.4 is a true, correct and complete list of all management agreements relating to the operation, management, construction, renovation, development or leasing of the Properties (collectively, the "**Management Agreements**").  True, correct and complete copies of the Management Agreements have been provided to Lender by Borrower and there exists no default by Borrower

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 34 of 116

or any of its Affiliates or Subsidiaries thereunder, nor, to the knowledge of Borrower, any defaults by any third party to such Management Agreements.

SECTION 4.5. **Leases**.  The Properties are not subject to any Leases other than the leases described on Schedule 4.5 to this Agreement (collectively, the **"Leases"**).  No Person has any possessory interest in any Property or right to occupy the same except under and pursuant to the Leases.  The Leases are in full force and effect and to Borrower's knowledge there are no defaults thereunder by either party beyond any applicable notice or cure period. True and complete copies of the Leases have been delivered to and there are no oral agreements with respect thereto.  The tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises and have commenced the payment of full, unabated rent under the Leases.  Each tenant is, to Borrower's knowledge, free from bankruptcy or reorganization proceedings.  To Borrower's knowledge, no tenant has or is asserting any claim of offset or other defense, counterclaim or other claim in respect of such tenant's obligations or the lessor's rights under any Lease.  No Subsidiary is in default of its obligations under any of the Leases.  No tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part.

## ARTICLE V

## BORROWER COVENANTS

SECTION 5.1. **Affirmative Covenants**.  From the date hereof and until payment and performance in full of all Obligations in accordance with the terms of this Agreement and the other Loan Documents, each Borrower hereby covenants and agrees with Lender that it shall comply with the following (and where applicable, it shall cause the JV and each of their Subsidiaries to comply with the following):

5.1.1    **Existence; Compliance with Legal Requirements**.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence and the existence of each Subsidiary, rights, licenses, permits, franchises, and trade names required for the operation of the Property in the manner presently being conducted.  Borrower shall comply with all Legal Requirements applicable to it and the Property, including Prescribed Laws (subject to Borrower's right to contest the applicability of any such Legal Requirement in accordance with Section 5.1.2 below).

5.1.2    **Taxes and Liens; Contests**.  Borrower shall pay all Property Taxes and Liens (other than Permitted Encumbrances) now or hereafter levied or assessed or imposed against the Property or any part thereof prior to the delinquency thereof.  Borrower will deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Property Taxes have been so paid no later than ten (10) days prior to the date on which the Property Taxes would otherwise be delinquent if not paid (or such later date as may be permitted by an Underlying Loan or such earlier date as may be required by an Underlying Loan).  Borrower, at its own expense, may contest (after prior written notice to Lender) by appropriate legal proceeding, promptly initiated and conducted in good faith and with reasonable diligence, the amount or validity or application in whole or in part of any Property Taxes or any Lien on the Property, and/or the applicability of

-29-

P-02887-ESI_00002120

any Legal Requirement, provided that: (a) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower, JV, each Subsidiary of any of the foregoing, the Property or any collateral for the Loan, as applicable, is subject and shall not constitute a default thereunder, and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (b) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (c) Borrower shall promptly, upon final non-appealable determination thereof, pay the amount of any such Property Taxes or Lien (together with all costs, interest and penalties which may be payable in connection therewith) and/or comply with such contested Legal Requirement and (d) such proceeding shall suspend the collection of such contested Property Taxes (unless Borrower shall have paid all such amounts so demanded under protest), and with respect to Liens, Borrower shall have caused any such Lien to be discharged (by bonding or otherwise) within thirty (30) days (or sooner if required to avoid a forfeiture of the Property) of the filing thereof, or Borrower shall furnish such security as may be requested by Lender (not to exceed one hundred twenty-five percent (125%) of the amount of such Lien being contested), to insure the payment of any such Property Taxes or Liens, together with all interest and penalties thereon (and Lender may pay over any such security to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or direct or indirect interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost, or there shall be any danger of the Lien of any Loan Document being primed by any related Lien) (notwithstanding the foregoing, however, so long as (and to the extent) Underlying Borrower has delivered such security to Underlying Lender pursuant to the Underlying Loan Agreement, Borrower shall not be required to deliver the same to Lender hereunder).  Borrower shall promptly upon final determination thereof pay the amount of any such Property Tax, Other Charge, or Lien, together with all costs, interest and penalties which may be payable in connection therewith, and comply with any such contested Legal Requirement.

**5.1.3   Access to Property**.   Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice (and subject to the rights of tenants under leases).

**5.1.4   Cooperate in Legal Proceedings**.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority that may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.  Borrower shall cooperate with Lender in obtaining the benefits of any condemnation proceeds or insurance proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed by Borrower for any expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) from such condemnation proceeds or insurance proceeds, as applicable.

**5.1.5   Further Assurances.**  Borrower shall, at Borrower's sole cost and expense, (a) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect

P-02887-ESI_00002120

the collateral at any time securing or intended to secure the Obligations under the Loan Documents, and to establish, maintain, and perfect Lender's security interest therein free of all other Liens (other than Permitted Encumbrances); (b) engage a tax monitoring service selected by Lender to monitor and alert Lender as to the payment and/or missed payment of Property Taxes and (c) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, in each case as Lender shall reasonably require from time to time.  In furtherance of the foregoing, Lender shall have the right to inspect the Properties at any time upon notice to Borrower.  Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, coupled with an interest and with full power of substitution, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the collateral for the Loan, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower is required to do under the Loan Documents or which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for in the Loan Documents and to accomplish the purposes of this Loan Agreement, including any amendment to the Loan Documents which may be required hereunder, in each case upon Borrower's failure to take any of the foregoing actions or any other applicable action required under the Loan Documents within five (5) Business Days after notice from Lender.  The foregoing powers of attorney are irrevocable and coupled with an interest.

      **5.1.6**   <u>**Reporting**</u>.

      (a)     Borrower will keep and maintain or will cause to be kept and maintained on a fiscal year basis (commencing January 1 of each year), in accordance with the Approved Accounting Method, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower, JV, each Subsidiary of any of the foregoing, and the Constituent Entity, and all items of income and expense in connection with the operation of the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable prior notice (which may be given verbally) to examine such books, records and accounts at the office of Borrower, JV and each Subsidiary of any of the foregoing or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  Borrower will promptly furnish (or cause to be furnished) to Lender copies of any reports provided to an Underlying Lender.

      (b)     Borrower will furnish (or cause to be furnished) to Lender annually, within  one hundred twenty (120) days following the end of each fiscal year of Borrower, a complete copy of Borrower's annual financial statements prepared in accordance with the Approved Accounting Method.  Such statements shall set forth the financial condition and the results of operations for the Borrower for such fiscal year.  Borrower's annual financial statements shall be accompanied by an Officer's Certificate certifying to such officer's knowledge that each annual financial statement fairly presents the financial condition and the results of operations of Borrower, and that such financial statements have been prepared in accordance with the Approved Accounting Method and as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower and if such Default or Event of

P-02887-ESI_00002120

Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)     Borrower shall deliver or cause to be delivered to Lender (who shall promptly deliver a copy of the same to each Lender) the following:

(i)     Collateral reports and such data, reports, statements and information, financial or otherwise, as Lender or any Lender may reasonably request, including, without limitation:

(A)     All forms of reports, financial or otherwise, delivered to a lender under the Underlying Loan Documents as and when the same are due thereunder;

(B)     Each month (1) updated Property level reports reflecting current sales, leasing and construction data for the Properties and (2) consolidated financial statements for all Properties in form and substance acceptable to Lender;

(C)     On or before forty-five (45) days after the end of each calendar quarter, consolidated financial statements for each JV in form and substance acceptable to Lender;

(D)     On or before fifteen days after the end of each calendar quarter: (1) the quarterly rent roll for each Property and (2) an accounting of Reich Overhead; and

(E)     Within five (5) Business Days after receipt thereof, all performance and other reports delivered to Borrower pursuant to the JV Agreements, including, without limitation, Section 10.3 of the JV Agreement of Acquisition JV, or any property management agreement.

(d)     Such further detailed information with respect to the operation of the Property, the Underlying Loans, and the financial affairs of Borrower, each JV, each Subsidiary of each of the foregoing and any Borrower Party, in each case as Lender may reasonably request within thirty (30) days after such request.

(e)     Any reports, statements or other information required to be delivered under this Agreement shall be provided to Lender electronically unless Lender requests in writing for such statements to be delivered in paper form or on a diskette, cd or flash drive.

(f)     Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened, in writing, against Borrower, any JV, any Subsidiary of any of the foregoing, any Constituent Entity and/or any Affiliated Indemnitor which will have a Material Adverse Effect.  Borrower shall promptly advise Lender of any material adverse change in Borrower's, any JV's, any Subsidiary of any of the foregoing's, any Constituent Entity's or any Affiliated Indemnitor's condition, financial or otherwise.

P-02887-ESI_00002120

(g)    Borrower shall give written notice to Lender within two (2) Business Days after the occurrence of any execution, modification or termination of any lease or contract of sale of all or any portion of any Property.

(h)    Borrower shall give a copy of any written notice to Lender simultaneously with any notice, report or disclosure  given or received in connection with any (i) Underlying Loan, (ii) any lease or contract of sale of all or any portion of any Property, (iii) any Management Agreement, (iv) any operating agreement of any Constituent Entity solely with respect to a Secured Property, (v) any Guaranty or (vi) any Property.

**5.1.7    Title to the Property**.  Borrower will warrant and defend: (a) the title to the Property and the Pledged Collateral and every part thereof and (b) the validity and priority of the Lien of the applicable Loan Documents, in each case against the claims of all Persons (subject only to the Permitted Encumbrances).

**5.1.8    Estoppel Statements**.  After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth: (a) the original principal amount of the Loan, (b) the Outstanding Principal Balance, (c) the Interest Rate, (d) the date installments of interest and/or principal were last paid, (e) any offsets or defenses to the payment of the Debt or the performance of the Obligations, if any, (f) that the Notes, this Agreement and the other Loan Documents are valid, legal and binding obligations of such party and have not been modified or if modified, giving particulars of such modification and such other things as Lender may reasonably request and (g) such other matters as Lender may reasonably require.  Borrower shall use commercially reasonable efforts to deliver to Lender, promptly after Lender's written request, tenant estoppel certificates from each commercial tenant leasing space at the Property in form and substance reasonably satisfactory to Lender (or otherwise in accordance with such tenant's lease), provided, however, that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year in the absence of a Default.

**5.1.9    Operation of the Property**.  Borrower shall cause the Property to be maintained in a good and safe condition and repair in all material respects, and at all times keep the Property in good working order and repair (subject to ordinary wear and tear and casualty damage and ongoing construction).

**5.1.10    Notices of Material Events**.  Deliver to Lender (who shall promptly deliver a copy of the same to each Lender) prompt written notice of the following: (a) the occurrence of any Default or Event of Default; (b) the filing or commencement of, or the threat, in writing, of any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Subsidiary thereof not previously disclosed in writing to the Lender or any material adverse development in any action, suit, proceeding, investigation or arbitration previously disclosed to the Lender that could reasonably be expected to result in liability in excess of $1,000,000.00 net of insurance coverage, including normal deductibles; (c) the occurrence of any ERISA event that, alone or together with any other ERISA events that have occurred, could reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $100,000; (d) any notice required by Section 5.1.11; and (e) any other development that results in, or could reasonably be

-33-

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 39 of 116

expected to result in, a Material Adverse Effect.  Each notice delivered under this <u>Section 5.1.10</u> shall be accompanied by an Officer's Certificate setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**5.1.11  <u>Underlying Loan Matters</u>**.

(a)      <u>Notices</u>.  Borrower shall deliver to Lender, promptly after the receipt or delivery, a copy of any notice of default received or sent after the date hereof by Underlying Borrower with respect to the Underlying Loan and of any other material written correspondence (including electronically transmitted items) given or received by Underlying Borrower or an Affiliated Indemnitor to or from the Underlying Lender or its agents.  Borrower has delivered to Lender copies of any notices of default received by Borrower prior to the date hereof, and no default alleged in such notices remains outstanding or uncured.

(b)      <u>Compliance with Underlying Loan Documents</u>.  Borrower shall cause JV and each Subsidiary of each of the foregoing to: (i) diligently perform and observe all of the terms, covenants and conditions of the Underlying Loan Documents on the part of such Underlying Borrower to be performed and observed within any applicable notice and cure periods under the Underlying Loan Documents; (ii) not enter into or be bound by any Underlying Loan Documents after the date hereof, agree to any material modifications, consolidation, restatement, or waiver of any existing Underlying Loan Documents, grant to any Underlying Lender any consent or waiver, or exercise any remedy available to an Underlying Borrower under the Underlying Loan Documents or any right or election under the Underlying Loan Documents, in each case without the prior written approval of Lender; (iii) provide Lender with a copy of any amendment or modification of, or waiver or consent granted under, the Underlying Loan Documents within five (5) Business Days after its receipt thereof and (iv) not enter into any financing, including, without limitation, any refinancing of an Underlying Loan, without the prior written consent of Lender.

(c)      <u>Underlying Loan Defaults</u>.  If any default occurs under the Underlying Loan Documents beyond applicable notice and cure periods (an "**Underlying Loan Event of Default**"), Borrower agrees that if it fails to undertake adequate steps (as reasonably determined by Lender) to effectuate a cure of such Underlying Loan Event of Default within five (5) Business Days of notice from Lender, Lender may (but shall be under no obligation to): (i) pay all or any part of the Underlying Loan and any other sums that are then due and payable, and perform any act or take any action on behalf of Borrower and/or such Underlying Borrower as may be appropriate, to cause all of the terms, covenants and conditions of the Underlying Loan Documents on the part of such Underlying Borrower to be performed or observed thereunder to be promptly performed or observed and (ii) pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender .  Borrower shall not impede, interfere with, hinder or delay, and shall not permit any Borrower Party to impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any default or asserted default under any Underlying Loan, or to otherwise protect or preserve Lender's interests following a default or asserted default under any Underlying Loan.  Borrower hereby grants Lender and its designees the right to enter upon the Property at any time following the occurrence and during the continuance of any Event of

P-02887-ESI_00002120

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 40 of 116

Default, or the assertion by any Underlying Lender that an Underlying Loan Event of Default has occurred, for the purpose of taking any such action or to appear in, defend or bring any action or proceeding to protect Lender's interest. Subject to the first sentence of this Section 5.1.11(c), Lender may take such action as Lender deems necessary to carry out the intents and purposes of this Section 5.1.11(c) (including communicating with an Underlying Lender with respect to any Underlying Loan defaults), upon notice to (but without the prior consent from) Borrower or any Underlying Borrower and only to the extent Borrower has failed within five (5) Business Days to make any required payments or provide the Underlying Lender with information requests, proposals or other communications on Lender's behalf as Lender may have required. Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender. All sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section 5.1.11(c) (including its reasonable attorneys' fees and costs): (A) shall be added to the Debt, (B) shall bear interest at the Default Rate for the period from the date that such costs or expenses were incurred to the date of payment to Lender and (C) shall be secured by the Loan Documents. Borrower hereby indemnifies Lender from and against all Losses of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Lender as a result of the foregoing actions, excluding such Losses arising from the willful misconduct or illegal acts of Lender. In the event that Lender makes any payment in respect of the Underlying Loan, Lender shall be subrogated to all of the rights of the Underlying Lender under the Underlying Loan Documents against the collateral therefor, in addition to all other rights it may have under the Loan Documents. If Lender shall receive a copy of any notice of default under the Underlying Loan Documents sent by an Underlying Lender, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon. As a material inducement to Lender's making the Loan, Borrower hereby absolutely and unconditionally releases and waives all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this Section 5.1.11, except for Lender's willful misconduct or illegal acts.

(d) <u>Distributions</u>. On each date on which amounts are due and payable to Lender pursuant to the Loan Documents, Borrower shall exercise its rights directly or indirectly under the organizational documents of each JV, each of the foregoing's Subsidiaries and each Constituent Entity to make a distribution of funds to Borrower in an amount sufficient to allow Borrower to make such required payment to Lender, Borrower shall not, and shall not cause any JV, any of the foregoing's Subsidiaries or any Constituent Entity to, make any distributions of any kind, returns of capital, or repayment of any loans (in each case whether in cash, assets, Equity Interests, or proceeds of any kind) to any Person that owns any direct or indirect Equity Interest in Borrower.

### 5.1.12 <u>Underlying JV and Subsidiary Matters</u>.

(a) <u>Notices</u>. Borrower shall deliver to Lender, promptly after the receipt or delivery, a copy of any notice of default received or sent by Borrower with respect to each JV and any Subsidiary of JV and of any other material written correspondence (including electronically transmitted items) given or received by Borrower to or from any other member of any JV or Subsidiary of JV. Borrower shall, upon the request of Lender, arrange for a meeting or conference call with another member of any JV or Subsidiary of JV to discuss any such notices or to discuss other matters relating to the JV or such Subsidiary requested by Lender.

P-02887-ESI_00002120

(b)     <u>Compliance with JV Agreements</u>.   Borrower shall: (i) diligently perform and observe all of the terms, covenants and conditions of the limited liability company operating agreement of each JV (each, a "**JV Agreement**") on the part of Borrower to be performed and observed within any applicable notice and cure periods under such JV Agreement and (ii) not agree to any modification or amendment to any JV Agreement, in each case without the prior written approval of Lender, including without limitation any Transfer by Reich, to the extent such approval or consent of Borrower is required under such JV Agreement.

(c)     <u>JV Agreement Defaults</u>.   If any default occurs under any JV Agreement beyond applicable notice and cure periods (a "**JV Agreement Event of Default**"), Borrower agrees that if it fails to undertake adequate steps (as reasonably determined by Lender) to effectuate a cure of such JV Agreement Event of Default within five (5) Business Days of notice from Lender, Lender may (but shall be under no obligation to): (i) pay such sums that are then due and payable, and perform any act or take any action on behalf of Borrower as may be appropriate, to cause all of the terms, covenants and conditions of such JV Agreement on the part of such Borrower to be performed or observed thereunder to be promptly performed or observed and (ii) pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender. Borrower shall not impede, interfere with, hinder or delay, and shall not permit any Borrower Party to impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any default or asserted default under any JV Agreement, or to otherwise protect or preserve Lender's interests following a default or asserted default under any JV Agreement. Subject to the first sentence of this <u>Section 5.1.12(c)</u>, Lender may take such action as Lender deems necessary to carry out the intents and purposes of this <u>Section 5.1.12(c)</u> (including communicating with another member of a JV with respect to any JV Agreement defaults), upon notice to (but without the prior consent from) Borrower and only to the extent Borrower has failed within five (5) Business Days to make any required payments or provide the other members with information requests, proposals or other communications on Lender's behalf as Lender may have required. Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender. All sums so paid and the costs and expenses incurred by Lender in exercising rights under this <u>Section 5.1.12(c)</u> (including its reasonable attorneys' fees and costs): (A) shall be added to the Debt, (B) shall bear interest at the Default Rate for the period from the date that such costs or expenses were incurred to the date of payment to Lender and (C) shall be secured by the Loan Documents. Borrower hereby indemnifies Lender from and against all Losses of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Lender as a result of the foregoing actions, excluding such Losses arising from the willful misconduct or illegal acts of Lender. In the event that Lender makes any payment in respect of a JV Agreement, Lender shall be subrogated to all of the rights of the other members under the JV Agreement against the collateral therefor, in addition to all other rights it may have under the Loan Documents. If Lender shall receive a copy of any notice of default under the JV Agreement sent by another member of a JV, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon. As a material inducement to Lender's making the Loan, Borrower hereby absolutely and unconditionally releases and waives all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this <u>Section 5.1.12</u>, except for Lender's willful misconduct or illegal acts.

P-02887-ESI_00002120

(d)      <u>Removal of Reich</u>.  In the event that Reich is expelled as a member from, or removed as the manager of, any JV, Borrower shall replace Reich within ninety (90) days of such expulsion or removal with a Qualified Replacement Manager.

(e)      <u>Industrial Properties</u>.  Borrower covenants and agrees that Borrower, and any Affiliate of Borrower, shall only acquire industrial real estate, whether directly or indirectly, through Acquisition JV or a Subsidiary thereof; <u>provided</u>, <u>however,</u> if Lender does not consent to the acquisition of a Permitted Investment, then an Affiliate of Borrower (but excluding any Subsidiary of Borrower) shall be permitted to acquire such Permitted Investment whether directly or indirectly, through Acquisition JV or a Subsidiary thereof; <u>provided</u> that: (i) such Permitted Investment, consisting of industrial real estate shall not be located within one hundred (100) miles of any Property or Permitted Investment (in all directions); and (ii) no Event of Default shall have occurred and be continuing hereunder or under any other Loan Document. Neither Borrower nor any Affiliate of Borrower shall: (1) serve as the manager or controlling Person of any entity which directly competes with JV, (2) render services or furnish advice to any entity which directly competes with JV or (3) invest or participate in any other venture which purchases industrial real estate (other than less than 1% of a publicly traded entity which purchases industrial real estate).

(f)      <u>Affiliate Agreements</u>.  Any Property Owner, JV or a Subsidiary thereof may enter into an agreement with an Affiliate of Borrower for the performance of any property management, development or asset management services (an "**Affiliate Agreement**"); <u>provided</u>, that: (i) Borrower shall have delivered a certified true, correct and complete copy of the applicable final executed Affiliate Agreement in the form reasonably approved by Lender in accordance with this Agreement and any other documentation, certificates or information as Lender may reasonably request in connection with the foregoing; (ii) such Affiliate Agreement shall provide that Lender may terminate and require Borrower to cause the replacement of such Affiliate with an independent third-party if an Event of Default is continuing, (iii) so long as: (A) no Event of Default has occurred and is continuing, (B) the Affiliate Agreement remains in full force and effect and (C) such Affiliate is not in default of its material obligations under the Affiliate Agreement, then Borrower may (or may cause Property Owner, JV or a Subsidiary to) make payments to such Affiliate of the fees due to such Affiliate pursuant to the terms of the Affiliate Agreement, as and when such fees are due and payable to such Affiliate; (iv) cause such Affiliate to promptly perform and/or observe all of the covenants and agreements required to be performed and observed by such Affiliate under the applicable Affiliate Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (v) promptly notify Lender of any "event of default" by Borrower, JV, Property Owner, Subsidiary or such Affiliate under the applicable Affiliate Agreement of which it has actual knowledge; (vi) promptly deliver to Lender a copy of each material notice, report and estimate received by it under such Affiliate Agreement, (vii) the terms and provisions of any such Affiliate Agreement, including any fees payable thereunder are subordinate to the Loan Documents, (viii) the terms of the Affiliate Agreement shall be entered into in the ordinary course of the Subsidiary's business and on terms which are intrinsically fair, commercially reasonable and are substantially similar to those that would be obtained in a comparable arm's–length transaction with an unrelated third party and in accordance with the Business Plan and (ix) enforce in a commercially reasonable manner the performance and observance of all of the material covenants and agreements required to be performed and/or observed by such Affiliate under the applicable Affiliate Agreement.

-37-

Borrower shall not permit, without the prior written consent of Lender, not to be unreasonably withheld, delayed or conditioned, the termination, the material modification, the change, the supplement, the altering or the amending any Affiliate Agreement, or the waiver or release of any of its rights and remedies under any Affiliate Agreement (other than renewals, modifications and amendments limited to the implementation of options or rights expressly contained in the Affiliate Agreement with respect to which Borrower, Property Owner, JV or a Subsidiary has no discretion as to the terms thereof).

        **5.1.13**  **Monetization of Assets**.  If Lender either: (a) fails to deliver the Extension Notice to Borrower or (b) provides written notice to Borrower that Lender is not extending the term of the Loan, on or before the date that is one hundred fifty (150) days' prior to the Stated Maturity Date (the "Marketing Commencement Date"), then each Borrower shall: (i) within thirty (30) days of the Marketing Commencement Date for each Property, prepare a marketing book containing customary financial and other information about the Property, retain a broker to market, finance or sell the Property; (2) use diligent efforts to, no later than seventy-five (75) days following the Marketing Commencement Date, enter into either: (A) a purchase and sale agreement for the sale of such Property or (B) a term sheet for the financing of such Property.  If: (I) Borrower fails to cause the: (1) execution of a qualifying purchase and sale agreement or (2) execution of a term sheet for the financing of the Secured Properties within seventy-five (75) days following the Marketing Commencement Date or (II) Borrower causes a Property Owner to enter into a qualifying purchase and sale agreement (or term sheet) but the purchaser (or lender) thereunder, as applicable, fails to timely close the respective transaction, then Lender, at Lender's sole option, upon written notice to Borrowers shall instruct the Escrow Agent to release the Assignment to the Lender; provided, however, if: (1) such qualifying purchase and sale agreement has not been terminated and Borrower is diligently causing the transaction to close or (2) the lender has not revoked its term sheet or loan commitment and Borrower is diligently causing the financing transaction to close, then the Stated Maturity Date shall automatically extend for a period not to exceed ninety (90) days.  Notwithstanding the foregoing, if Lender causes the release of the Assignment prior to the consummation of the transactions contemplated by a qualifying purchase and sale agreement or term sheet entered into prior to the Stated Maturity Date and such contemplated transactions close after the release of the Assignment, then Lender shall be obligated to pay to Borrower any and all funds received by Lender in excess of the Loan Amount plus Maximum Yield.  From and after the release of the Assignment to the Lender, Lender shall indemnify Borrower and its Subsidiaries and Affiliates, and against any and all Losses that may be imposed on, incurred by, or asserted against Borrower or its Subsidiaries and Affiliates in any manner relating to or arising out of Underlying Loans.  The terms and provisions of this Section 5.1.13 shall survive until the payment in full of the Loan Obligations (as such term is defined in the Guaranty).

        **5.1.14**  **Leasing.**  Within 150 days of the date hereof, the Property Owners shall have entered into leases with tenants who are not Affiliates of the Borrowers for 90% of the rentable square footage of the Properties.

        **SECTION 5.2.**  **Negative Covenants**.  From the date hereof and until payment and performance in full of all Obligations in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that it shall not do

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 44 of 116

(and where applicable, it shall not cause or permit any JV or Subsidiary thereto to do), directly or indirectly, any of the following:

**5.2.1** **Liens; Indebtedness**.  Subject to Borrower's contest and similar rights contained in the Loan Documents, Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or any direct or indirect interest therein or permit any such action to be taken, except Permitted Encumbrances.  Borrower shall not (directly or indirectly) create, incur, assume, or allow to exist any Indebtedness with respect to Borrower, JV, any Subsidiary of any of the foregoing or any Constituent Entity, other than Permitted Indebtedness.  Borrower shall not (directly or indirectly) permit JV or any Subsidiary of the foregoing to create, incur, assume, or allow to exist any Indebtedness with respect to Property Owner, other than Permitted Indebtedness.

**5.2.2** **Alterations**.  Borrower shall not and shall not cause or permit JV or any Subsidiary of any of the foregoing to: (a) commit or suffer any material waste of the Property, (b) make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or intentionally take any action that might invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of the Loan Documents or otherwise cause a Material Adverse Effect; (c) permit or cause any alterations in violation of the Underlying Loan Documents; or permit or cause any alterations to any Property unless consistent with the Business Plan for such Property that has been approved by Lender in writing.

**5.2.3** **Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower, JV or any Subsidiary of any of the foregoing by any Person, except for adequate consideration and in the ordinary course of Borrower's business.  Borrower shall not cause or permit JV or any Subsidiary of any of the foregoing or any Constituent Entity to cancel or otherwise forgive or release any claim or debt (other than termination of leases in accordance therewith) owed to it by any Person, except for adequate consideration and in the ordinary course of its business.

**5.2.4** **Organization; Compliance with Legal Requirements**.

(a)     Borrower shall not and shall not cause or permit any JV or any Subsidiary of any of the foregoing or any Constituent Entity to: (i) change its principal place of business or state of organization without first giving Lender thirty (30) days' prior written notice; (ii)  to the fullest extent permitted by applicable Legal Requirements, engage in any dissolution, liquidation, or consolidation or merger with or into any other business entity; (iii) modify, amend, waive or terminate its organizational documents; (iv) fail to maintain qualification to do business in any jurisdiction to the extent the same is required for the ownership, maintenance, management and operation of the Property or (v) cease to operate the Property in the manner in which it is presently being operated (other than temporary cessation in connection with any continuous and diligent renovation or restoration of the Property following a Casualty or Condemnation), or change the trade name or names under which it operates the Property.

P-02887-ESI_00002120

(b)      Borrower shall not and shall not cause or permit any JV or any Subsidiary of any of the foregoing or any Constituent Entity to (i) violate, and shall not permit any other Person in occupancy of or involved with the operation or use of the Property to violate, any Prescribed Laws or otherwise commit any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents or (ii) at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, permit (or allow to occur): (A) any of the funds or other assets of Borrower, JV, any Subsidiary of any of the foregoing or Constituent Entity to constitute property of, or be beneficially owned, directly or indirectly, by any Embargoed Person, (B) an Embargoed Person to own any interest of any nature whatsoever in Borrower, JV, any Subsidiary of any of the foregoing or Constituent Entity, as applicable or (C) any of the funds of Borrower, JV, any Subsidiary of any of the foregoing or Constituent Entity, as applicable, to be derived from any unlawful activity, in each case with respect to the foregoing clauses (A) through (C) with the result that the investment in Borrower, JV, any Subsidiary of any of the foregoing or Constituent Entity, as applicable (whether directly or indirectly), is or would be prohibited by applicable Legal Requirements, or the Loan is or would be in violation of applicable Legal Requirements. Borrower covenants and agrees that in the event Borrower receives any notice that Borrower (or any of its beneficial owners, affiliates or participants) or any Person that has a direct or indirect interest in the Property become an Embargoed Person or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall promptly notify Lender.  At Lender's option, it shall be an Event of Default hereunder if any of the representations and warranties contained in Section 4.1.13 hereof are untrue in any material respect at any time.  Borrower acknowledges that the Prescribed Laws require all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution. Consequently, Lender may from time-to-time request, and Borrower shall provide to Lender, Borrower's name, address, tax identification number and/or such other identification information as shall be necessary for Lender to comply with federal law (including such information concerning its Subsidiaries and its and their direct and indirect owners), and re-make the representations and warranties contained in Section 4.1.13 hereof.  An "account" for this purpose may include, without limitation, a deposit account, cash management service, a transaction or asset account, a credit account, a loan or other extension of credit, and/or other financial services product.

**5.2.5   ERISA**.  Assuming that no portion of the Loan is funded (initially or through participation, assignment, transfer or securitization of the Loan) with plan assets of any plan covered by ERISA or §4975 of the Code, unless Lender (or other applicable party) relied on an available prohibited transaction exemption, all of the conditions of which are and will continue to be satisfied, Borrower shall not and shall not cause or permit JV or any Subsidiary of any of the foregoing to engage in any transaction that would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA, or otherwise cause Borrower to be unable to make the representations contained in Section 4.1.8 hereof.  Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that: (a) the representations contained in Section 4.1.8 hereof are

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 46 of 116

true and correct as of the date of such certification and (b) one or more of the following circumstances is true: (i) Equity Interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R §2510.3 101(b)(2); (ii) less than twenty five percent (25%) of each outstanding class of Equity Interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R §2510.3 101(f)(2); (iii) Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R §2510.3 101(c) or (e) or (iv) the assets of Borrower and its Subsidiaries are not otherwise "plan assets" (within the meaning of 29 C.F.R. §2510.3 101) of one or more "employee benefit plans" (as defined in §3(3) of ERISA) subject to Title I of ERISA.

### 5.2.6    **Transfers**.

(a)    Without the prior written consent of Lender, Borrower shall not, and shall not permit to occur, any: (i) Transfer (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of the Property, any part thereof, or any legal or beneficial interest therein, or any direct or indirect Equity Interest in any Restricted Party, (ii) change of Control of the Property or a Restricted Party, (iii) Transfer that is made "without fair and adequate consideration" or with the intent to hinder or defraud creditors or (iv) Transfer that is prohibited by the provisions of this Agreement or any other Loan Document.  Notwithstanding the foregoing provisions of this Section 5.2.6(a), the following Transfers shall be permitted without Lender's consent (subject to the satisfaction of the applicable terms and conditions set forth below):

(i)    Transfers of direct or indirect Equity Interests in Borrower so long as (a) HFZ Guarantor at all times owns, directly or indirectly, no less than twenty-five percent (25%) of each Borrower, (b) Ziel Feldman and Helene Feldman or an HFZ Replacement Principal shall at all times Control each Borrower and (c) any amounts paid by transferee of such Equity Interest shall be invested in the Properties;

(ii)    Transfers of direct or indirect Equity Interests in an entity that owns a direct or indirect Equity Interest in Borrower for bona fide estate planning purposes by any natural person to one or more of such natural person's family members or trusts (or other entities) established for the benefit of one or more of such natural person's immediate family members;

(iii)    Transfers of direct or indirect Equity Interests in Borrower that occur by operation of law upon the death of a natural person that was the holder of such interest to a member of the immediate family of such interest holder or a trust (or other entity) or family conservatorship established for the benefit of such immediate family member;

(iv)    Transfers of the direct or indirect interests in a Borrower to and among the holders thereof as of the date hereof;

(v)    Permitted Encumbrances; and

(vi)    Sales and/or leases of one or more of the Properties and/or portions thereof or interests therein, provided: (A) such sales and/or leases are in the ordinary course of the Borrower Parties' business and are made for due consideration and not with the intent to hinder

-41-

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 47 of 116

or defraud creditors, (B) such sales and/or leases are not made to or with Affiliates of Borrower, (C) all Net Liquidation Proceeds relating to such sale and/or leases are paid to Lender, and applied as a prepayment of the Loan; provided, however, in each case with respect to any such Transfer described in clauses (i) through (iii) above, the following conditions are satisfied:

(A)    Borrower shall give Lender written notice of such Transfer, together with copies of all instruments effecting such Transfer, and an Officer's Certificate certifying that the requirements of this Section 5.2.6 have been satisfied, not less than five (5) Business Days prior to the date of such Transfer (other than with respect to Transfers described in clause (ii) above, notice of which shall be delivered not more than thirty (30) days after such Transfer);

(B)    such Transfer does not and will not result in the termination or dissolution of Borrower, JV, any Subsidiary of the foregoing, Constituent Entity (unless of Property Owner in connection with a Liquidation Event and payment of the Net Liquidation Proceeds to Lender pursuant to Section 2.3.3(b) by operation of law or otherwise;

(C)    no such Transfer shall be to any Person that would cause the representations made in Sections 4.1.8 or 4.1.13 to be untrue if made immediately following such Transfer;

(D)    if such Transfer would cause the transferee to increase its direct or indirect interest in Borrower to an amount which equals or exceeds twenty percent (20%) of the direct or indirect Equity Interests in Borrower (and such transferee did not hold at least a twenty percent (20%) interest prior to such Transfer), such proposed transferee complies with all of Lender's "know your customer" requirements, all Prescribed Laws and all applicable banking rules and regulations, and Borrower shall, prior to such Transfer, deliver to Lender (at Borrower's sole cost and expense) customary searches (credit, judgment, lien, etc.) acceptable to Lender with respect to such transferee;

(E)    no such Transfer shall result in an Underlying Loan Event of Default;

(F)    no such Transfer shall result in a change of Control of the Property or a Restricted Party; and

(G)    Borrower shall have reimbursed Lender for all reasonable, out-of-pocket expenses actually incurred by Lender in connection with such Transfer, regardless as to whether or not such Transfer is consummated.

(b)    Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer in violation of this Agreement.  This Section 5.2.6 shall apply to every such Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous such Transfer.  Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its direct and indirect owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on such Persons'

-42-

P-02887-ESI_00002120

ownership of Borrower and the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Obligations contained in the Loan Documents.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Obligations, Lender can recover the Debt by a sale of the Property in accordance with the terms and provisions of this Agreement.  For all purpose under the Loan Documents, a Transfer of the Property or Borrower shall include, but not be limited to: (i) an installment sales agreement wherein Borrower agrees to sell the Property, or any part thereof, for a price to be paid in installments; (ii) an agreement by Borrower leasing all or substantially all of the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any leases or any Revenues; (iii) if a Restricted Party is a corporation, any merger, consolidation or sale or pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the sale or pledge of the limited liability company interest of any general partner or any profits or proceeds relating to such partnership interest, or the sale or pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any division, merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the sale or pledge of the limited liability company interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such limited liability company interest, or the sale or pledge of non-managing limited liability company interests or the creation or issuance of new non-managing limited liability company interests or (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the sale or pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests.

**5.2.7** **Merger, Consolidation, Dissolution or Liquidation**.  Borrower shall not, and shall cause each Subsidiary not to: (a) engage in the sale of any material assets other than in the normal course of business or (b) merge or consolidate with any other Person or engage in a division, conversion, dissolution or liquidation.

**5.2.8** **Acquisitions**.  Borrower shall not, and shall cause each such Subsidiary not to, acquire all or a material portion of the Capital Stock or assets of any Person in any transaction or in any series of related transactions; provided, however, that Acquisition JV shall be permitted to form new Subsidiaries to enter into Permitted Investments, subject to the requirements of Section 2.1 and other applicable provisions of this Agreement with respect to such Permitted Investments.

**5.2.9** **Negative Pledges.**  Borrower shall not, and shall cause each such Subsidiary not to, execute a negative pledge agreement with any Person covering any of its Property.

**5.2.10** **Transactions With Affiliates or Subsidiaries**.  Other than entering into Affiliate Agreements permitted under this Agreement and the payment of Reich Overhead and fees and other expenses due and payable under any Affiliate Agreements, Borrower shall not (and shall not cause or permit any JV or its Subsidiaries to): (a) enter into any transaction with any

-43-

P-02887-ESI_00002120

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 49 of 116

Subsidiary or other Affiliate, including, without limitation, the purchase, sale, or exchange of Property, or the loaning or giving of funds, including payment of any fees or intercompany reimbursements, to any Affiliate or any Subsidiary, other than, subject to Section 5.1.12(f), the payment of the Reich Overhead or (b) create (except as permitted pursuant to Section 5.2.8) or acquire any Subsidiary.

**5.2.11 Restricted Payments, Bonuses and Other Indebtedness**.  Borrower shall not (and shall cause each JV and its Subsidiaries not to): (a) declare or pay or make any forms of distributions to its members; (b) declare or pay any bonus compensation to its officers; (c) hereafter incur or become liable for any Indebtedness other than any Permitted Indebtedness or (d) make any prepayments on any existing or future Indebtedness (other than the Obligations).

**5.2.12 Loans and Investments**.  Borrower shall not make or have outstanding loans, advances, extensions of credit or capital contributions to, or investments in, any Person other than Permitted Investments.

**5.2.13 Borrower Parties**.  Borrower shall not permit any Borrower Party to:

(a)     incur: (i) any additional Indebtedness other than Permitted Indebtedness or (ii) any indebtedness or obligations in the form of preferred equity investments or other similar debt or equity investment not in existence on the Closing Date; provided, however, that the foregoing shall not be deemed a restriction on any Constituent Entity from making capital contributions or accepting capital contributions to the extent such capital contributions are required to complete its applicable Property and the terms and provisions pertaining to such capital contributions are set forth in the organizational documents of such member of the Constituent Entity delivered to Lender on the Closing Date;

(b)     amend any of the organizational documents of any Borrower Party which would diminish in any material way the Borrower's rights or interests (whether directly or indirectly);

(c)     in any way amend or otherwise alter the timing or flow of funds or distributions to a Borrower Party, which in any way reduces the amounts due to the Borrower;

(d)     amend any of the loan documents relating to the Underlying Loans in any material respect; or

(e)     incur, directly or through any existing Subsidiary or any future Subsidiary formed for the purpose of acquiring additional real property or otherwise, any Payment Guaranty, Completion Guaranty or Contribution Agreement obligations in violation of Section 5.2.1.

**5.2.14 Leasing**.  Borrower shall not and shall not cause or permit JV or any Subsidiary of any of the foregoing to: (a) enter into any Lease or (b) modify any Lease, except to the extent permitted by the Underlying Loan Documents and consistent with the Business Plan for the applicable Property that has been approved by Lender in writing.

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 50 of 116

## ARTICLE VI

## INSURANCE; CASUALTY AND CONDEMNATION

**SECTION 6.1. <u>Insurance</u>**. Borrower shall cause each Property Owner to maintain insurance coverage in accordance with the terms and conditions of the Underlying Loan Documents, or if the Underlying Loan has been repaid, such coverage as Lender may reasonably request.

**SECTION 6.2. <u>Casualty</u>**. If any Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall (a) give prompt notice of such damage to Lender and (b) promptly cause Property Owner to use proceeds made available by the applicable Underlying Lender (if any) to commence and diligently prosecute the completion of Restoration so that such Property resembles, as nearly as possible, the condition the Property was in immediately prior to such Casualty (so long as applicable zoning laws in effect at the time permit such rebuilding), with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.4 hereof. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower. In addition, Lender may participate in any settlement discussions with any insurance companies (and shall have the right to approve any final settlement) with respect to any Casualty in which the Net Proceeds or the costs of completing the Restoration are equal to or greater than the Net Proceeds Threshold. Borrower shall and shall cause Property Owner to execute and deliver to Lender all instruments required by Lender to permit such participation.

**SECTION 6.3. <u>Condemnation</u>**. Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding in respect of any Condemnation of any Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall and shall cause Property Owner to from time to time deliver to Lender all instruments reasonably requested by Lender to permit such participation. Borrower shall and shall cause Property Owner to, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Furthermore, Borrower shall cooperate with Lender in obtaining for Lender the benefits of any proceeds lawfully or equitably payable in connection with a Condemnation of the Property. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to perform the Obligations at the time and in the manner provided in this Agreement and the other Loan Documents, and the Outstanding Principal Balance shall not be reduced until any Condemnation proceeds shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Obligations. Lender shall not be limited to the interest paid on the Condemnation proceeds by the applicable Governmental Authority but shall be entitled to receive out of the Condemnation proceeds interest at the rate or rates provided herein. If the Property or any portion thereof is taken by a Governmental Authority, Borrower shall cause Property Owner to promptly commence and diligently prosecute Restoration (to the extent such taking resulted in repairable damage) and otherwise comply with the provisions of Section 6.4 herein.

P-02887-ESI_00002120

SECTION 6.4. <u>Application of Net Proceeds</u>.    All proceeds or awards paid in connection with any Casualty or Condemnation shall be used and applied solely in accordance with the terms and conditions of the Underlying Loan Agreement, or if the Underlying Loan doesn't exist or has been repaid or the Underlying Lender has waived its rights to require the same, shall be paid solely to Lender and shall (a) in the case of Condemnation proceeds, be applied to repay the Debt pursuant to <u>Section 2.3.3(b),</u> and (b) in the case of Casualty proceeds, be held by Lender in an Eligible Account established by Lender from time to time (the "**Net Proceeds Reserve Account**") as additional collateral for the Obligations, subject to the terms and conditions of this Agreement.  In the event Borrower or any party other than the Underlying Lender is a payee on any check representing such proceeds or awards, Borrower shall immediately endorse (and cause all such third parties to endorse) such check payable to the order of the Underlying Lender, or if the Underlying Loan has been repaid or the Underlying Lender has waived its rights to require the same, to Lender.  Subject to the rights of the Underlying Lender pursuant to the Underlying Loan Documents, Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse any such check payable to the order of Lender in the event Borrower has not done so within five (5) days after Lender's demand therefor.  The expenses incurred by Lender in the adjustment and collection of such proceeds or awards shall become part of the Debt and shall be reimbursed by Borrower to Lender within five (5) days after Lender's written demand.  Borrower hereby releases Lender from any and all liability with respect to the settlement and adjustment by Lender of any claims in respect of any Casualty or Condemnation unless caused by Lender's willful misconduct.  The following provisions shall apply in connection with the application of Net Proceeds so received by Lender:

(a)    If the Net Proceeds are less than the Net Proceeds Threshold and the costs of completing Restoration are less than the Net Proceeds Threshold, the Net Proceeds (if any) received by Lender will be disbursed by Lender to Borrower upon receipt, provided that no Event of Default then exists and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration of the Property (if applicable) in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than the Net Proceeds Threshold or the costs of completing Restoration is equal to or greater than the Net Proceeds Threshold, Lender may elect in its sole discretion to disburse Net Proceeds (if any) received by Lender to (i) Borrower for Restoration or (ii) for application to the Debt.

(c)    All Net Proceeds received by Lender and not disbursed to Borrower shall be held by Lender in the Net Proceeds Reserve Account and shall be applied (i) to the repayment of Debt if Lender so elects and is not required to allow Borrower to use the same as provided in <u>Section 6.4(a)</u> above, or (ii) toward the cost of Restoration to the extent so required pursuant to <u>Section 6.4(a)</u> above or if Lender has elected to make such Net Proceeds available pursuant to <u>Section 6.4(b)</u>; <u>provided</u>, <u>however</u>, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Debt on the respective dates of payment provided for, or perform the Obligations as required under, this Agreement and the other Loan Documents, except to the extent such amounts are actually paid out of such Net Proceeds.  If Lender has elected to make the Net Proceeds available to Borrower, Borrower shall cause Property Owner to commence any applicable Restoration as soon as reasonably practicable (but in no event later than ninety (90) days after Lender has informed Borrower of its election) and shall cause

-46-

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 52 of 116

Property Owner to complete the same in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements in all material respects.

## ARTICLE VII

## RESERVED

## ARTICLE VIII

## EVENTS OF DEFAULT; REMEDIES

**SECTION 8.1. Events of Default**.  Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(a)     If: (i) any payment of principal or interest due with respect to the Loan is not paid when due and payable, subject to a five (5) Business Day grace period, (ii) the entire Debt is not paid in full on the Maturity Date or (iii) any other monetary sum required to be paid hereunder or under any other Loan Document is not paid within five (5) Business Days after written demand from Lender;

(b)     if any of the Property Taxes are not paid prior to delinquency (unless same are being contested by Borrower in accordance with the terms and conditions of the applicable Underlying Loan Documents, or if no Underlying Loan is outstanding with respect to a particular Property, the Property Taxes for such Property are not paid prior to delinquency);

(c)     if the Policies are not kept in full force and effect pursuant to the terms hereof, or if certified copies of the Policies are not delivered to Lender within thirty (30) days after Lender's request therefor;

(d)     the occurrence of a Transfer (other than a Transfer permitted pursuant to Section 5.2.6 hereof);

(e)     if: (i) any representation or warranty made by Borrower herein or by any Borrower Party in any other Loan Document as of the date such representation or warranty was made or is deemed to have been remade is or (ii) any financial statement, report, certificate or other instrument, agreement or document furnished to Lender by or on behalf of any Borrower Party after the date hereof shall have been (or contained statements or information that is), false or misleading in any material respect as of the date the same was delivered, unless with respect to the foregoing misrepresentations or false or misleading information (each, a "**Misrepresentation**"): (A) such Misrepresentation was not knowingly or intentionally made, (B) Lender has suffered no material Loss on account thereof (or Borrower shall have reimbursed Lender for the amount of such Loss so demanded by Lender) or the same has not resulted in a Material Adverse Effect, (C) such Misrepresentation can be cured (meaning that the facts and circumstances underlying the applicable Misrepresentation can be changed such that the applicable representation or information as made or delivered will be true and correct) and (D) such Misrepresentation has been so cured within thirty (30) days after the earlier of (1) the

-47-

P-02887-ESI_00002120

date on which Borrower first has actual knowledge that such Misrepresentation exists and (2) the date on which Lender first notifies Borrower that such Misrepresentation exists;

(f)      if a Bankruptcy Action occurs with respect to Borrower, JV, any Subsidiary of any of the foregoing or any Constituent Entity; provided, however, that if such Bankruptcy Action was involuntary and not consented to by such Person and such Person (and its Affiliates) did not collude with creditors in connection with such involuntary Bankruptcy Action, the same shall constitute an Event of Default hereunder only upon the same not being discharged, stayed or dismissed within ninety (90) days;

(g)      if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(h)      if Borrower breaches any of the negative covenants contained in Section 5.2 hereof;

(i)      if Borrower breaches any of its covenants contained in Section 5.1.6(a) through (d) hereof and such breach continues for a period of five (5) Business Days following Lender's notice to Borrower of the same;

(j)      if an Underlying Loan Event of Default occurs (without regard to any subsequent payment or performance of any obligations of Underlying Borrower under the Underlying Loan Documents by Lender);

(k)      if there shall occur and be continuing an "Event of Default" under and as defined in any other Loan Document, which, if such "Event of Default" specifically contains a notice requirement and/or grace period, remains outstanding after the giving of such notice and the expiration of such grace period;

(l)      if a Default not specified in the clauses enumerated above continues to exist for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days;

(m)      the termination or dissolution of any JV.

(n)      if Borrower breaches any of its covenants contained in Section 5.1.14.

**SECTION 8.2. Remedies**.

(a)      Upon the occurrence of an Event of Default (other than an Event of Default described in Section 8.1(f) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in

-48-

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 54 of 116

equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including declaring the Debt to be immediately due and payable; and upon the occurrence of any Event of Default described in Section 8.1(f) above, the Debt shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.  Notwithstanding anything to the contrary contained herein, upon an Event of Default under Section 8.1(a) of this Agreement, Lender may direct Newco Member to cause the exercise of Lender's Forced Sale Right (as defined in the Borrower Operating Agreements) contained in Section 6.7.1 of the Borrower Operating Agreements.

(b)      During the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing: (i) Lender shall not be subject to any "one action" or "election of remedies" law or rule, (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, including, without limitation, sold and/or otherwise realized upon in satisfaction of the Debt or the Obligations have been paid in full and (iii) Lender may, in its sole discretion, without impairing or otherwise affecting any other rights and remedies of Lender hereunder, at law or in equity, apply, ex parte, for the appointment of a custodian, trustee, receiver, keeper, liquidator or conservator of the Property or any part thereof, irrespective of the adequacy of the security for the Debt and without regard to the solvency of Borrower or of any Person liable for the payment of the Debt, to which appointment Borrower does hereby consent and such receiver or other official shall have all rights and powers permitted by applicable law and such other rights and powers as the court making such appointment may confer, but the appointment of such receiver or other official shall not impair or in any manner prejudice the rights of Lender to receive the Revenues with respect to the Property pursuant to this Agreement or any other Loan Document.

(c)      Lender shall have the right from time to time to sever the Notes and the other Loan Documents into one or more separate notes, pledge agreements and other security documents in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney,

-49-

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 55 of 116

coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until five (5) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  The costs or expenses incurred in connection with the preparation, execution, recording or filing of the foregoing Loan Documents (and amendments thereto) shall be paid by Borrower.

(d)     With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt in any preference or priority, and Lender may seek satisfaction out of the Property, or any part thereof, in its absolute discretion in respect of the Debt.  Except as limited by applicable law, Lender shall have the right to exercise its remedies hereunder in any manner and for any amounts then due and payable as determined by Lender, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest or (ii) in the event Lender elects to accelerate less than the entire Debt.

(e)     Any amounts or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of the Debt in such order, priority and proportions as Lender determines.

(f)     The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.

(g)     Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or under the other Loan Documents or being deemed to have cured any Event of Default, make, do or perform any obligation of Borrower hereunder or under the other Loan Documents in such manner and to such extent as Lender may deem necessary.  Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes.  All out-of-pocket costs and expenses incurred by Lender in remedying or attempting to remedy such Event of Default or such other breach or default by Borrower or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate from the date such costs and expenses were incurred to the date reimbursement payment is received by Lender.  All such costs and expenses incurred by Lender, together with interest thereon calculated at the Default Rate, shall be deemed to constitute a portion of the Obligations, shall be secured by the liens and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

(h)     Upon the occurrence of any Event of Default (irrespective of whether or not the same consists of an ongoing condition, a one-time occurrence, or otherwise), the same shall be

-50-

deemed to continue at all times thereafter; <u>provided</u>, <u>however</u>, that such Event of Default shall cease to continue only if Lender shall accept payment or performance of the defaulted obligation or shall execute and deliver a written confirmation that such Event of Default has ceased to continue.  Lender shall not be obligated under any circumstances whatsoever to accept such payment or performance or execute and deliver any such writing.  Without limitation, this Section shall govern in any case where reference is made in this Loan Agreement or elsewhere in the Loan Documents to: (i) any "cure" (whether by use of such word or otherwise) of any Event of Default, (ii) "during an Event of Default," "the continuance of an Event of Default" or "after an Event of Default has ceased" (in each case, whether by use of such words or otherwise) or (iii) any condition or event which continues beyond the time when the same becomes an Event of Default.

(i)       Upon the occurrence of an Event of Default and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may, at Lender's sole option, upon written notice to Borrowers, instruct the Escrow Agent to release the Assignment to the Lender.  From and after the release of the Assignment to the Lender, Lender shall indemnify Borrower and its Affiliates and against any and all Losses that may be imposed on, incurred by, or asserted against Borrower or its Affiliates in any manner relating to or arising out of Underlying Loans.

SECTION 8.3. <u>Lender Directed Remedies</u>.  Upon the occurrence and during the continuance of any Event of Default, Lender shall (and is hereby authorized by the parties hereto), accelerate the maturity of the Loan and promptly commence and diligently pursue in good faith the exercise of its enforcement rights or remedies against Borrower so long as Lender is permitted to exercise such rights and remedies by the terms of the Loan Documents or under applicable law (including, without limitation, any or all of the following: (a) solicitation of bids from third parties to conduct the liquidation of all or a material portion of any Property, (b) the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers or other third parties for the purposes of valuing, marketing, promoting, and selling a material portion of any Property, (c) the opposition of the use of cash collateral or sale of assets in an Bankruptcy Action, (d) seeking to obtain relief from any stay imposed by applicable law governing a Bankruptcy Action, (e) notification of account debtors to make payments to Lender or its agents ,  (f) any action to take possession of all or any material portion of any Property or commencement of any legal proceedings or actions against or with respect to all or any material portion of any Property), or (g) direct the Escrow Agent to release the Assignments to Lender pursuant to the Escrow Agreement,  provided that: (i) such Event of Default has not been waived or cured, (ii) in the good faith determination of Lender, taking such action is permitted under the terms of the Loan Documents and applicable law, (iii) taking such action will not result in any liability of Lender or the Lenders to Borrower or any other Person and (iv) Lender shall be entitled to all of the benefits of <u>Section 10.13</u> in connection with taking such enforcement action.  Any such action shall be taken by Lender to realize a commercially reasonable value from any Property within a commercially reasonable time.

**ARTICLE IX**

**RESERVED**

P-02887-ESI_00002120

# ARTICLE X

# MISCELLANEOUS

**SECTION 10.1. Survival**.    This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lenders of the Loan and the execution and delivery to Lenders of the Notes, and shall continue in full force and effect so long as all or any of the Obligations are outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lenders.

**SECTION 10.2. Lender's Discretion**.  Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or to make any election, waiver, or request, or to make any determination, or find that any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove, or to make such election, waiver, request, or determination, decision, or finding shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive. Whenever pursuant to this Agreement, Lender exercises any right given to it to reasonably approve or disapprove, or to make any election, waiver, or request, or to make any determination reasonably, or find that any arrangement or term is to be reasonably satisfactory to Lender, during the continuance of an Event of Default, the decision of Lender to approve or disapprove, or to make such election, waiver, request, or determination, decision, or finding shall be in the sole and absolute discretion of Lender and shall be final and conclusive.

**SECTION 10.3. Governing Law**.

(A)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW)) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS

P-02887-ESI_00002120

THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(B)      ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.   BORROWER HEREBY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.6, AND AGREES THAT SERVICE OF PROCESS AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION.  THIS PROVISION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

SECTION 10.4. **Modification, Waiver in Writing**.  No amendment or waiver of any provision of this Agreement or any other Loan Document and no consent with respect to any departure by Borrower or any applicable Borrower Party therefrom or other consent or approval to be given under this Agreement or any other Loan Document by Lender, shall be effective unless the same shall be in writing and signed by the Lender and the Borrower Parties party thereto, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 10.5. **Delay Not a Waiver**.  No failure by Lender to exercise any right, remedy, or option under this Agreement, any other Loan Document, or any present or future supplement hereto or thereto, or in any other agreement between Borrower and Lender, or delay by Lender in exercising the same, will operate as a waiver thereof.  No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by Borrower of any provision of this Agreement.  Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy which Lender may have.

P-02887-ESI_00002120

**SECTION 10.6. <u>Notices Generally</u>**.  Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by overnight courier to the relevant party at its address set forth below:

|  |  |
|---|---|
| If to Borrower: | c/o H F Z Capital Group LLC<br>600 Madison Avenue, 15th Floor<br>New York, New York 10022<br>Attention:  Ziel Feldman and Nir Meir<br>Email:  zfeldman@hfzcap.com; nir@hfzcap.com |
| with copies to: | Holland & Knight LLP<br>31 West 52nd Street<br>New York, New York 10019<br>Attention: Sean M. Garahan<br>Email: sean.garahan@hklaw.com |
| If to Lender: | c/o<br>Shachar Shimony - Law office<br>Triangular Tower, Azrieli Center, 28th Floor<br>132 Menachem Begin St., Tel-Aviv, 6701101, Israel<br>Attention: Shachar Shimony, Adv<br>Email: shachar@shimony-law.net |
| with copies to: | Meister Seelig & Fein<br>125 Park Avenue, 7th Floor<br>New York, New York 10017<br>Attention: Daniel J. Dwyer<br>Email: djd@msf-law.com |

Notices sent by hand or overnight courier service shall be deemed to have been given when received.  Notices delivered through electronic communications to the extent provided in <u>Section 10.6.1</u> below, shall be effective as provided in said <u>Section 10.6.1</u>.  Notices for the Borrower and Lender may be given by their respective counsels with the same force and effect as given by Borrower or Lender.

**10.6.1 <u>Electronic Communications</u>**.  Notices and other communications to Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Lender.  Lender or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.  Unless Lender otherwise prescribes, (a) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent before 6 PM

-54-

P-02887-ESI_00002120

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 60 of 116

NYC time, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient and (b) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (a) of notification that such notice or communication is available and identifying the website address therefor.

**10.6.2 Change of Address, etc**. Any party hereto may change its address or email address for notices and other communications hereunder by notice to the other parties hereto.

**SECTION 10.7. Trial by Jury**. BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER AND BORROWER ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.

**SECTION 10.8. Headings**. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**SECTION 10.9. Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**SECTION 10.10. Preferences**. Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**SECTION 10.11. Waiver of Notice**. Borrower hereby expressly waives, and shall not be entitled to, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

-55-

P-02887-ESI_00002120

Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

SECTION 10.12. **Remedies of Borrower**.  If a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Further, it is agreed Lender shall not be in default under this Agreement, or under any other Loan Document, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within thirty (30) days after Borrower first had knowledge of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, promptly thereafter.  Failure to give such notice shall constitute a waiver of such claim.

SECTION 10.13. **Expenses; Indemnity**.

(a)     Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of written notice from Lender for all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with: (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement and the other Loan Documents; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, either in response to third party claims or in prosecuting or defending any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property or any other security given for the Loan and (viii) enforcing any Obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the

-56-

nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the illegal acts or willful misconduct of Lender.

(b)        Borrower shall indemnify, defend and hold harmless Lender, each Lender and each of the foregoing's Affiliates, and directors, managers, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing, and the successors and assigns of the foregoing (each, an "**Indemnified Party**"), from and against any and all Losses that may be imposed on, incurred by, or asserted against an Indemnified Party in any manner relating to or arising out of: (i) any Defaults or Events of Default under the Loan and/or in connection with the enforcement of the Loan Documents, (ii) any breach by Borrower of its Obligations under, or any misrepresentation by any Borrower Party contained in the Loan Documents, (iii) the use or intended use of the proceeds of the Loan, (iv) costs incurred by Lender in connection with any amendment to, or restructuring of, the Debt or the Loan Documents, (v) any accident, injury to, or death of, Persons or loss of or damage to the Property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or rights of way, (vi) any use, non-use or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or rights of way, (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof, (viii) any failure of the Property to be in compliance with any Legal Requirements, (ix) any and all claims and demands whatsoever which may be asserted against an Indemnified Party by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any lease or other agreement relating to the Property, and (x) any and all Losses that Lender may incur, directly or indirectly, as a result of a breach of Sections 4.1.8 or 5.2.9 hereof by Borrower; provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that the applicable indemnified liabilities arise from the illegal acts or willful misconduct of Lender.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all such indemnified liabilities incurred by such Indemnified Party.

(c)        Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, if the defendants in any such claim or proceeding include both Borrower and any Indemnified Party and Borrower and such Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Parties that are different from or in addition to those available to Borrower, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Party, provided that no compromise or settlement shall be entered without Borrower's consent, which consent shall not be unreasonably withheld or delayed.  Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

P-02887-ESI_00002120

(d)    The indemnifications made pursuant to this Section 10.13 shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by any of the following: (i) any satisfaction, release or other termination of this Agreement or any other Loan Document, (ii) any assignment or other transfer of all or any portion of this Agreement or any other Loan Document or Lender's interest in the Property (but, in such case, such indemnifications shall benefit both the Indemnified Parties and any such assignee or transferee), (iii) any exercise of Lender's rights and remedies pursuant hereto or under any other Loan Document, including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, (iv) any exercise of any rights and remedies pursuant to this Agreement, the Notes or any of the other Loan Documents, (v) any transfer of all or any portion of the Property (whether by Borrower or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), (vi) any amendment to this Agreement, the Note or any other Loan Documents and/or (vii) any act or omission that might otherwise be construed as a release or discharge of Borrower from the Obligations or any portion thereof.

**SECTION 10.14. Schedules Incorporated**.  The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**SECTION 10.15. Offsets, Counterclaims and Defenses**.  Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.  Borrower hereby waives  the right to assert (and agrees not to assert) a counterclaim of any nature, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any Obligations.  No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments that Borrower is obligated to make under any of the Loan Documents.  Notwithstanding the foregoing, Borrower does not waive any of its rights to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Lender in any separate action or proceeding.

**SECTION 10.16. No Joint Venture or Partnership; No Third Party Beneficiaries**.  Borrower, on the one hand, and Lender, on the other hand, intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and/or Lender nor to grant Lender any interest other than that of lender.  This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the Obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume

P-02887-ESI_00002120

that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

SECTION 10.17. **Publicity**.  All news releases, publicity or advertising through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, shall be subject to the prior approval both Lender and Borrower.

SECTION 10.18. **Waiver of Marshalling of Assets**.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

SECTION 10.19. **Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower or any Subsidiary thereof, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender each engages in the business of real estate financings and other real estate transactions and investments that may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

SECTION 10.20. **Brokers and Financial Advisors**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower shall indemnify, defend and hold Lender and each Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted directly or indirectly, by or on behalf of Borrower or any Affiliate thereof or was retained directly or

P-02887-ESI_00002120

indirectly, by or on behalf of Borrower or any Affiliate thereof in connection with the transactions contemplated herein.   The provisions of this Section 10.20 shall survive the expiration and termination of this Agreement and the payment of the Debt.

SECTION 10.21. **Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

SECTION 10.22. **Time is of the Essence**.  Time is of the essence of each provision of this Agreement and the other Loan Documents.

SECTION 10.23. **Certain Additional Rights of Lender (VCOC)**.   Notwithstanding anything to the contrary contained in this Agreement, Lender shall have: (a) the right to routinely consult with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower; provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances; and provided further that consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times and upon reasonable advance notice; (b) the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any reasonable times upon reasonable notice; and (c) the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property).   The rights described above in this Section 10.23 may be exercised by any entity which owns and Controls, directly or indirectly, substantially all of the interests in Lender.

SECTION 10.24. **Duplicate Originals, Counterparts**.   This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original and all of which together shall constitute a single agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

SECTION 10.25. **Successors and Assigns Generally**.   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Borrower Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender, and Lender may not assign or otherwise transfer any of its rights or obligations hereunder except: (i) to an assignee in accordance with the provisions of Section 10.27, (ii) by way of participation in accordance with the provisions of Section 10.29 or by way of pledge or assignment of a security interest subject to the restrictions of Section 10.31 (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.29 and, to the extent expressly contemplated

-60-

P-02887-ESI_00002120

hereby, the Related Parties of Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

SECTION 10.26. **Assignments by Lenders**.  Lender may at any time assign to one or more lenders all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loan at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(a)  Required Consents.  The consent of Borrower in its sole discretion shall be required if such assignment is to a Person that is not an Affiliate of Lender, any investor in such Lender or a Related Fund with respect to Lender.

(b)  Assignment and Assumption.  The parties to each assignment shall execute and deliver to Lender an Assignment and Assumption in the form of Exhibit D and the assignee, if it is not a Lender, shall deliver to Lender an administrative questionnaire in form reasonably acceptable to Lender.

(c)  No Assignment to Borrower.  No such assignment shall be made to the Borrower or any of the Borrower's Affiliates or Subsidiaries.

(d)  No Assignment to Natural Persons.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by Lender pursuant to Section 10.28 below, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 2.2.3 and Sections 11.7 and 10.13 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by Lender of a participation in such rights and obligations in accordance with Section 10.29.

SECTION 10.27. **Register**. Lender acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amounts of the Loan owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, absent manifest error, and the Borrower and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice or knowledge to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  For the avoidance of doubt, the foregoing provisions are intended to

-61-

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 67 of 116

comply with the registration requirements in Treasury Regulations Section 5f.103-1(c), or any successor provisions thereof, so that the Loan (or any notes representing such Loans) are considered to be issued in "registered form" pursuant to such regulations, and all parties hereto shall construe the provisions of the Loan Documents to ensure that the Loan (or notes, as applicable) will be considered to have been so issued.

SECTION 10.28. **Participations**.  Any Lender may at any time, without the consent of, or notice to, Borrower sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries, each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loan owing to it); provided that: (i) such Lender's obligations under this Agreement shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; (iii) the Borrower, and Lender shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) such Lender maintains a register reflecting the name and address of each Participant and the principal amounts of Loans owing to such Participant.

SECTION 10.29. **Limitations Upon Participant Rights**.  A Participant shall not be entitled to receive any greater payment under Section 2.2.3 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant unless the sale of the participation to such Participant was made with Borrower's prior written consent.

SECTION 10.30. **Certain Pledges**.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 10.31. **Limitation on Liability**.  The terms and provisions of this Agreement are joint and several obligations of Borrower, and  no personal liability shall be asserted against any Affiliate of Borrower or any Person owning, directly or indirectly any legal or beneficial interest in Borrower or any Affiliate of Borrower.

**[NO FURTHER TEXT ON THIS PAGE; SIGNATURE PAGE FOLLOWS]**

P-02887-ESI_00002120

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**HFZ MEMBER RB PORTFOLIO LLC**, a Delaware limited liability company

By: _____

Name: NIR MEIR
Title: Authorized Signatory

**HFZ MEMBER RB ACQUISITIONS LLC**, a Delaware limited liability company

By: _____

Name: NIR MEIR
Title: Authorized Signatory

STATE OF NEW YORK )
: ss:
COUNTY OF New York )

On the 7 day of September in the year 2020, before me, the undersigned, personally appeared Nir Meir, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

Notary Public

SAUL RITTER
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01RI5087929
Qualified in Nassau County
Commission Expires November 10, 2021

[Signatures Continued on Next Page]

Signature Page to HFZ Industrial Loan Agreement

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 69 of 116

**LENDER:**

_____

**Abrahami Avishai**

Passport Number: 39024532

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 70 of 116

**EXHIBIT A**
**Information on the Underlying Loans**

1.  Mortgage Loan in an amount not to exceed $7,346,000.00 made by Copperpoint Insurance Company encumbering the property located at 707 Spence Lane, Nashville, TN 37217.

2.  Mortgage Loan in an amount not to exceed $8,948,333.31 made by Belmont Bank & Trust Company encumbering the property located 500 Bailey Ave, Buffalo, NY 14210.

3.  Mortgage Loan in the original principal amount of $10,436,000.00 made by Standard Insurance Company encumbering the property located at 1100 Milwaukee Avenue, South Milwaukee, WI 53172.

**EXHIBIT B**

Reserved

P-02887-ESI_00002120

**EXHIBIT C**

FORM OF OFFICER'S CERTIFICATE

Borrower Name:

Property Address:

     This Officer's Certificate is being delivered in accordance with that certain Loan Agreement dated _____, 20__ (the "**Loan Agreement**") between Borrower and [_____] ("**Lender**").   Capitalized terms used in this Officer's Certificate and not specifically defined herein have the meaning provided in the Loan Agreement.  The undersigned officer of Borrower, having personal knowledge of the matters set forth herein, hereby certifies on behalf of Borrower the following:

     **[___]   Pursuant to Section 5.1.6 (Delivery of Reports)**:   To the knowledge of the undersigned:

     **[___] – Annual/Quarterly Reports:**  Each financial statement, rent roll, or other report included with this Officer's Certificate (as applicable) are true, correct, and complete in all material respects, and fairly presents the financial condition and the results of operations of Borrower and the Property being reported upon and such financial statements have been prepared in accordance with the Approved Accounting Method.

     **[___] – Annual/Quarterly Reports:**  As of the date hereof there exists no event or circumstance which constitutes a Default or Event of Default under the Loan Documents other than [PLEASE DESCRIBE IF APPLICABLE, INCLUDING THE PERIOD OF TIME IT HAS EXISTED AND THE ACTION THEN BEING TAKEN TO REMEDY THE SAME: _____].

     **[___] – Quarterly Reports:**  The representations and warranties of Borrower set forth in Section 4.1 of the Loan Agreement are true and correct in all material respects and there are no undisputed trade payables outstanding for more than sixty (60) days from the later of the date incurred or the date an invoice was issued therefor.

BY SIGNING BELOW, the undersigned certifies that (a) all information provided in this Officer's Certificate is true, complete, and correct in all material respects and does not omit any material fact that would make any such information false or misleading, and (b) the undersigned representative is duly authorized to sign this Officer's Certificate on Borrower's behalf.

Date: [_____]                    _____

                                          Name:
                                          Title:

P-02887-ESI_00002120

**EXHIBIT D**

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption (this "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [__] (the "Assignor") and [__] (the "Assignee"). Capitalized terms not defined herein shall have the meanings assigned to such terms in the Loan Agreement referred to below (as amended, modified, supplemented, or restated from time to time, the "Loan Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from Assignor, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by Lender as contemplated below: (i) all of such Assignor's rights and obligations in its capacity as a Lender under the Loan Agreement, the other Loan Documents and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of such Assignor under the respective facilities identified below (including without limitation any letters of credit and guarantees included in such facilities); and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of such Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Loan Agreement, the other Loan Documents or any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignors and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignors.

1.      Assignors:      [__]

2.      Assignee:      [__]

3.      Borrower:      **HFZ MEMBER RB PORTFOLIO LLC** and **HFZ MEMBER RB ACQUISITIONS LLC** (collectively, the "Borrower")

5.      Loan Agreement:      Loan Agreement entered into as of [_____], 2019, between the Borrower, the Lender and the Lenders party thereto.

6.      Assigned Interest:

| Loan Assigned | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans |
|---|---|---|---|
|  |  |  |  |

[SIGNATURE PAGES FOLLOW]

P-02887-ESI_00002120

Effective Date:   _____ ___, _____

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR:**

[__]


By:_____
Name:
Title:

**ASSIGNEE:**
[__]


By:  _____
Name:
Title:

P-02887-ESI_00002120

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.   Representations and Warranties.

1.1   Assignor.  Each Assignor: (a) represents and warrants that with respect to its portion of the Assigned Interests: (i) it is the legal and beneficial owner of the Assigned Interest; (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim; and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to: (i) any statements, warranties or representations made in or in connection with the Loan Agreement or any other Loan Document; (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any other instrument or document delivered pursuant thereto or any collateral thereunder; (iii) the financial condition of the Borrower, any of its subsidiaries or Affiliates (including, without limitation, the Borrower) or any other Person obligated in respect of any Loan Document; or (iv) the performance or observance by the Borrower, any of its subsidiaries or Affiliates (including, without limitation, the Borrower) or any other Person of any of their respective obligations under any Loan Document.

1.2.   Assignee.  The Assignee: (a) represents and warrants that: (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement; (ii) it meets all requirements of an eligible assignee under the Loan Agreement (subject to receipt of such consents as may be required under the Loan Agreement); (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder and (iv) it has received a copy of the Loan Agreement, together with copies of the most recent financial statements delivered pursuant thereto, as applicable, the other Loan Documents, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on Lender and (b) agrees that: (i) it will, independently and without reliance on the Assignors or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.   Payments.  From and after the Effective Date, Lender shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignors for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

P-02887-ESI_00002120

3.   General Provisions.   Whenever in this Assignment and Assumption any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Assignee or Assignor that are contained in this Assignment and Assumption shall bind and inure to the benefit of their respective successors and assigns.  This Assignment and Assumption shall become effective when it shall have been executed by the Assignees and Assignors and when the Assignors shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto. This Assignment and Assumption may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in the foregoing sentence. Delivery of an executed signature page to this Assignment and Assumption by facsimile transmission or electronic delivery of a signature page shall be as effective as delivery of a manually signed counterpart of this Assignment and Assumption.   THIS ASSIGNMENT AND ASSUMPTION SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW) WITHOUT REGARD TO ANY OTHER CONFLICT OF LAW RULES THAT WOULD LEAD TO THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.

P-02887-ESI_00002120

**EXHIBIT E**

Secured Properties

1.     707 Spence Lane, Nashville, TN 37217.

2.     500 Bailey Ave, Buffalo, NY 14210.

3.     1100 Milwaukee Avenue, South Milwaukee, WI 53172.

P-02887-ESI_00002120

**EXHIBIT F**

<u>Form of Assignment</u>

P-02887-ESI_00002120

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 80 of 116

## ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST (this "Assignment") is entered into as of _____ ___, 2020 (the "Effective Date"), by _____ a [    ] with an address [    ] and [ ] file number [ ] ("Assignor") and Abrahami Avishai ("Assignee").

## RECITALS

WHEREAS, Assignor has agreed to assign one hundred percent (100%) of its membership interest (the "Interest") in a [    ] with an address [   ] and [ ] file number [ ] _____ (the "Company") to Assignee.

NOW, THEREFORE, in consideration of the foregoing, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## AGREEMENT

1.      Assignment of the Interest. Assignor hereby transfers, conveys, assigns and delivers to Assignee, as of the date hereof, all of such Assignor's right, title, interest, obligations and liabilities in and to the Interest on an "as is" basis and without representation and warranty. As of the date hereof, Assignee hereby assumes the Interest and hereby agrees to perform and observe, from and after the Effective Date, all of the obligations which are required to be performed or observed by Assignee as holder of the Interest.

2.      Miscellaneous.

(a)      Recitals Incorporated. The recitals set forth in this Assignment are hereby incorporated into this Assignment as if fully set forth herein.

(b)      Governing Law. This Assignment shall be governed in all respects by the internal laws of the State of New York without reference to any conflict of laws principles.

(c)      Successors and Assigns. The provisions of this Assignment shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties to this Assignment. Neither Assignor nor Assignee may assign any of its rights or obligations under this Assignment without the prior written consent of the other party.

(d)      Amendment. This Assignment may not be amended, waived, discharged or terminated other than by a written instrument signed by the party against whom enforcement of any such amendment, waiver, discharge or termination is sought.

(e)      Entire Agreement. This Assignment and the operating agreement of the Company constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties.

(f)      Severability. If any term or provision of this Assignment, or the application thereof to any person or circumstance, shall to any extent be invalid or unenforceable, the remainder of

9211/7/8053559.v1

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 81 of 116

this Assignment or the application of such term or provision to any other person or under any other circumstance shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law.

(g)    <u>Counterparts; Delivery of Signatures</u>. This Assignment may be executed in any number of counterparts, each of which when taken together shall constitute one instrument. Signatures to this Assignment may be delivered via facsimile or by email via .pdf format.

(Signatures on Next Page)

9211/7/8053559.v1

P-02887-ESI_00002120

IN WITNESS WHEREOF, Assignor has  executed this Assignment as of the Effective Date.

ASSIGNOR:

_____

Name:
Title:

ASSIGNEE:

_____

Abrahami Avishai

9211/7/8053559.v1

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 83 of 116

STATE OF NEW YORK          )
                           : ss:
COUNTY OF _____    )

     On the _____ day of _____ in the year 2020, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.


                                         _____
                                         Notary Public

9211/7/8053559.v1

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 84 of 116

**EXHIBIT G**

Form of Escrow Agreement

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 85 of 116

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "**Agreement**") dated as of the ___ day of September, 2020, from **HFZ MEMBER RB PORTFOLIO LLC,** a Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file  number 6970777 and **HFZ MEMBER RB ACQUISITIONS LLC**, a Delaware limited liability company with an address of 600 Madison Avenue, 15th Floor New York, New York 10022 and Delaware file  number 6992942 (individually and collectively, as the context requires, jointly and severally, "**Borrower**"), to **Abrahami Avishai** (the "**Lender**").

## RECITALS

A.      Lender has made a loan to Borrower on the date hereof (the "**Loan**") in the amount of  $30,000,000.00 pursuant to that certain Loan Agreement (the "**Loan Agreement**"), dated the date hereof, between Borrower and Lender.

B.      The Loan is secured in part by a pledge of the income from certain properties (the "**Properties**")  as more particularly described in Schedule A attached hereto and made a part hereof.  Borrowers own indirect interests in and control the entities described in Schedule B (the "**Property Owners**") attached hereto and made a part that own and control the Properties.

NOW, THEREFORE**,** in consideration of the above and the promises contained in this Agreement, the receipt and sufficiency of which are acknowledged, Borrower agrees as follows:

1.      As part of the Loan transaction, Borrower will deliver to Escrow Agent (as hereinafter defined) certain executed original assignments Schedule C attached hereto and made a part hereof (collectively, the "**Assignments**"), which will be held in escrow by Meister Seelig & Fein, LLP (the "**Escrow Agent**") pending Borrower's performance of the of its obligations under the Loan Agreement.

2.      Upon the occurrence and continuance of an Event of Default, as such term is defined in the Loan Agreement, Lender may utilize the Assignments  to vest full, unencumbered title in Property Owners in the Lender, in addition to availing itself of all other rights and remedies under the terms of the Loan Agreement.

3.      The Assignments deposited hereunder shall be held in escrow with the Escrow Agent under the following terms:

(a)      Escrow Agent shall deliver the Assignments to Borrower or to Lender, as the case may be, upon the following conditions:

(i)      To Borrower upon receipt of written demand therefor signed by Borrower and Lender stating that the Loan has been satisfied in full; or

9211/7/8052640.v1

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 86 of 116

(ii)     To Lender, upon receipt of written demand therefor signed by Lender stating that an Event of Default (as defined in the Loan Agreement) beyond any applicable grace, notice or cure period has occurred under the Loan Agreement.

(b)     All mailings and notices from Escrow Agent to Lender and/or Borrower, or from Lender and/or Borrower to Escrow Agent provided for in this paragraph shall be addressed to the party to receive such notice at the address set forth in the Loan Agreement  if to Escrow Agent to the following address: Meister Seelig & Fein LLP, 125 Park Avenue, 7th Floor, New York, New York 10017, Attention: Daniel J. Dwyer, Esq.

(c)     Upon receipt of a written demand for the Assignment made by Lender or Borrower pursuant this Agreement, Escrow Agent shall promptly forward a copy thereof (by registered or certified mail, return receipt requested) or by hand delivery or overnight courier to the other party. The other party shall have the right to object to the delivery of the Absolute Assignment Documents by delivery to and receipt by Escrow Agent of written notice of objection, specifying in detail the basis and reasons for such objection, within ten (10) business days after receipt thereof. Upon receipt of such notice of objections, Escrow Agent shall promptly forward a copy thereof (by registered or certified mail, return receipt requested) or by hand delivery or overnight courier to the party who made the initial written demand.

(d)     In the event that (i) Escrow Agent shall have received a notice of objection as provided for in Section 3(c) hereof and within the time therein prescribed or (ii) any other disagreement or dispute shall arise between or among any of the parties hereto, or any claim or demand is made for the Absolute Assignment Documents, whether or not any litigation has been instituted, then, in either event, at Escrow Agent's option, (x) Escrow Agent may refuse to comply with any claim or demand on it and continue to hold the Absolute Assignment Documents, until a final order or judgment is entered with respect to the delivery of the Absolute Assignment Documents, in which case Escrow Agent may then deliver the Absolute Assignment Documents in accordance with said directions, order or judgment, and Escrow Agent shall not be or become liable in anyway or to any person for his refusal to comply with any such claims or demands, or (y) in the event Escrow Agent shall receive a written notice signed by either Borrower or Lender advising that a litigation between Borrower and Lender over entitlement to the Absolute Assignment Documents has commenced, Escrow Agent may deposit the Absolute Assignment Documents with the Clerk of the Court in which said litigation is pending or (z) Escrow Agent may take such affirmative steps as it may, in its option, elect in order to terminate its duties as Escrow Agent by the commencement of an action or interpleader the costs thereof to be borne by whichever of the Borrower or Lender is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder. Borrower and Lender each agree, jointly and severally, to reimburse Escrow Agent for all out-of-pocket costs and reasonable expenses incurred in performing its duties as Escrow Agent in the event of any disagreement or dispute under this Section or otherwise, including but not limited to, reasonable attorneys' fees incurred, excepting therefrom any costs, fees and expenses arising from the gross negligence or willful misconduct of Escrow Agent.  In addition, neither Lender nor Borrower shall be responsible for the payment of any costs, fees or expenses arising from Escrow Agent performing its duties under this Agreement.

(e)     It is expressly understood that Escrow Agent is acting hereunder as a depository only and is not responsible or liable in any manner whatever for the sufficiency

correctness, genuineness or validity of any instrument deposited with it or for the form of executing of such instrument or for the identity, authority or rights of any person executing or depositing the same or for the terms and conditions of any instrument pursuant to which the parties may act.

(f)     Escrow Agent shall not have duties or responsibilities, except those set forth in this Section, and shall not incur any liability in acting upon any signature, notice, request, waiver consent, receipt of other paper or document believed by Escrow Agent to be genuine, and Escrow Agent may assume that any person purporting to give it any notice on behalf of any party in accordance with the provisions hereof has been duly authorized to do so. Borrower and Lender hereby indemnity and agree to hold Escrow Agent harmless from and against any and all loss damage, cost or expense Escrow Agent may incur in connection with this transaction and/or any dispute or litigation arising in or from this transaction other than for acts of Escrow Agent's gross negligence or willful misconduct.

(g)     Lender and Borrower agree that if either shall, pursuant to this Section, deliver to Escrow Agent a written demand for the Absolute Assignment Documents stating that the other has defaulted in the performance of this Agreement, as the case may be, the party making such demand shall, promptly, after delivering such written demand to Escrow Agent, deliver a copy of such written demand to the other party; together with a statement of the facts and circumstances underling the alleged default; provided, however, that nothing in this Section, nor ay default by Borrower or Lender shall have any effect whatsoever upon Escrow Agent's rights, duties and obligations under this Section 3.

(h)     Escrow Agent may not represent either party in any litigation arising out of, under or by way of this Agreement.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have caused this Escrow Agreement to be executed and delivered to be effective as of the date first above written.

**BORROWER**:

**HFZ MEMBER RB PORTFOLIO LLC**, a Delaware limited liability company

By: _____
          Name:
          Title:

**HFZ MEMBER RB ACQUISITIONS LLC**, a Delaware limited liability company

By: _____
          Name:
          Title:

STATE OF NEW YORK    )
                    : ss:
COUNTY OF _____  )

On the ____ day of _____ in the year 2020, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

IN WITNESS WHEREOF, the undersigned have caused this Escrow Agreement to be executed and delivered to be effective as of the date first above written.

**LENDER:**

_____

Abrahami Avishai

P-02887-ESI_00002120

IN WITNESS WHEREOF, the undersigned have caused this Escrow Agreement to be executed and delivered to be effective as of the date first above written.

**ESCROW AGENT:**

**MEISTER, SEELIG & FEIN LLP**

By: _____
Name: Daniel J. Dwyer
Title:   Partner

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 91 of 116

**SCHEDULE A**

<u>Properties</u>

1.      707 Spence Lane, Nashville, TN 37217.

2.      500 Bailey Ave, Buffalo, NY 14210.

3.      1100 Milwaukee Avenue, South Milwaukee, WI 53172.

**SCHEDULE B**

<u>Property Owners</u>

1.      1100 Milwaukee Ave, LLC

2.      707 Spence Lane LLC

3.      Buffalo Bailey LLC

P-02887-ESI_00002120

**SCHEDULE C**

**ASSIGNMENTS**

1. ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST made by HFZ Member 1100 LLC, as assignor, to Abrahami Avishai, as assignee with respect to 100% of the interests in 1100 Milwaukee Ave, LLC;

2. ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST made by HFZ Reich Properties LLC as assignor, to Abrahami Avishai, as assignee with respect to 100% of the interests in 707 Spence Lane LLC;

3. ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST made by HFZ Reich Properties LLC, as assignor, to Abrahami Avishai, as assignee with respect to 100% of the interests in Buffalo Bailey LLC;

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 94 of 116

**EXHIBIT H**

Form of Non-Recourse Carveout Guaranty

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 95 of 116

## CARVEOUT GUARANTY

THIS CARVEOUT GUARANTY (this "**Guaranty**") is made as of September__, 2020 by **Zeil Feldman** an individual, having New York drivers license number 302488210 , having an address at c/o HFZ Capital Group, LLC, 600 Madison Avenue, 15th Floor New York, New York 10022 and **NIR MEIR**, an individual, having New York drivers license number 131760643, having an address at c/o HFZ Capital Group, LLC, 600 Madison Avenue, 15th Floor New York, New York 10022 (individually and collectively, as the context requires, jointly and severally, the "**Guarantor**"), for the benefit of **Abrahami Avishai**  (the "**Lender**").

W I T N E S S E T H:

WHEREAS, Lender has made a loan to Borrower on the date hereof (the **"Loan"**) in the amount of  $30,000,000.00 pursuant to that certain Loan Agreement (the "**Loan Agreement**"), dated the date hereof, between Borrower and Lender. and

WHEREAS, Guarantor is the owner of direct or indirect interests in Borrower, and Guarantor will directly or indirectly and substantially benefit from the Lender making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    **Definitions**.  As used herein, the following terms shall have the following meanings:

(a)    "**Carveout Obligations**" means all losses actually incurred by Lender (such losses to include, without limitation, the failure to recover any or all Loan Obligations) resulting from any of the following:

(i)    any fraud or intentional misrepresentation by Borrower in connection with the Loan; and

(ii)    the misapplication or conversion by Borrower of any monies in contravention of any provision of the Loan Documents, including, without limitation, any Revenue.

(b)    "**Event of Default**" means any default under any of the Loan Documents and the continuance of such default beyond any applicable notice or grace period for such default contained in the Loan Documents.

1

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 96 of 116

(c)      "**Guaranteed Obligations**" means the Loan Obligations and the Carveout Obligations.

(d)      "**Guarantor Claims**" shall have the meaning set forth in Section 5.1 of this Guaranty.

(e)      "**herein**," "**hereof**," "**hereunder**," and "**herewith**" shall be deemed to refer to this entire Guaranty  and not any particular provision of this Guaranty.

(f)      "**Including**" or "**including**" means "including, without limitation."

(g)      "**Loan Obligations**" means the obligations of the Borrower to pay the Debt pursuant to the Loan Agreement.

(h)      "**Loan Obligations Trigger Event**" means any of the following: (i) the wrongful objection to the release of the Assignments (as such term is defined in the Escrow Agreement) to the Lender pursuant to the Escrow Agreement or  (ii) the occurrence of an Event of Default described in Section 8.1(d), (f) or (m) of the Loan Agreement.

(i)      "**Person**" means an individual, corporation, partnership, limited liability partnership, limited liability company, trust, unincorporated association, government, governmental authority, or other entity.

1.2.    **Other Defined Terms**. Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement unless such term is otherwise specifically defined herein.

## ARTICLE II
## NATURE AND SCOPE OF GUARANTY

2.1    **Guaranty of Obligation**.  Subject to the terms hereof, (a) effective immediately upon the occurrence of a Loan Obligations Trigger Event (and without any notice or further act or condition of any kind) and continuing at all times thereafter, Guarantor hereby irrevocably and unconditionally guarantees to Lender (and its successors and assigns with respect to any interest in the Loan) the payment and performance of all Loan Obligations then outstanding or at any time thereafter incurred, as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise, and (b) effective immediately on the date hereof (and without any notice or further act or condition of any kind), Guarantor hereby irrevocably and unconditionally agrees that it shall be liable to Lender (and its successors and assigns of an interest in the Loan) for the payment and performance of all Carveout Obligations. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

2.2    **Nature of Guaranty**. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance, and is not a guaranty of collection. This Guaranty may not be revoked by Guarantor, and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after Guarantor's death or dissolution

P-02887-ESI_00002120

(and in any such event, this Guaranty shall be binding upon such Guarantor's estate and such Guarantor's legal representatives and successors and assigns). The fact that, at any time, or from time to time, the Loan or the Guaranteed Obligations may be increased or reduced, shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and shall not be discharged by the assignment or negotiation of all or part of the Loan. This Guaranty shall survive any reinstatement of the Loan.

2.3    **Guaranteed Obligations Not Reduced by Offset**. The Guaranteed Obligations, and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because, or by reason, of any existing or future offset, claim or defense of Borrower or any other Person against Lender or against payment of the Loan or the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Loan or the Guaranteed Obligations (or the transactions creating the Loan or the Guaranteed Obligations) or otherwise.

2.4    **Payment by Guarantor**. If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, within thirty (30) days after demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount then due on the Guaranteed Obligations, to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations pursuant to the terms of the Loan Documents. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

2.5    **No Duty to Pursue Others**. It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (a) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (b) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan or the Guaranteed Obligations, (c) enforce Lender's rights against any other guarantors of the Loan or the Guaranteed Obligations, (d) join Borrower or any other Person liable on the Loan or the Guaranteed Obligations in any action seeking to enforce this Guaranty, (e) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan or the Guaranteed Obligations, or (f) resort to any other means of obtaining payment of the Loan or the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Loan or the Guaranteed Obligations.

2.6    **Waivers**. Guarantor acknowledges that it has reviewed the provisions of the Loan Documents, and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment, extension, increase, waiver, consent or other modification of the Loan Agreement (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Agreement or in connection with the Loan or the Guaranteed Obligations, (v) the occurrence of any breach by Borrower or an Event of Default or Loan Obligations Trigger Event, (vi) Lender's transfer or disposition of the Loan or the Guaranteed

3

P-02887-ESI_00002120

Obligations, or any part thereof provided Guarantor shall not be obligated to make payment of any Guaranteed Obligations due hereunder to any address other than the address for such payment set forth herein unless and until Guarantor shall receive notice of a different address for payment, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Loan or the Guaranteed Obligations, (viii) protest, proof of nonpayment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, except to the extent expressly required by the terms hereof or applicable law, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Loan or the Guaranteed Obligations.

2.7 **Payment of Expenses**. In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees and disbursements) actually incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.   All costs and expenses will accrue interest at the highest default rate in any instrument evidencing the Loan Obligations until payment is actually received by the Lender.  The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

2.8 **Effect of Bankruptcy**. In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Loan or the Guaranteed Obligations, as set forth herein, then any prior release or discharge from the terms of this Guaranty, or credit, given to Guarantor by Lender shall be without effect and this Guaranty shall be restored and remain in full force and effect to the extent of the amount rescinded or restored.  It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by the indefeasible payment and performance in full of the Guaranteed Obligations, or Guarantor's performance of such obligations, and then only to the extent of such performance; and that in the event of any such rescission or restoration by the Lender with respect to any payment as provided above in this paragraph, then to the extent of such rescission or restoration the Guaranteed Obligations shall also be restored and shall remain in effect.

2.9 **Waiver of Subrogation, Reimbursement and Contribution**.  Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably defers, until the indefeasible payment in full of the Loan and the Guaranteed Obligations, all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower, or any other Person liable for payment of any or all of the Guaranteed Obligations, for any payment made by Guarantor under or in connection with this Guaranty.

2.10 **Borrower**. The term "Borrower" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company, joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

P-02887-ESI_00002120

2.11 **Other Guaranties**. This Guaranty is separate, distinct and in addition to any liability or obligations that Borrower or any guarantor may have under any other guaranty or indemnity executed by Borrower or any guarantor in connection with the Loan.

## ARTICLE III
## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTORS OBLIGATIONS

Guarantor hereby (i) consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, except to the extent expressly required by the terms hereof, and (ii) waives any common law, equitable, statutory or other rights (including without limitation, except to the extent required by the terms hereof, rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

3.1 **Modifications**. Any amendment, renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Loan, the Loan Obligations, the Loan Agreement or any other document, instrument, contract or understanding between Borrower and Lender or any other Person pertaining to the Loan or the Loan Obligations, or any failure of Lender to notify Guarantor of any such action.

3.2 **Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower except to the extent affecting the Guaranteed Obligations.

3.3 **Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other Person at any time liable for the payment of all or part of the Loan or the Guaranteed Obligations; or any death or dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

3.4 **Invalidity of Guaranteed Obligations**. The unenforceability against Borrower or any other Person at any time liable for the payment of all or part of the Loan or the Guaranteed Obligations or any document or agreement executed in connection with the Loan or the Guaranteed Obligations for any reason whatsoever, including, without limitation, the fact that (a) the Loan or the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (b) the act of creating the Loan or the Guaranteed Obligations or any part thereof is *ultra vires*, (c) the officers or representatives executing the Loan Agreement or otherwise creating the Loan or the Guaranteed Obligations acted in excess of their authority, (d) the creation, performance or repayment of the Loan or the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Loan or the Guaranteed Obligations or executed in connection with the Loan or the Guaranteed Obligations or given to secure the repayment of the Loan or the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (e) the Loan Agreement has been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Loan or the Guaranteed Obligations or any part thereof for any reason.

P-02887-ESI_00002120

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 100 of 116

3.5     **Release of Obligors**. Any full or partial release of the liability of Borrower on the Loan or the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Loan or the Guaranteed Obligations, or any part thereof except to the extent of the portion of the Guaranteed Obligations actually released, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other Person, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that any other Person will be liable to pay or perform the Loan or the Guaranteed Obligations, or that Lender will look to any other Person to pay or perform the Loan or the Guaranteed Obligations.

3.6     **Other Collateral**. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Loan or the Guaranteed Obligations.

3.7     **Release of Collateral**. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) by any Person of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Loan or the Guaranteed Obligations.

3.8     **Care and Diligence**. The failure of Lender or any other Person to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Loan or the Guaranteed Obligations, (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Loan or the Guaranteed Obligations.

3.9     **Unenforceability**. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Loan or the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed, as between Lender and Guarantor, that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Loan or the Guaranteed Obligations.

3.10    **Merger**. The reorganization, merger or consolidation of Borrower into or with any other Person.

3.11    **Other Actions Taken or Omitted**. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof; and it

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 101 of 116

is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the indefeasible payment in full of the Loan and the Guaranteed Obligations.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

To induce Lender to enter into the Note, Mortgage and the other Loan Documents, and extend and maintain credit to Borrower, Guarantor represents and warrants to Lender as follows:

4.1 **Benefit**. Guarantor is an Affiliate of Borrower, and is the owner of direct or indirect interests in Borrower, and has received, or will receive, direct or indirect and substantial benefit from the Loan.

4.2 **Familiarity and Reliance**. Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower, and is familiar with the value of any and all collateral intended to be created as security for the payment of the Loan or Guaranteed Obligations; however, as between Lender and Guarantor, Guarantor is not relying on such information, or the financial condition of Borrower, the collateral or any other condition, as an inducement to enter into this Guaranty.

4.3 **No Representation by Lender**. Neither Lender, nor any other Person on Lender's behalf, has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

4.4 **Guarantor's Financial Condition**. As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is solvent and has, and will have, assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities fairly estimated) and debts, and has property and assets sufficient to satisfy and repay its obligations and liabilities, as and when the same become due.

4.5 **Legality; Due Authorization; Enforceability**. The execution, delivery and performance by Guarantor of this Guaranty, and the consummation of the transactions contemplated hereunder, do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights and subject, as to enforceability, to general principals of equity regardless of whether enforcement is sought in a proceeding in equity or at law.

7

P-02887-ESI_00002120

4.6     **Litigation**. Other than as may have been disclosed to Lender, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Guarantor's knowledge, threatened, in writing, against or affecting Guarantor which would reasonably be expected to materially adversely affect the ability of Guarantor to perform its obligations under this Guaranty.

4.7     **Survival**. All representations and warranties made by Guarantor herein shall survive the execution hereof.

**ARTICLE V**
**SUBORDINATION OF CERTAIN INDEBTEDNESS**

5.1     **Subordination of All Guarantor Claims**. As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of any Person in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be, created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence and during the existence of an Event of Default, or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other Person, any amount upon the Guarantor Claims, until the indefeasible payment in full of the Loan and the Guaranteed Obligations.

5.2     **Claims in Bankruptcy**. In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Borrower as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly, from the receiver, trustee or other court custodian, dividends and payments which would otherwise be payable upon Guarantor Claims. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor, and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon the indefeasible payment and performance in full to Lender of the Loan and the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

5.3     **Payments Held in Trust**. In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, then Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and Guarantor further agrees

8

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 103 of 116

that it shall have absolutely no dominion over (or equitable or beneficial ownership of) the amount of such funds, payments, claims or distributions so received, and Guarantor covenants promptly to pay the same to Lender.

5.4     **Liens Subordinate**. Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Loan or the Guaranteed Obligations, regardless of whether such liens, security interests, judgment liens, charges or other encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any right it may have against Borrower, or (ii) foreclose, repossess, sequester, or otherwise take steps, or institute any action or proceeding (judicial or otherwise, including, without limitation, the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding), to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower securing payment of the Guarantor Claims held by Guarantor.

## ARTICLE VI
## MISCELLANEOUS

6.1     **Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.  The rights of Lender hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor any consent to departure therefrom, shall be effective unless in writing, and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand except to the extent such a notice or demand is required by the terms hereof.

6.2     **Notices**. All notices, consents, approvals and requests required or permitted hereunder shall be in writing, and shall be either hand delivered or sent, by (a) certified or registered U.S. mail, Return Receipt Requested, first class postage prepaid, or (b) expedited prepaid delivery service, either commercial (e.g., Federal Express or comparable national courier) or U.S. Postal Service, with proof of attempted delivery.  Notices may be given by the respective parties' counsel with the same force and effect as if such notices were given by the respective parties hereto.  All notices to any party shall be addressed to such party at its following address:

If to Guarantor:             c/o H F Z Capital Group LLC
                             600 Madison Avenue, 15th Floor
                             New York, New York 10022
                             Attention:  Ziel Feldman and Nir Meir
                             Email:  zfeldman@hfzcap.com; nir@hfzcap.com

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 104 of 116

| with copies to: | Holland & Knight LLP |
| | 31 West 52nd Street |
| | New York, New York 10019 |
| | Attention: Sean M. Garahan |
| | Email: sean.garahan@hklaw.com |
| | |
| If to Lender: | c/o Shachar Shimony - Law office |
| | Triangular Tower, Azrieli Center, 28th Floor |
| | 132 Menachem Begin St., Tel-Aviv, 6701101, Israel |
| | Attention: Shachar Shimony, Adv |
| | Email: shachar@shimony-law.net |
| | |
| with copies to: | Meister Seelig & Fein |
| | 125 Park Avenue, 7th Floor |
| | New York, New York 10017 |
| | Attention: Daniel J. Dwyer |
| | Email: djd@msf-law.com |

Any party may give notice, in the manner permitted by this Section, designating a new address in the United States for all notices to such party pursuant to this Section, and such notice shall become effective upon receipt of such notice by the other party or parties to this Guaranty.

6.3     **Governing Law; Submission to Jurisdiction**. THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, AND EACH OF LENDER (BY ITS ACCEPTANCE HEREOF) AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH OF LENDER (BY ITS ACCEPTANCE HEREOF) AND GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  FURTHERMORE, THE GUARANTOR AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING REFERRED TO ABOVE MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, DIRECTED TO GUARANTOR AT THE ADDRESS INDICATED IN THIS GUARANTY FOR SUCH PARTY, AND SERVICE SO MADE SHALL BE COMPLETE AND FOR ALL PURPOSES DEEMED BY THE GUARANTOR TO BE GOOD AND SUFFICIENT SERVICE FIVE DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

6.4     **Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, then such provision shall be fully severable, and this Guaranty shall be construed and enforced as if such

P-02887-ESI_00002120

illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty.

6.5     **Amendments and Waivers**. No term or provision of this Guaranty may be amended, waived or otherwise modified except pursuant an instrument in writing executed by the party (or an authorized representative of the party) against whom enforcement of such amendment, waiver or modification is sought.

6.6     **Parties Bound; Assignment; Joint and Several**. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; *provided, however,* that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder.  If Guarantor consists of more than one Person, the obligations and liabilities of each such Person shall be joint and several.

6.7     **Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

6.8     **Recitals**. The "WHEREAS" introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be deemed to be represented and warranted by the Guarantor as *prima facie* evidence of the facts and documents referred to therein.

6.9     **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument.  It shall not be necessary, in making proof of this Guaranty, to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart, without impairing the legal effect of the signatures thereon, and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

6.10    **Rights and Remedies**. If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, then such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

6.11    **Entirety**. THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF, EXCEPT AS PROVIDED IN THE LOAN DOCUMENTS.  THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE

P-02887-ESI_00002120

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 106 of 116

TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER RELATING TO THE GUARANTEED OBLIGATIONS.

6.12 **Waiver of Right To Trial By Jury**. GUARANTOR, AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF LENDER AND GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

6.13 **No Third Party Beneficiaries**. This Guaranty is solely between the Guarantor and the Lender, and solely for the benefit of the Lender and any subsequent holder or holders of the Note, and nothing in this Guaranty, whether express or implied, shall be construed to give any other Person any legal or equitable right, remedy or claim under or in respect of this Guaranty.

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 107 of 116

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of the date above set forth.

_____
**ZEIL FELDMAN**, *individually*


_____
**NIR MEIR**, *individually*


STATE OF NEW YORK       )
                                          : ss:
COUNTY OF _____   )

On the ____ day of _____ in the year 2020, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


STATE OF NEW YORK       )
                                          : ss:
COUNTY OF _____   )

On the ____ day of _____ in the year 2020, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

P-02887-ESI_00002120

Case 24-11047-PDR    Doc 295-1    Filed 06/24/26    Page 108 of 116

_____
Notary Public

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 109 of 116

**EXHIBIT I**

Portfolio Profit Example

[see attached]

P-02887-ESI_00002120

Reich Brothers Economic Analysis

| Asset | Address | Acquisition | | Capital Stack | | | Stabilized Cash Flow | | | Appraisal | Residual Valuation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Purchase Price | Deal Capitalization | Equity | Debt | LTC | Stabilized NOI | Annual Interest | Free Cash Flow | As-Is Value | Exit Cap Rate | Exit Value |
| **Short-Term Assets (<12 month exit)** | | | | | | | | | | | | |
| Columbus Castings | 2211 Parsons Ave | 9,000,000 | 9,000,000 | 9,000,000 | - | 0.0% | - | - | - | 10,300,000 | 0.0% | 10,000,000 |
| | | | | | | | | | | | | |
| **Long-Term Assets (36 month+ hold)** | | | | | | | | | | | | |
| Caterpillar Milwaukee | 1100 Milwaukee Ave | 19,500,000 | 20,576,333 | 10,140,333 | 10,436,000 | 50.7% | 3,500,000 | (521,800) | 2,978,200 | 44,300,000 | 7.00% | 50,000,000 |
| Panasonic Salem | 5475 Gaffin Road | 11,000,000 | 17,600,000 | 3,500,000 | 14,100,000 | 80.1% | 1,300,000 | (542,850) | 757,150 | 21,700,000 | 5.00% | 26,000,000 |
| Heinz Kraft | 910 Mayer Ave | 20,000,000 | 28,000,000 | 20,000,000 | 8,000,000 | 28.6% | 4,000,000 | (400,000) | 3,600,000 | 37,900,000 | 7.50% | 53,333,333 |
| SCA Flagstaff | 1600 East Butler Avenue | 3,440,000 | 4,374,002 | 1,794,002 | 2,580,000 | 59.0% | 640,000 | (129,000) | 511,000 | 5,960,000 | 7.50% | 8,533,333 |
| QuadGraphics Columbus | 4051 Fondorf Drive | 3,000,000 | 3,427,688 | 1,177,688 | 2,250,000 | 65.6% | 450,000 | (112,500) | 337,500 | 4,800,000 | 7.50% | 6,000,000 |
| SPX Tulsa | 2121 N. 161st Avenue | 5,860,000 | 5,981,639 | 2,441,639 | 3,540,000 | 59.2% | 950,000 | (177,000) | 773,000 | 6,840,000 | 7.50% | 12,666,667 |
| Nashville | 707 Spence Lane | 8,370,000 | 10,657,988 | 3,312,988 | 7,345,000 | 68.9% | 750,000 | (367,250) | 382,750 | 11,500,000 | 6.75% | 11,111,111 |
| Sears Ocala | 655 SW 52nd Ave | 70,000,000 | 72,000,000 | 19,500,000 | 52,500,000 | 72.9% | 6,500,000 | (2,625,000) | 3,875,000 | 82,800,000 | 6.00% | 108,333,333 |
| Robinson Buffalo | 500 Bailey Avenue | 10,325,000 | 10,789,834 | 4,078,584 | 6,711,250 | 62.2% | 1,000,000 | (335,563) | 664,438 | 12,400,000 | 7.50% | 13,333,333 |
| Caterpillar Aurora | 325 State Route 31 | 68,500,000 | 102,000,000 | 30,500,000 | 71,500,000 | 70.1% | 11,500,000 | (3,575,000) | 7,925,000 | 102,900,000 | 7.50% | 153,333,333 |
| Conair Phoenix | 7811 N Glen Harbor Blvd. | 19,000,000 | 22,500,000 | 7,500,000 | 15,000,000 | 66.7% | 2,700,000 | (750,000) | 1,950,000 | 34,500,000 | 6.75% | 40,000,000 |
| **Total Assets Owned** | | 247,995,000 | 306,907,484 | 112,945,234 | 193,962,250 | 63.2% | 33,290,000 | (9,535,963) | 23,754,038 | 375,900,000 | 6.90% | 492,644,444 |
| | | | | | | | | | | | | |
| **Assets Under Contract** | | | | | | | | | | | | |
| Harland Clarke | Portfolio | 38,000,000 | 39,500,000 | 24,500,000 | 15,000,000 | 38.0% | 4,092,184 | (750,000) | 3,342,184 | 40,000,000 | 6.75% | 60,624,948 |
| ProCon Hazelton | 594 Can Do Expressway | 13,840,000 | 14,150,000 | 6,150,000 | 8,000,000 | 56.5% | 1,200,000 | (400,000) | 800,000 | 14,000,000 | 6.50% | 18,461,538 |
| **Total Assets Under Contract** | | 51,840,000 | 53,650,000 | 30,650,000 | 23,000,000 | 42.9% | 5,292,184 | (1,150,000) | 4,142,184 | 54,000,000 | 6.69% | 79,086,487 |
| **Total Assets Owned/In Contract** | | 299,835,000 | 360,557,484 | 143,595,234 | 216,962,250 | 60.2% | 38,582,184 | (10,685,963) | 27,896,222 | 429,900,000 | 6.87% | 571,730,931 |

| | |
|---|---|
| **Investment** | 30,000,000 |
| **Annual Interest (8.5%)** | 2,550,000 |
| **Profit Participation (1.5%)*** | 3,167,602 |
| **Total Profit** | 5,717,602 |
| **Return on Investment** | 19.1% |

\* Profit Participation is calculated as 1.5% of $211,173,447 (Exit Value less Debt and Return of Equity)

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 110 of 116

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 111 of 116

SCHEDULE I

**Organizational Structure**

(see attached)

INDEX NO. 651356/2023

RECEIVED NYSCEF: 09/22/2023

FILED: NEW YORK COUNTY CLERK 09/22/2023 03:04 PM

NYSCEF DOC. NO. 29

P-02887-ESI_00002120

Organizational chart of HFZ Capital Group LLC (NY) entities:

- H F Z CAPITAL GROUP LLC (NY)
  - 100% → HFZ RB Acquisitions Member Two LLC (DE)
    - 50% → HFZ Member RB Acquisitions LLC (DE)
  - G-WB Portfolio Holdings Inc. — 30% → HFZ Member RB Acquisitions LLC (DE)
  - 100% → HFZ RB Acquisitions Member One LLC (DE)
    - 20% → HFZ Member RB Acquisitions LLC (DE)
  - 100% → HFZ RB Acquisitions Manager LLC (DE)
    - 0% - non-member manager → HFZ Member RB Acquisitions LLC (DE)
  - HFZ Member RB Acquisitions LLC (DE)
    - 95% → HFZ REICH PROPERTIES LLC (DE)
  - Reich Bros, LLC (DE) — 5% → HFZ REICH PROPERTIES LLC (DE)
    - HFZ REICH PROPERTIES LLC (DE)
      - Buffalo Bailey LLC (DE) [Buffalo]
      - 707 Spence Lane LLC (DE) [Nashville]
  - 100% → RB Portfolio Manager LLC (DE)
    - 0% - non-member manager → HFZ Member RB Portfolio LLC (DE)
  - G-WB Portfolio Holdings Inc — 30% → HFZ Member RB Portfolio LLC (DE)
  - 100% → HFZ RB Portfolio Member Two LLC (DE)
    - 20% → HFZ Member RB Portfolio LLC (DE)
  - 100% → HFZ RB Portfolio Member One LLC (DE)
    - 50% → HFZ Member RB Portfolio LLC (DE)
  - HFZ Member RB Portfolio LLC (DE)
    - 50% → HFZ REICH HOLDINGS, LLC (DE)
  - Reich Bros, LLC (DE) — 50% → HFZ REICH HOLDINGS, LLC (DE)
    - HFZ REICH HOLDINGS, LLC (DE)
      - 100% → HFZ Member 1100 LLC (DE)
        - 100% → 1100 Milwaukee Ave, LLC [Caterpillar]

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 113 of 116

## SCHEDULE II

### Schedule of Existing Guaranty Obligations

| Property | Guarantor | Guarantee Type(s) |
|---|---|---|
| Caterpillar | Adan Reich | Limited Recourse Guarantee, environmental indemnity |
| Caterpillar | Jonathan Reich | Limited Recourse Guarantee, environmental indemnity |
| Caterpillar | Reich Bros, LLC | Limited Recourse Guarantee, environmental indemnity |
| Caterpillar | Ziel Feldman | Limited Recourse Guarantee, environmental indemnity |
| Nashville | Adam Reich | Limited Guaranty, Hazardous Materials Indemnity Agreement |
| Nashville | Jonathan Reich | Limited Guaranty, Hazardous Materials Indemnity Agreement |
| Buffalo | Reich Bros, LLC | Guaranty |

P-02887-ESI_00002120

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 114 of 116

**SCHEDULE 4.3**

**Purchase Agreements**

1.      Purchase and Sale of Real Property, dated as of April 24, 2020, by and among Valassis Manufacturing Company, Inc., Clipper Magazine, LLC and Harland Clarke Corp. (collectively, "Seller") and 3275 Electronics Way, LLC ("Buyer"), as amended by that certain First Amendment to Agreement for Purchase and Sale of Real Property, dated as of May 26, 2020, as amended by that certain Reinstatement of Second Amendment to Agreement for Purchase and Sale of Real Property dated as of August 4, 2020, as further amended by that certain Third Amendment to Agreement for Purchase and Sale of Real Property dated as of August 28, 2020.

2.      Purchase and Sale Agreement, dated as of January 29, 2020, by and between 594 Humboldt, LLC, as seller and 594 Can Do, LLC, as buyer, as amended by that certain First Amendment to Agreement of Sale, dated as of March 9, 2020.

Case 24-11047-PDR   Doc 295-1   Filed 06/24/26   Page 115 of 116

**SCHEDULE 4.4**

**Management Agreements**

1.      Management and Maintenance Agreement dated as of June 28, 2018 by and between 1100 Milwaukee Ave, LLC and Reich Bros, LLC.

2.      Management and Maintenance Agreement dated as of April 30, 2019 by and between 707 Spence Lane, LLC and Reich Bros, LLC.

Case 24-11047-PDR Doc 295-1 Filed 06/24/26 Page 116 of 116

**SCHEDULE 4.5**

**Leases**

1.      Rooftop Option and Lease Agreement dated April 13, 1998 between Caterpillar Global Mining, LLC ("Caterpillar"), as landlord and New Cingular Wireless PCS, LLC, as tenant, ("Tenant"), as amended by an Estoppel and Consent Certificate and Lease Amendment dated August 3, 2000, as further amended by a Second Amendment to Rooftop Option and Lease Agreement dated October 2, 2012 and as further amended by that certain Third Amendment to Rooftop and Lease Agreement by and between 1100 Milwaukee Ave, LLC, as successor-in-interest to Caterpillar and Tenant.

2.      Lease by and between 1100 Milwaukee Ave, LLC, as landlord and Badger Industries, Inc., as tenant dated as of March 9, 2020.

3.      PCS Site Agreement dated April 24, 1996 by and between Caterpillar and Sprint Spectrum Realty Company, LP.

4.      Site Lease Agreement by and between 1100 Milwaukee Ave, LLC and Cellco Partnership (d/b/a Verizon Wireless) dated January 6, 2020.

5.      Lease by and between 707 Spence Lane, LLC, as landlord and Stone World TN, Inc., as tenant dated as of March 2020.

6.      Lease by and between 707 Spence Lane, LLC, as landlord and LINCARE, Inc., as tenant dated as of November 25, 2019.

7.      Lease by and between Buffalo Bailey, as landlord and Robinson Home Products Inc., as tenant dated as of November 5, 2019.